UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JASON WEMES<br>         Plaintiff<br><br>v.<br><br>THE CANANDAIGUA NATIONAL BANK<br>& TRUST COMPANY<br>         Defendant | Civil Action No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jason Wemes, by and though counsel, alleges as follows against Defendant Canandaigua National Bank & Trust Company (the "Bank").

## INTRODUCTION

1. This is an employment discrimination action. Before the Bank terminated Plaintiff with no reason, Plaintiff's previous supervisor deemed him an individual of "honor and integrity," a "man of his word," and an employee who "exemplifie[d] customer service."

2. In addition to being a wonderful employee, Plaintiff is also an openly gay man who has been married to his husband for more than a decade.

3. Months before his termination, Plaintiff had a new supervisor, Jason Ingalls. Ingalls made homophobic remarks to Plaintiff, on which Plaintiff confronted Ingalls.

4. In June 2021, Plaintiff was working at the Bank when a law enforcement investigator showed Plaintiff a picture of a heavyset man with black hair, sunglasses, and a thick black beard (hereinafter referred to as the "suspect"). Plaintiff has brown hair and never grew a beard while with the Bank. The investigator asked Plaintiff if he had seen the suspect, saying that the suspect was alleged to have attempted to lure a 14-year-old boy into a bathroom in the Bank.

1

5. About one hour later Plaintiff was brought in for questioning. After searching Plaintiff's cell phone and browser history, investigators ceased questioning Plaintiff, even declining to search his desk when invited. But Ingalls later ominously informed Plaintiff that it did not "look good" for him.

6. Upon information and belief, Ingalls informed others at the Bank that Plaintiff was the suspect, and was able to spread this lie because him and his deputy were the only other Bank employees who had seen the picture of the suspect.

7. The Bank, citing the investigation into the suspect, told Plaintiff he was being suspended with pay. But the Bank did not pay Plaintiff while he was suspended, and terminated him with no reason before the two week suspension had ended. Since being questioned at the Bank more than one year ago, law enforcement has not attempted to speak with Plaintiff about the matter.

8. By terminating Plaintiff, the Bank proliferated a dangerous, disgusting, and dehumanizing stereotype that gay men are inherently disposed to pedophilia.

9. To redress these wrongs, Plaintiff brings claims against the Bank for violations of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq*. ("NYSHRL"); and the New York Labor Law, N.Y. Lab. Law §§ 1, et seq. ("NYLL").

## JURISDICTION AND VENUE

10. Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.

11. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's related claims arising under New York State law.

12. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PREREQUISITES

13. On or around August 6, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, in part, discrimination and retaliation in violation of Title VII.

14. The EEOC provided Plaintiff a Notice of Right to Sue letter dated June 9, 2022.

15. Plaintiff filed this Complaint asserting claims under Title VII fewer than 90 days after receiving his Notice of Right to Sue.

16. Any and all other prerequisites to the filing of this action have been met.

## PARTIES

17. Plaintiff Jason Wemes resides in Geneva, New York.

18. Defendant Canandaigua National Bank & Trust Company has a principal place of business in Canandaigua, New York

## FACTUAL BACKGROUND

**A. Before his termination, the Bank regarded Wemes as an "exceptional employee."**

19. The Bank hired Wemes on or around 2014.

20. The Bank terminated Wemes on or around July 12, 2021.

21. The Bank never informed Wemes the reason for his termination.

3

22. At the time of Wemes' termination, he was working full time for the Bank as a custodial supervisor earning approximately $24 per hour with benefits.

23. Wemes is a gay man, and has been married to his husband for 15 years.

24. From 2018 to 2020, Wemes' direct supervisor at the Bank was Brett Elliot.

25. During each of these three years, Elliot provided Wemes an overall rating of "Far Above Expectations" on Wemes' work evaluations.

26. Elliot's reviews of Wemes during these years described him as: "a person of integrity and honesty - he treats all with respect and courtesy"; "a man of his word"; and someone who "exemplifies customer service."

27. In January 2021, Brett Elliot and Barb Wagner nominated Wemes for the Bank's Arthur Hamlin Award, which recognizes an "exceptional employee who consistently demonstrates outstanding performance and lives our CNB values each and every day like Arthur S. Hamlin."

**B. Jason Ingalls, Wemes' new supervisor, made homophobic comments directed towards Wemes.**

28. On or around February 2021, Elliot left his employment with the Bank and Jason Ingalls became Wemes' immediate supervisor.

