UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JASON WEMES,

                              Plaintiff,

           - against -

THE CANANDAIGUA NATIONAL BANK
& TRUST COMPANY,

                              Defendant.

Case No.: 22-cv-06297 (MAV) (MWP)

---

**PLAINTIFF JASON WEMES' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Oral Argument Requested

**GREGORY L. SILVERMAN, ESQ., PLLC**

Dated: June 30, 2025       By:    s/ Gregory L. Silverman
                                    118 Genesee St.
                                    Geneva, NY  14456
                                    Tel: 585-480-6686
                                    greg@silverman-law.com
                                    Attorney for Plaintiff Jason Wemes

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

FACTS ................................................................................................................................3

LEGAL ARGUMENT .........................................................................................................7

   I.   Legal Standard ........................................................................................................7

   II.  Wemes Was Subjected to a Discriminatory and Retaliatory Hostile Work Environment.............................................................................................................8

        A.  Discrimination under the NYSHRL.................................................................8

        B.  Retaliation under the NYSHRL and Title VII.................................................9

   III.  CNB's Termination of Wemes Was Discriminatory ..........................................11

        A.  Wemes' prima facie claim.............................................................................11

        B.  A jury could believe that CNB's reason for terminating Wemes was pretextual and partly motivated by his sexual orientation. ..................................12

        C.  CNB is liable for Ingalls' conduct ................................................................21

        D.  Conclusion ....................................................................................................22

   IV.  CNB's Termination of Wemes Was Retaliatory .................................................22

   V.  CNB Violated the NY Labor Law by not Paying Wemes All Accrued Vacation Time .....23

   VI.  CNB'S Attorney's Fees Claim is Frivolous.........................................................23

CONCLUSION...................................................................................................................24

## INTRODUCTION

Plaintiff Jason Wemes was framed. He was a longtime outstanding employee for Defendant Canandaigua National Bank (CNB). In 2021 his coworkers nominated him for CNB's most outstanding employee award. His world changed weeks later when CNB's Director of Security Jason Ingalls became his immediate supervisor. Months before his termination, Ingalls began making homophobic comments towards Wemes. Ingalls told Wemes, for example, that a picture of his husband was inappropriate for work. Wemes opposed this demand that he remove the picture by asking why other straight couples could have their pictures displayed, but not him.

In June 2021 law enforcement (LE) entered CNB's main branch where Wemes worked. They were posing as a 14-year-old on the gay dating app Grindr looking to make an arrest on charges of luring a minor. They had two photos of the suspect: a "selfie" showing his face; another one with his pants pulled down to show his purple underwear. CNB agrees that the suspect's face "definitely" did not look like Wemes. LE and CNB tell contradicting stories about when the suspect's pictures were purportedly deleted.

Wemes first unknowingly encountered Ontario County Sheriff Nathan Bowerman dressed casually in the basement looking through the safety deposit window. He asked if he needed help. Bowerman then showed Wemes a picture of the suspect and asked if Wemes had seen him. Wemes had not, but offered to tell Ingalls. LE declined this offer and Wemes returned to work.

Wemes became concerned when LE wanted to speak with him later on. As Wemes showed officers his underwear did not match the suspect's, Ingalls entered and left with one officer. Wemes showed the remaining officer that his phone did not have Grindr, and that his ID badge did not match the suspect's. Wemes later heard Ingalls and LE discuss how they had spent personal time together. After LE departed that day, Wemes explained to Ingalls how he did not

1

match the suspect's pictures, and did not want to lose his job for something he did not do. Ingalls said it "did not look good" for him. The next day, after Wemes worked his entire shift, he met with Ingalls and CNB's HR Director Michelle Pedzich. They suspended him for two weeks while LE and CNB's investigation continued. Without a written reason, CNB later terminated Wemes. Wemes served a litigation hold and filed his EEOC complaint. CNB then contacted LE. Only afterwards did LE prepare its first and only written incident report to "help" CNB.

CNB argues it fired Wemes simply because LE said he was their suspect. But a jury could believe that Wemes was not a suspect after LE first solicited his assistance in finding the suspect, and only became a suspect after Ingalls' involvement with LE. Indeed, Ingalls was CNB's "point person" for LE's investigation. A juror could conclude that CNB's decision to terminate Wemes was because Ingalls steered LE's investigation towards Wemes, and the only information CNB had about LE's investigation came from Ingalls and his deputy, Joseph Hernandez.

A juror's belief that Ingalls' discriminatory bias caused Wemes' termination is supported by CNB's and LE's contradictory and implausible testimony on material issues: what happened during LE's initial interaction with Wemes, when Ingalls initially encountered LE, when Grindr showed the suspect near LE, if or how the suspect's picture showed a lanyard, badge reel, purported identification, or vehicle that could be connected to Wemes, and when CNB reviewed and captured surveillance footage. What is certain, however, is that CNB failed to preserve relevant surveillance footage that would have uncovered the truth about these key issues.

In sum, a reasonable jury could believe Wemes and conclude that Ingalls both steered LE to say Wemes was a suspect, and persuaded CNB to terminate him, because of his sexual orientation, and in retaliation for Wemes' opposition of his homophobic comments, in violation of the NYSHRL and Title VII.