29. Wemes maintained an office in a cubicle while working for the Bank.

30. At times, Ingalls would log in with his own credentials on the computer in Wemes' cubicle.

31. Shortly after Ingalls became Wemes' supervisor, Ingalls said that the picture of Wemes and his husband displayed in Wemes' cubicle was inappropriate for work. Wemes then asked Ingalls why this picture was inappropriate when there were other cubicles and offices with pictures of opposite-sex spouses,

4

32. Wemes also had a Human Rights Campaign sticker (blue with a yellow equals sign) in his cubicle. Ingalls asked Wemes why this sticker was displayed and told Wemes that "we don't need that" and that it "doesn't need to be here." Wemes asked Ingalls why he thought that, and responded that the sticker wasn't hurting anyone.

33. While at a Bank social outing, Wemes was with a group of employees which included Ingalls. Ingalls was talking about gender pronouns in a mocking manner. Wemes responded that gender pronouns should not be a joking matter. In response Ingalls shot Wemes a dirty look. The conversation about gender pronouns then stopped.

34. On or around April 2021, Wemes was working near Ingalls, who began to make a comment around another co-worker then abruptly stopped, saying that Wemes "didn't like women like that." Wemes then asked Ingalls what his personal life had to do with his work.

35. At times Ingalls would mock Wemes when he was on the phone by repeating what Wemes had said in a high-pitched voice.

### C. Law enforcement was at the Bank searching for an individual that definitely did not look like Wemes.

36. On or around June 29, 2021, Wemes went to the basement in the Bank's main office in Canandaigua solely for purposes of his work.

37. A man whom Wemes did not know, but later learned was a law enforcement investigator, was standing in the basement area. The man showed Wemes a picture depicting a heavyset man with black hair, sunglasses, and a thick black beard (hereinafter referred to as the "suspect") taking a "selfie" of himself (hereinafter referred to as the "First Picture"), and asked Wemes if he had seen the suspect.

38. Wemes has brown hair.

39. Wemes had never grown a beard during his employment with the Bank.

5

40. Wemes told the investigator that he thought he had seen the suspect at the Bank before, possibly a couple of weeks ago. The investigator then informed Wemes the suspect was wanted for attempting to lure a 14-year-old into a bathroom.

41. The suspect as shown in the First Picture definitely did not look like Wemes.

42. Wemes asked if he should call security; the investigator said no.

43. Shortly afterwards, Wemes was informed that he was wanted for questioning.

44. Wemes was subsequently interrogated regarding whether he was the suspect.

45. In addition to the First Picture, law enforcement also possessed a second picture of the suspect which showed the lower portion of the suspect's body with his pants slightly pulled down to show the suspect was wearing purple underwear (hereinafter referred to as the "Second Picture").

46. The Second Picture also showed the suspect wearing a badge connected to a badge reel. Wemes explained to law enforcement how the badge and the badge reel in the Second Picture were different than those he used.

47. Wemes showed law enforcement that he was not wearing purple underwear that day, unlike the suspect in the Second Picture.

48. Wemes allowed law enforcement to search his cell phone for the Grindr app that was purportedly being used to lure the suspect; the Grindr app was not on Wemes' phone.

49. Law enforcement went to Wemes' work computer and searched his browser history.

50. Wemes asked if law enforcement wanted to search through his desk drawers. This offer was declined.

51.     Upon information and belief, the only other individuals associated with the Bank who actually viewed the First Picture and Second Picture were Ingalls and Joe Hernandez.

**D. Wemes was terminated with no reason.**

52.     Wemes subsequently worked for about an hour after the interrogation. Later Ingalls told Wemes that things didn't "look good" him.

53.     On or around June 30, 2021, Wemes finished his shift around 3:30 PM. On or around 4:30 PM Ingalls called Wemes and asked that he go to the main office in Canandaigua.

54.     Once there Wemes sat down with Ingalls and Michelle Pedzich from Human Resources. Wemes was told that he was being suspended for two weeks with pay while an investigation into the suspect was conducted.

55.     Wemes was told he could come back to work around July 15th.

56.     Wemes said that he didn't want to lose his job over something he didn't do.

57.     Pedzich told Wemes the Bank's position to anyone who asked would be that he was on emergency leave for family issues.

58.     Upon information and belief, Ingalls had informed others at the Bank that Wemes was in fact the individual accused of trying to lure a 14-year-old boy into a bathroom.

59.     On July 12, 2021 Wemes received a phone call from Ingalls and Pedzich informing him that he was being terminated.

60.     Wemes also received a letter dated July 12, 2021 stating that he was terminated. This letter listed no reason why Wemes was terminated.