2

## FACTS

The following is a summary of the facts set forth in Plaintiff's Responses to Defendant's Statement of Facts, and Statement of Additional Facts Pursuant to L.R. 56(A)(2) (collectively "SMF") which is hereby incorporated in its entirety by reference herein.

**Wemes was a highly esteemed Custodial Supervisor**

Wemes began working for CNB in 2014 as a part-time Custodial Supervisor. SMF ¶ 118. His duties included supervising cleaning staff (many of whom had developmental delays), ensuring CNB was properly cleaned, and performing custodial duties himself. SMF ¶ 119. Wemes' past three performance evaluations, from his former supervisor, all rated him "Far Exceeds Expectations." SMF ¶ 120, **Ex. 1**. It was well known at CNB that Wemes was a gay man with his longtime partner Josh. SMF ¶ 9, 121.

**Ingalls became Wemes' supervisor and regularly made homophobic comments**

Ingalls became Wemes' direct supervisor in February 2021. SMF ¶ 122. A few months before that, Ingalls mocked Wemes when he was on the phone by parroting what Wemes had said in a high-pitched voice and flipping his hand in a stereotypical feminine manner. SMF ¶ 128. Ingalls did this again after he became Wemes' supervisor; Wemes was on the phone but could hear Ingalls mocking him in a high-pitched voice. SMF ¶ 129. Wemes asked Ingalls if there was an issue with him. Ingalls responded with an angry look. *Id.*

Ingalls made other derogatory comments to Wemes because of his sexual orientation. About one month after Ingalls became Wemes' supervisor he pointed to a Human Rights Campaign (HRC) sticker (blue with a yellow equals sign) in Wemes' cubicle. SMF ¶ 124. Ingalls told Wemes that "we don't need that" and that it "doesn't need to be here." Wemes asked Ingalls why he thought that, and said that the sticker wasn't hurting anyone. Ingalls responded with a

laugh and looked at Wemes like he was an idiot, and walked away. *Id.* Ingalls also told Wemes that a photo of him and his husband displayed in Wemes' cubicle – which Ingalls directly pointed to – was inappropriate for work. SMF ¶ 125. Wemes asked him why this picture was inappropriate when there were other cubicles and offices with pictures of opposite-sex spouses; Ingalls responded by laughing and walking away. *Id.* Ingalls also said that he "needed a bigger box for all this stuff," insinuating that Wemes would be leaving the job. *Id.*

In the spring of 2021, Wemes was with a group of employees at a social outing, which included Ingalls. SMF ¶ 126. Some employees were discussing a transgender employee at Bushnell's Basin. Ingalls, in a mocking manner, commented that when he made the employee ID badge he was unsure what gender to specify. Barb Wagner asked Ingalls what his pronouns were in a joking way. Wemes responded that gender pronouns should not be a joking matter. In response Ingalls shot Wemes a dirty look. *Id.*

In or around April 2021, Ingalls and other individuals were talking near an elevator. SMF ¶ 127. Wemes approached the group with a greeting, in sum or substance, "Hey, what's going on?" The conversation stopped, and Ingalls said, "Jason doesn't like women like that." Wemes got onto the elevator with the group. When the group had left and Wemes and Ingalls were alone in the elevator, Wemes asked Ingalls what his personal life had to do with work. *Id.*

In January 2021, Wemes was nominated to receive the Arthur Hamlin award, which is given out each year to recognize an exceptional employee. SMF ¶ 130. Wemes' former supervisor Barb Wagner, nominated Wemes, partly because: "He is a compassionate supervisor able to bring out the best in all he supervises – spending time with each to understand their needs and to share information. It is Jason's inherent nature to lend a hand, take on a challenge or "raising his hand" to volunteer." *Id.* at **Ex. 4**. Many people who worked with Wemes, including

Ingalls, were included in a video celebrating this nomination. *Id.* In it, some employees properly pronounced Wemes' last name or gave him a fun nickname like "J-Dubs." *Id.* at **Ex. 6**. But Ingalls (the only man in a black shirt) mispronounced his last name to call him "Wee-mees," rhyming his last name with the slang word for penis, "weenies." *Id.* at **Ex. 6** at 0:44-55.

**Wemes' initial encounter with LE in the basement on June 29**

Wemes was working in the basement as part of his normal routine when he saw a man, who he now understands was Bowerman, dressed casually looking into the safety deposit room through the door's glass window. SMF ¶ 131. Wemes asked if he needed help; he declined. SMF ¶ 132. As Wemes walked away, Bowerman changed his mind, showed Wemes a picture on his cell phone depicting a heavyset man with black hair, sunglasses, and a thick black beard taking a "selfie" of himself, and asked if Wemes had seen that person. SMF ¶ 133-34. Wemes had brown hair and had never grown a beard while with CNB. SMF ¶ 135. Wemes responded that he had seen that person at a local restaurant, and probably at CNB previously. SMF ¶ 136.

Visingard then appeared to exit the bathroom, and told Wemes their suspect was attempting to lure a minor into the bathroom. SMF ¶ 137. Wemes responded that he would contact the head of security, Jason Ingalls. *Id.* They said that was not necessary because they were going to go back upstairs and look around. *Id.* Wemes returned to work. *Id.*

**The suspect "definitely" did not look like Wemes**

LE showed another CNB employee, Kristy Merriman, a picture of the suspect. SMF ¶ 138-139. Merriman said the suspect did not resemble Wemes. SMF ¶ 140. Both Ingalls and Hernandez agreed that the suspect "definitely did not look like" Wemes." SMF ¶ 141-45, **Ex. 8**. Hernandez did not believe Wemes was the suspect based on the "picture of the person." SMF ¶ 144. Neither Ingalls or Hernandez requested a copy of this picture from LE. SMF ¶ 144-145.