61.     On or July 15, 2021, Wemes emailed the Bank to ask for the reason why he was terminated. Wemes never received a response.

62. While the Bank promised Wemes that his mandated leave would be a paid suspension, the Bank instead used Wemes accrued leave time to pay his wages during this time.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF TITLE VII: SEX DISCRIMINATION

63. All allegations of this Complaint are restated herein.

64. The Bank discriminated against Plaintiff based on his sex in violation of Title VII by terminating his employment and failing to fully pay his wages during a so-called paid suspension.

65. The Bank's unlawful discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Title VII.

66. As a direct and proximate result of the Bank's unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law, including interest, costs, expenses, and reasonable attorney's fees.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF TITLE VII: RETALIATION

67. All allegations of this Complaint are restated herein.

68. Plaintiff engaged in protected activities under Title VII when he communicated his disapproval of certain conduct by Ingalls which Plaintiff reasonably believed in good faith was discriminatory.

69. The Bank retaliated against Plaintiff for engaging in protected activities by terminating his employment and failing to fully pay his wages during a so-called paid suspension.

70. The Bank's unlawful retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Title VII.

71. As a direct and proximate result of the Bank's unlawful conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law, including interest, costs, expenses, and reasonable attorney's fees.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF THE NYSHRL: SEX AND SEXUAL ORIENTATION DISCRIMINATION

72. All allegations of this Complaint are restated herein.

73. The Bank discriminated against Plaintiff based on his sex and sexual orientation in violation of the NYSHRL by subjecting Plaintiff to inferior terms, conditions, and privileges of employment, terminating his employment, and failing to fully pay his wages during a so-called paid suspension.

74. The Bank's unlawful discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Title VII.

75. As a direct and proximate result of the Bank's unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law, including interest, costs, expenses, and reasonable attorney's fees.

## FOURTH CAUSE OF ACTION
### VIOLATIONS OF THE NYSHRL: RETALIATION

76. All allegations of this Complaint are restated herein.

77. Plaintiff engaged in protected activities under the NYSHRL when he communicated his disapproval of certain conduct by Ingalls which Plaintiff reasonably believed was discriminatory.

78. The Bank retaliated against Plaintiff for engaging in protected activities by subjecting Plaintiff to inferior terms, conditions, and privileges of employment, terminating his employment, and failing to fully pay his wages during a so-called paid suspension.

79. Defendants' unlawful retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL.

80. As a direct and proximate result of the Bank's unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law, including interest, costs, expenses, and reasonable attorney's fees.

## FIFTH CAUSE OF ACTION
### VIOLATIONS OF THE NYLL: FAILURE TO PAY ALL WAGES OWED

81. All allegations of this Complaint are restated herein.

82. The NYLL requires covered employers, including Defendant, to compensate employees in accordance with their agreed terms of employment.

83. Specifically, the Bank informed Plaintiff he was being placed on a two-week paid suspension.

84. The Bank did not pay Plaintiff's wages during this suspension as if he was working.

85. Instead, the Bank used Plaintiff's accrued leave time to pay him wages during this suspension.

86. As a result of Defendant's failure to compensate Plaintiff with pay during his suspension, as promised, Defendant have violated NYLL §§ 191 and 193, as well as all applicable regulations thereunder.

87. Defendants' unlawful actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYLL.

88. As a direct and proximate result of Defendants' unlawful conduct in violation of the NYLL, Plaintiff is entitled to recover damages to the greatest extent permitted under the law, including interest, costs, expenses, and reasonable attorney's fees.

## REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiff Jason Wemes respectfully requests a judgment:

A. Declaring that the practices complained of herein are unlawful under applicable federal and state law;

B. Enjoin Defendant from subjecting employees to discrimination on the basis of sex or sexual orientation and retaliating against employees who engage in activity protected under Title VII and the NYSHRL;

C. Awarding Plaintiff damages in an amount to be determined at trial, including without limitation lost pay and benefits, compensatory damages, and punitive damages to the maximum amount permitted by law;

D. Awarding Plaintiff pre-judgment and post-judgment interest, costs, expenses, disbursements, and reasonable attorney's fees; and

E. Providing such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all matters triable by jury.

                                      **GREGORY L. SILVERMAN, ESQ., P.C.**

Dated: July 7, 2022                By:    <u>*/s/ Gregory L. Silverman*</u>
                                                        Gregory L. Silverman
                                                        *Counsel for Plaintiff Jason Wemes*
                                                         118 Genesee St.
                                                         Geneva, NY  14456
                                                         Tel: 585-648-0246
                                                         greg@silverman-law.com