**Wemes' second interaction with LE**

When LE encountered Ingalls and advised him of their investigation, Ingalls "escorted us up to speak with Wemes." SMF ¶ 155, **Ex. D**. Wemes was concerned about this, and had LE question him in a room with a working security camera. SMF ¶ 157-59. There LE showed Wemes a second picture, which showed the lower portion of the suspect's body and his purple underwear (referred to as the "Second Picture"). SMF ¶ 160. Wemes showed them he was not wearing purple underwear. SMF ¶ 161. Ingalls then came into the room and said "Who's in charge here and what's going on?" SMF ¶ 162. Neither Bowerman nor Visingard verbally responded; Visingard just left the room with Ingalls. *Id.* After this Wemes believed that Ingalls was trying to persuade LE to say he was the suspect. *Id.* The way Ingalls initially presented himself seemed planned because Visingard departed with Ingalls without answering his questions, and because Ingalls had been regularly making homophobic comments to him. *Id.* LE searching for a gay suspect was the perfect set up to have Wemes fired. Pl.'s Resp. SMF ¶ 92.

When in the room with just Bowerman, Wemes let Bowerman to scroll through his phone to see how he did not have Grindr on his phone, and detailed how his white ID badge was different than what was seen in the picture. SMF ¶¶ 164. Visingard returned with Ingalls, and said it did not "look good" for Wemes. SMF ¶ 166. After this interaction Wemes saw and heard Ingalls, Visingard, and CNB's discuss spending personal time together outside work at youth sporting events and a wine tasting. SMF ¶ 168.

**Wemes' third interaction with LE**

LE returned one more time, looking through Wemes' browser history. SMF ¶ 169. Wemes invited them to go through his desk; they declined. *Id.* Visingard said he was sure Wemes was the suspect and should just come clean. *Id.* Wemes rejected admitting to something he did not do,

and LE departed. *Id.* Later that day Wemes called Ingalls to tell him how he was not the suspect. SMF ¶ 170. Ingalls responded that it did not "look good" for him. *Id.*

**CNB suspended and terminated Wemes**

Wemes worked the next day on CNB's opening of its new Geneva office. SMF ¶ 171. At the end of his shift, he met with Pedzich and Ingalls. They suspended him with pay for two weeks to allow LE to complete their investigation and while CNB did its own internal investigation. SMF ¶ 172. Wemes turned in the badge and badge reel he was wearing the prior day. SMF ¶ 173.

During his suspension CNB employee Naiomi Best told Wemes she heard Ingalls telling other CNB employees he was the suspect. SMF ¶ 174. Wemes received a termination letter dated July 12, 2021 that did not state a reason for the termination. Pl.'s Resp. SMF ¶ 106, **Ex. G**. Wemes then emailed CNB to request a reason. SMF ¶ 175, **Ex. 10**. On or around August 2, 2021, Best called Wemes and said that Ingalls told her that Wemes had blocked or ignored his calls and texts because he was trying to get in touch with Wemes. SMF ¶ 176. Wemes had not blocked nor received any direct communications from Ingalls since his suspension. *Id.*

<u>**ARGUMENT**</u>

**I.    Legal Standard**

Summary judgment is appropriate only where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 (2d Cir. 2010). The

Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010). "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Plaintiffs "usually must rely on bits and pieces of information to support an inference of discrimination [or retaliation]." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015). A jury may properly "base its verdict wholly on reliable inferences deduced from circumstantial evidence." *U.S. v. Brown*, 937 F.2d 32, 36 (2d Cir. 1991).

## II. Wemes Was Subjected to a Discriminatory and Retaliatory Hostile Work Environment

### A. Discrimination under the NYSHRL

To establish a discriminatory hostile work environment claim under the NYSHRL, a plaintiff must show "by a preponderance of the evidence that she has been treated less well than other employees because of" a protected characteristic like sex or sexual orientation. *Valerio v. Metro. Transportation Auth.*, No. 24-1614, 2025 WL 686028, at *4 (2d Cir. Mar. 4, 2025). "Summary judgment is appropriate if the record establishes as a matter of law that discrimination played no role in the defendant's actions." *Id.*

When reviewing the evidence in the light most favorable to Wemes, a reasonable jury could conclude that Ingalls' regular homophobic comments towards Wemes – that the picture of his husband and HRC sticker was inappropriate for work, gratuitously interjecting that Wemes did not "like women like that," mispronouncing his last name as rhyming with "weenies," and

8

mocking him with a high pitched voice and flipping his hand in a stereotypical feminine manner - constituted treating him "less well" then other employees because of his sexual orientation.

## B. Retaliation under the NYSHRL and Title VII

Title VII and the NYSHRL broadly prohibit employers from retaliating against employees for engaging in protected activity. *Nolan Graber v. Cayuga Home for Child.*, No. 5:24-CV-468, 2024 WL 4870326, at *5 (N.D.N.Y. Nov. 22, 2024). Plaintiffs may pursue retaliation claims under Title VII and the NYSHRL predicated on a "work environment permeated with retaliatory actions; i.e., a retaliatory hostile work environment." *Id.* "To state a *prima facie* case of a retaliatory hostile work environment, the plaintiff must plausibly allege that: (1) she participated in protected activity; (2) of which defendant was aware; and (3) she was subjected to materially adverse retaliatory actions." *Id.* "All that is relevant is whether the actions, taken in the aggregate, are materially adverse and would dissuade a reasonable employee from making a complaint of discrimination." *Id.* "Notably, the plaintiff does not need to establish that the retaliatory actions were 'severe and pervasive.'" *Id*.

### 1. Wemes' responses to Ingalls constituted protected activity.

Title VII's opposition clause makes it "unlawful for an employer to discriminate against any employee because he has opposed any practice made unlawful" by Title VII. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (cleaned up). The *Crawford* Court reasoned that the term "oppose" means to "resist or antagonize to contend against; to confront; resist; withstand" and "to be hostile or adverse to, as in opinion." *Id.*

> "Oppose" goes beyond "active, consistent" behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it. Countless people were known to "oppose" slavery before Emancipation, or are said to "oppose" capital punishment today, without writing public letters, taking to the streets, or resisting the government. And we would call it "opposition" if an employee took a stand

9

> against an employer's discriminatory practices not by "instigating" action, but by standing pat, say, by refusing to follow a supervisor's order….There is, then, no reason to doubt that a person can "oppose" by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.

*Id.*; *see also Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990) (protected activity includes "informal protests of discriminatory employment practices, including making complaints to management [and] protesting against discrimination by industry or by society in general."); *Valentín-Almeyda v. Mun. of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006) ("protected conduct includes…complaining to one's supervisors."); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (holding that "an employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress").

Weeks after after Ingalls became Wemes' supervisor, Wemes opposed Ingalls' homophobic comments. After Ingalls said his HRC sticker was inappropriate for work, Wemes directly questioned Ingalls about this conclusion and refused his demand that it be removed. SMF ¶ 124. When Ingalls mocked Wemes by parroting what he said in a high-pitched voice, Wemes asked if Ingalls had a problem with him. SMF ¶ 129. Ingalls continued his homophobic comments unabated, SMF ¶¶ 125-128, and told Wemes he needed a "bigger box" for his desk, implying that Wemes would be leaving this job. SMF ¶ 125.

To extent CNB attempts a *Faragher/Ellerth* defense under Title VII, it should be rejected. CNB's Policy states that complaints about unlawful conduct may be made to supervisors, who are then required to report it to Human Resources. See Pl.'s Resp. SMF ¶ 57, **Ex. A**. Wemes complained to his supervisor about the comments. SMF ¶¶ 124-129.

10

In sum, a reasonable jury could conclude that Ingalls' homophobic comments towards Wemes were in retaliation for Wemes' opposing Ingalls' homophobic remarks, and would dissuade a reasonable person from making a complaint of discrimination.

## III.    CNB's Termination of Wemes Was Discriminatory

A plaintiff sets forth a *prima facie* case of discrimination under Title VII and the NYSHRL by showing that (1) he is a member of a protected class; (2) he is qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024).

Afterwards, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for its adverse action." *Bart*, 96 F.4th at 570. If the defendant makes such a showing, "the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination." *Id*. At this third stage, the plaintiff is "not required to demonstrate the falsity of the employer's proffered reason," but can instead prove "that an impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation." *Id*. Differently put, the burden shifts to the plaintiff to provide "other evidence indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class." *Id*. at 576.

The NYSHRL is construed more liberally than Title VII, and requires an independent analysis of a plaintiff's discrimination claims. *See Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122-23 (2d Cir. 2024). Nevertheless, to survive summary judgment under the NYSHRL, a plaintiff must establish that the adverse employment action was "caused at least in part by discriminatory or retaliatory motives." *Faustin v. New York and Presbyterian Hospital*, No. 23CV8323, 2025 WL 1755192, at *5 (S.D.N.Y. June 25, 2025).

### A.  Wemes' prima facie claim.

The first three elements are undisputed: Wemes was gay, qualified for his position, and terminated. SMF ¶¶ 7, 9, 24-27, 106. As shown above, Ingalls previous homophobic comments, LE soliciting Wemes' assistance in finding the suspect during their initial encounter, that the suspect "definitely" did not look like him, and Ingalls "escorting" LE to speak with Wemes after they informed him of their investigation, far exceeds the low bar to show that the circumstances surrounding Wemes' termination "give rise to an inference of discrimination." *See Bart*, 96 F.4th at 570; *see also Zubulake v. UBS Warburg, LLC*, 382 F. Supp.2d 536, 544 (S.D.N.Y. 2005) ("evidence of a defendant's prior discriminatory treatment of a plaintiff or other employees is relevant and admissible…to establish whether a defendant's employment action against an employee was motivated by invidious discrimination.").

Additionally, as detailed below, the contradictions and implausibility of certain testimony of LE, CNB, and its officers and employees create additional inferences of discrimination. Most importantly, Wemes' testimony and these inconsistencies would allow a reasonable jury to conclude that his termination was partly motivated by his sexual orientation.

### B.  A jury could believe that CNB's reason for terminating Wemes was pretextual and partly motivated by his sexual orientation.

CNB argues it terminated Wemes simply because LE informed Ingalls that Wemes was their suspect. A reasonable jury, however, could believe that CNB's termination of Wemes was "motivated at least in part" by Wemes' sexual orientation. *See Bart*, 96 F.4th at 570.

To show an employer's proffered reason for an adverse action is pretextual, a plaintiff can point to "weaknesses, implausibilities, inconsistencies, or contradictions." *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013). It also bears repeating that when reviewing the record on summary judgment, a court "may not make credibility determinations or weigh the

evidence," and it "must draw all reasonable inferences in favor of the nonmoving party." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)). Put differently, a court:

> must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Id.*

### 1. Visingard's testimony cannot be credited as an interested witness.

An interested witness is one whose testimony, "by reason of relationship, friendship, antagonism, or prejudice in favor of or against one side or the other,…in your judgment, is biased or likely to be biased toward the side which he or she favors." *United States v. Jenkins*, 43 F.4th 300, 304 (2d Cir. 2022). Visingard only prepared the Incident Report after CNB informed him that Wemes had brought a lawsuit to "help" CNB. *See* Pl.'s Resp. SMF ¶ 65. Wemes also overheard and saw Visingard, Ingalls, and CNB's CFO discussing spending personal time together at youth sporting events, being together on a golf course, and wine tastings. SMF ¶ 168.

Regardless, all of Visingard's testimony could be discredited because, given the contradictions in his testimony with Wemes, CNB, and Bowerman, a jury could disbelieve Visingard's testimony on a material fact, and thus have "the right to reject the testimony of that witness in its entirety." *Sims v. Blot*, 354 F. App'x 504, 506 (2d Cir. 2009); *Reeves*, 530 U.S. at 134 ("the trier of fact can infer from the falsity of the explanation that the [witness] is dissembling to cover up" the truth). Further, Visingard has already been found by a court to have testified untruthfully: "Despite Detective Visingard's testimony that the defendant indicated she

13

understood her rights and was willing to speak to him with her rights in mind, the videotape clearly shows that this exchange or express waiver never happened." GLS Dec. ¶ 14, **Ex. 25**.

### 2. CNB's and LE's testimony on material events are inconsistent and implausible.

<u>LE's initial interaction with Wemes in the basement</u>.

Visingard's testimony is inherently contradictory on this topic. First, he said never interacted with Wemes in the basement because was stationed in the basement bathroom from five minutes before Wemes arrived to a couple minutes after he left, and could not see or hear what was happening outside. Pl.'s Resp. SMF ¶ 72. But his affidavit filed in support of this motion averred that he indeed interacted with Wemes in the basement. *Id.*

Like Visingard's testimony, Bowerman contradicted himself. He first said that Visingard exited the bathroom and "was speaking with all three of us at one point." *Id.* Later Bowerman testified that he had no recollection of whether Visingard spoke to Wemes during this initial interaction. *Id.* Bowerman eventually testified that he told Wemes he was looking for someone, and this interaction with Wemes in the basement did not end, but that Wemes led him and Visingard to view surveillance footage in a "continuous interaction." *Id.*

CNB's statements on this interaction contradict Bowerman and Visingard. It claimed that after a detective showed Wemes his police badge, "Wemes turned around and promptly left the lower lobby." Pl.'s Resp. SMF ¶ 72, **Ex. 1** at DEF00452.

While CNB claims that LE concluded that Wemes was their suspect after this interaction, Bowerman disagreed. Pl.'s Resp. SMF ¶ 74.[1]

---

[1] Q. After you spoke with Mr. Wemes in the basement, do you believe that he was a possible suspect?
A. Not -- I didn't right away.  It was a little while after as we continued the investigation.

<u>When the pictures of the suspect were purportedly deleted</u>.

CNB adopts portions of Visingard's testimony, that after Wemes left the basement the contents of his messages with the suspect – including the pictures – were deleted. Pl.'s Resp. SMF ¶ 73. But Visingard's Incident Report claims that he showed Ingalls and Hernandez pictures of the suspect after the initial basement encounter. *Id.* Indeed, Ingalls and Hernandez recounted Visingard showing them the suspect's pictures. *Id.* Further, they claimed that Grindr also showed the suspect a few feet away when they were upstairs near Wemes' desk. *Id.*

Bowerman testified that Visingard never told him that the contents of the suspect's messages, which included the pictures, were deleted. *Id.*

CPD's Chief Nielsen said that Visingard told him the suspect's messages were deleted when his Grindr account was tagged as fraudulent, which occurred after June 29. *Id.*

<u>The suspect "definitely" did not look like Wemes</u>.

All of the CNB employees and Bowerman who saw the First Picture agreed it definitely did not look like Wemes. SMF ¶ 140 (Merriman); ¶ 141-45 (Ingalls and Hernandez); ¶ 146 (Bowerman).

Visingard contradicted this testimony, saying that the suspect never sent a picture that included his face. SMF ¶ 147.

<u>When Ingalls initially encountered LE</u>.

After Merriman told LE that she had not seen the person in the picture, she called Jason Ingalls to inform him that she saw the suspect's picture. SMF ¶¶ 148-50. Ingalls testified that Merriman told him the officers were in the basement, but he could not find them, and at "some point" later he first encountered them near Wemes' cubicle on the second floor. SMF ¶¶ 151-153. His memo states: "I found out later that the investigators ran into Tim Tepedino and Tim brought

15

the investigators up to Jason Wemes desk." SMF ¶ 153, **Ex. 8**. Tepedino, an individual with

Autism, has no recollection of what happened that day. SMF ¶ 154.

Visingard's Incident Report contradicts Ingalls, stating it was actually Ingalls who

"escorted us to speak with Wemes" after LE advised him of the investigation. SMF ¶ 155. When

shown this language, Ingalls did not recall if this was accurate or if he disagreed. SMF ¶ 156.

When Grindr showed the suspect near Visingard.

Visingard claimed that he observed the location of the suspect within five feet of him

while in the basement bathroom when Wemes was speaking with Bowerman. SMF ¶¶ 69-71.

This assertion defies credibility. First, Visingard's ability to conclude this is implausible based on

his own testimony that he could not see nor hear anything occurring outside the bathroom while

he was inside. Pl.'s Resp. SMF ¶ 69. Second, an officer – whose mission it was to arrest the

suspect – and saw the suspect approaching his location to five feet away, then moving farther

away after departing, and Visingard waited one to two minutes before exiting the bathroom. *Id.*

Third, Visingard never told Bowerman this fact, which would have been critical to their

investigation. Pl.'s Resp. SMF ¶ 70.

The lanyard, badge reel, and CNB ID

CNB asserts LE thought Wemes was the suspect because the suspect's second picture

showed a "lanyard" or "badge reel" that was the same as Wemes', and "visibly attached to a

CNB identification badge." SMF ¶ 76(B).

But Visingard testified that this picture showed a lanyard only around the neck, not badge

reel connected to a belt loop, and there was no ID attached. Pl.'s Resp. SMF ¶ 76(B). He

disavowed his Incident Report which claimed that Wemes had the "same ID" as the suspect's. *Id.*

16

Bowerman also said the suspect's picture did not include an ID. *Id.* But unlike Visingard, he said the suspect had a "retractable lanyard" clipped to the belt. *Id.*

Pedzich said the suspect's badge reel was not CNB-issued, and never said an ID was visible. *Id.* Hernandez's notes in Ingalls memo says it was the "zip line" that was the same as Wemes', but never mentions an ID was visible. Hernandez later testified said that two-third's of the suspect's ID was visible, and that one could see numbers on the ID badge. *Id.*

Ingalls testified that the suspect's picture showed a badge reel connected to a belt loop, and that a non-CNB issued ID was visible, and could not recall if it belonged to Wemes. *Id.* He later contradicted himself, saying that the badge was consistent with the one Wemes had. *Id.*

Wemes detailed how his ID was different than the suspect's. SMF ¶ 164.

The CNB van and mountain dew can as connecting Wemes to the suspect.

CNB claims that other "similarities" tied Wemes with the suspect. But the evidence offered only compounds the contradictions. Visingard said that the Second Picture showed the inside of a vehicle with a mountain dew can; Ingalls identified the vehicle as a CNB van and relayed that Wemes "loves the Mountain Dew." Pl.'s Resp. SMF ¶ 76(C). Visingard said Ingalls and Hernandez were with him when they viewed the CNB van and found a mountain dew can. *Id*. Visingard implausibly reasoned that he did not collect the can as evidence because "drinking Mountain Dew is not against the law." *Id.*

Ingalls contradicted Visingard. He never viewed a CNB van, but only Wemes' personal vehicle, which did not match the Second Picture. *Id.* Further, LE never mentioned mountain dew to him, nor did he communicate that mountain dew was associated with Wemes. *Id.*

Hernandez never recalled seeing a mountain dew can. *Id.* He went outside to view a CNB van, but had no recollection of who may have accompanied him, or when he viewed it. *Id.*

Bowerman viewed a CNB van with Visingard, and never mentioned mountain dew. *Id.*

Wemes never saw a mountain dew can in the suspect's picture. SMF ¶ 165.

<u>Failure to arrest</u>.

Visingard's Incident Report partly reads: "I advised both Hernandez and Ingalls that there

was no doubt in my mind that I was in fact communicating with Wemes but I didn't have enough

to charge him." Pl.'s Resp. SMF ¶ 83, **Ex. D**.

The CPD's General Orders state that if an officer has a "reasonable suspicion" a person

has committed a crime, they "shall conduct an investigative detention" to determine whether

probable cause exists, or whether there is sufficient evidence to believe a person has committed a

crime. *Id.*, **Ex. 3**. If there is probable cause, the General Orders mandate an arrest. *Id.* If, after his

questioning of Wemes and review of the evidence, Visingard had "no doubt" Wemes was the

suspect, then it follows he had a reasonable belief Wemes had committed a crime, and the

General Orders mandated that he arrest Wemes – which he did not do. Under such

circumstances, a reasonable jury could conclude that Visingard's failed to follow CPD policy,

which discredits his alleged belief that Wemes was trying to lure a minor. "Departures from the

normal procedural sequence also might afford evidence that improper purposes are playing a

role." *Vill of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

<u>CNB review and preservation of surveillance footage</u>

CNB first said it reviewed no surveillance footage to determine the potential suspect

because LE said Wemes was their suspect. SMF ¶ 198. But Ingalls was assisting LE in

determining who could be the suspect, and Pedzich testified he reviewed footage with LE. SMF

¶ 199-200. Ingalls testified that he does not recall whether: he reviewed surveillance footage with

LE, they requested to see footage, or he offered LE the chance to review footage. SMF ¶ 201.

CNB conducted its own internal investigation of this incident. SMF ¶ 177. When it conducts investigations, CNB typically preserves video surveillance footage, and believes it is important to do so. SMF ¶¶ 178-79. Surveillance footage is maintained for 90 days. SMF ¶ 179. CNB disclosed eleven separate videos of surveillance footage captured at CNB on June 29. SMF ¶ 180, **Exs. 11-21**. Pedzich and Ingalls testified that these videos were compiled by Ingalls and Hernandez on June 29 or 30. SMF ¶ 181. But Hernandez testified he only captured the footage after Wemes' termination on July 12. SMF ¶¶ 182.

CNB's internal counsel sent Ingalls and Pedzich a litigation hold notice on August 6, 2021 directing the preservation of any video recordings "relating to [Wemes] and his employment or the termination." SMF ¶ 183, **Ex. 22**. After receiving this litigation hold notice, CNB either did not preserve, or does not recall if any additional surveillance footage was preserved. SMF ¶ 184. Ingalls received the notice. SMF ¶ 185. Hernandez was never asked to save potential footage. SMF ¶ 186.[2]

Ingalls testified that CNB's cameras would have captured the following unpreserved actions that would have answered crucial questions about who is telling the truth in this case:

- Ingalls walking from his office to Merriman to speak with her after she called him about viewing a picture of the suspect (time unknown).

- Ingalls search for LE after speaking with Merriman (time unknown), and his actions before encountering Wemes being questioned by LE on the second floor (time unknown).

- The 13-minute span between LE encountering Wemes in the basement around 16:42, SMF ¶ 141, **Ex. 8**, and seeing them interact with Tepedino at 16:55. SMF ¶ 180, **Ex. 19**, DEF001231.

- What actions Ingalls takes before his first appearance in the surveillance footage SMF ¶ 180, **Ex. 21**, DEF001233; SMF ¶ 197.

---

[2] Further, Ingalls does not recall reviewing his texts or emails for potentially probative documents. SMF ¶¶ 187-88.

- What actions Ingalls, Hernandez, and LE took to determine whether Wemes might the suspect before they leave, including looking at vehicles in the parking lot.

SMF ¶¶ 189-197.

CNB should ultimately face consequences for its failure to preserve surveillance footage.[3] But even if Wemes does not "seek sanctions for spoliation, [he] may still be entitled to an adverse inference on summary judgment." *Scales v. Webster Bank, N.A.*, No. 3:24-CV-50, 2025 WL 1207397, at *7 (D. Conn. Apr. 25, 2025) (*citing Mali v. Fed. Ins. Co.*, 720 F.3d 387, 392–93 (2d Cir. 2013). "The record can warrant an adverse inference concerning spoliation where the moving party establishes that: (1) the evidence at issue existed; (2) the evidence was in the exclusive possession of the non-moving party; and (3) the non-production of the evidence has not been satisfactorily explained." *Id.*

It is undisputed that additional relevant footage of law enforcement and Ingalls' actions on June 29 existed, were in CNB's exclusive possession, and unpreserved despite their relevance to Wemes' termination and EEOC lawsuit. The third element is met as: (1) the inconsistencies about who viewed and captured footage when, SMF ¶¶ 180-182, 186; and (2) CNB had no recollection if any additional relevant footage, besides that already saved, after the litigation hold notice. SMF ¶ 184. Adverse credibility determinations are appropriate when a witness in response to material questions answers: "I don't recall." *Moodie v. Fed. Res. Bank of N.Y.*, 862 F.Supp. 59, 66 (S.D.N.Y.1994) (the response "is not a serious challenge" to the allegation asserted); *SS&J Morris, Inc. v. I. Appel Corp.*, 2000 WL 1028680 (S.D.N.Y. July 26, 2000) (finding witnesses' "I don't recall" answers insincere and deliberately "evasive or incomplete").

---

[3] Wemes plans to subsequently file a Motion for Sanctions on this issue.

Here, when viewing the evidence in a light most favorable to Wemes, a reasonable jury could conclude that Ingalls cherry-picked what surveillance footage he would save as to cover up the truth about his interactions with LE. Summary judgment should be denied on this fact alone.

Communications with LE after June 29.

CNB testified that Ingalls, as the "point person" indeed communicated with LE "at least once or twice" during Wemes' suspension. SMF ¶ 202.

Bowerman said he had no contacts about this investigation after June 29. SMF ¶ 204.

Visingard first said the "only other contact" he had with "any bank staff was when he received a" call from an attorney for the bank informing him that Wemes filed suit. SMF ¶ 205. But then he changed his mind, saying he did not recall whether he spoke with Ingalls or Hernandez after he left the bank on June 29. *Id.*

### C. CNB is liable for Ingalls' conduct

Under the so-called "cat's paw theory," an employer may be liable for adverse actions influenced by the discriminatory animus of a supervisor who did not personally make the ultimate employment decision. *Valerio v. Metro. Transportation Auth.*, No. 24-1614, 2025 WL 686028, at *3 (2d Cir. Mar. 4, 2025). But no cat's paw theory is required when "an employer attempts "to confine decision-making power to a small number of individuals," as the employer "may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendation it relies." *Krause v. Kelahan*, 575 F. Supp. 3d 302, 309 (N.D.N.Y. 2021) (*citing Vance v. Ball State Univ.*, 570 U.S. 421, 428-29 (2013)). "Accordingly, the recommending employee amounts to a supervisor, and any discriminatory animus found attributable to him can be imputed directly to the employer, no cat's paw required." *Id.*

First, the cat's paw theory is not required at this juncture because CNB wholly relied on Ingalls concerning the information about LE's investigation, and who recommended he be terminated. SMF ¶ 104; *see Krause,* 575 F. Supp. at 302. Only Ingalls and Hernandez communicated with LE on behalf of CNB, and Ingalls was CNB's "point person." SMF ¶ 202-03, **Ex. S** at No. 12. Put differently, Ingalls controlled what CNB officers and managers heard about LE's investigation. SMF ¶¶ 95, 103.

Second, a reasonable jury could also find that Ingalls influenced CNB's decision to terminate him under the cat's paw theory. In addition to controlling what CNB heard about LE's investigation, Ingalls' homophobic comments were not "stray remarks." They support a finding of discriminatory motive given their frequency in the span of a few months, and that Ingalls was Wemes' supervisor who "played a substantial role" in the termination. *See Bart*, 96 F.4th at 578.

### D.  Conclusion

This case presents a litany of discrepancies in testimony on material facts. Questions abound concerning why LE and CNB did not preserve critical evidence like the suspect's pictures and surveillance footage. When viewing the evidence in a light most favorable to Wemes and drawing all inferences in his favor, a reasonable jury could conclude that he only became a purported suspect after Ingalls convinced LE to question Wemes. Ingalls controlled CNB's knowledge about LE's conclusions, allowing him to falsely declare that Wemes was LE's suspect, which caused his termination.

### IV.   CNB'S Termination Was Retaliatory

Under Title VII, a plaintiff must show (1) "an adverse employment action"; (2) "participation in a protected activity"; (3) "that the defendant knew of the protected activity"; and "(4) a causal connection between the protected activity and the adverse employment action."

22

*Littlejohn v. City of N.Y.*, 795 F.3d 297, 316 (2d Cir. 2015). The NYSHRL employs a more liberal standard: "a plaintiff claiming retaliation must demonstrate that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) (the NYCHRL standard now mirrors the NYSHRL).

Plaintiff can meet both tests here. As shown above, Wemes' opposition to Ingalls' homophobic comments constitutes protected activity. CNB knew of the protected activity because Ingalls is a CNB officer. Pl.'s Resp. SMF ¶ 57. Given the temporal proximity and LE's appearance at CNB looking for a gay man, a reasonable jury could find a causal connection between Wemes' opposition and his termination because it was an opportunity for Ingalls to retaliate. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (causation may be inferred when a plaintiff suffers an adverse action at an "opportunity to retaliate").

### V. CNB Violated the NY Labor Law by not Paying Wemes All Accrued Vacation Time

CNB's termination letter agreed to pay Wemes' "accrued, unused vacation time." SMF ¶ 106, **Ex. G**. The payout of accrued "vacation pay is a matter of agreement to provide such a benefit." *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 120 (S.D.N.Y. 2009) (citing *Glenville Gage Co., Inc. v. Indus. Bd. of Appeals*, 421 N.Y.S.2d 408, 409 (3d Dept. 1979).

NY Labor Law §§ 193 and 198 require that employers pay employees wages that are owed. Wages include vacation and separation pay. *See* Labor Law § 190(1), § 198-c(2). In 2021 Wemes had 116 hours of vacation time to use. Pl.'s Resp. SMF ¶ 112, **Ex. 23.** He had used 16 hours before his suspension in June, leaving 100 vacation hours remaining. CNB only paid 51 vacation hours to Wemes in his final paycheck. Thus 49 hours remained unpaid and owed. It follows that CNB failed to pay Wemes all wages owed under the Labor Law.

## VI.    CNB'S Attorney's Fees Claim Is Frivolous

As shown above, CNB claim that Wemes brought this suit in bad faith is preposterous. If CNB had actually reviewed the material facts in the record, it could have discovered the significant credibility issues LE and CNB face given their inconsistent and improbable testimony, their failure to preserve the suspect's pictures, and Ingalls' failure to preserve critical surveillance footage. CNB added fuel to this fire by submitting Visingard's recent affidavit. *See* Pl.'s Resp. SMF ¶ 72 (Visingard testified that he never saw Wemes in the basement; his recent affidavit now states that he interacted with Wemes there).

## <u>CONCLUSION</u>

Plaintiff Jason Wemes respectfully requests that Defendant's Motion for Summary Judgment and Attorney's Fees be denied.

**GREGORY L. SILVERMAN, ESQ., PLLC**

Dated: June 30, 2025          By:     s/ Gregory L. Silverman
                                       118 Genesee St.
                                       Geneva, NY  14456
                                       Tel: 585-480-6686
                                       greg@silverman-law.com
                                       Attorney for Plaintiff Jason Wemes

24