UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JASON WEMES,

                              Plaintiff,

                    - against -

THE CANANDAIGUA NATIONAL BANK
& TRUST COMPANY,

                              Defendant.

Case No.: 22-cv-06297 (MAV) (MWP)


**PLAINTIFF JASON WEMES'
RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS, AND
STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO L.R. 56(A)(2)**


                              **GREGORY L. SILVERMAN, ESQ., PLLC**

Dated: June 30, 2025          By:      s/ Gregory L. Silverman
                                       118 Genesee St.
                                       Geneva, NY  14456
                                       Tel: 585-480-6686
                                       greg@silverman-law.com
                                       Attorney for Plaintiff Jason Wemes

Plaintiff Jason Wemes, through counsel, pursuant to Fed. R. Civ. P. 56 and Rule 56(a)(2) of this Court's Local Rules of Civil Procedure, respectfully submits the following responses to Defendant's Local Rule 56(a)(1) Statement of Material Facts, and provides a Statement of Additional Material Facts in opposition to Defendant's motions for summary judgment and attorney's fees.

**I.  CNB**

1.  CNB is a full-service, community-owned financial institution with offices located throughout Monroe and Ontario Counties in New York.  *See* MP Aff. at ¶ 15.

    **PLAINTIFF'S RESPONSE:** Undisputed.

2.  CNB takes an active role in the community through its investment into and support of local organizations and initiatives, including its involvement in LGBTQ+ initiatives and programs in the communities it serves. *See* MP Aff. at ¶ 17.

    **PLAINTIFF'S RESPONSE:** Undisputed.

3.  CNB employs a diverse team of people to achieve its core values of honesty and integrity, responsibility, teamwork, respect, innovation, professionalism, and commitment. *See* MP Aff. at ¶ 16.

    **PLAINTIFF'S RESPONSE:** Undisputed

4.  CNB maintains robust employment policies grounded in equal opportunity and nondiscriminatory practices, including policies that prohibit unlawful discrimination, harassment, or retaliation in any form. *See* MP Aff. at ¶¶ 18 through 22; *see also id*. at **Exhibit**

**A**, DEF00213 through DEF00230.

    **PLAINTIFF'S RESPONSE:** Undisputed

5. CNB's employment policies further provide that accrued but unused vacation and sick time are not paid out when an employee is terminated. *See* MP Aff. at ¶ 24; *see also id.* at **Exhibit A**, DEF00244, DEF00273, DEF00277.

    **PLAINTIFF'S RESPONSE:** Undisputed

6. CNB's employment policies also emphasize the at-will nature of employment with the organization. *See* MP Aff. at ¶ 23; *see also id.* at DEF00247 through DEF00248.

    **PLAINTIFF'S RESPONSE:** Undisputed

## II. Wemes' Employment with CNB

7. Wemes is gay and has identified as such his entire adult life. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 10:15-11:10.

    **PLAINTIFF'S RESPONSE:** Undisputed

8. In or around 2011, Wemes applied for, was interviewed for, and offered the at-will role of Custodial Supervisor with CNB. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 38:11-41:11.

    **PLAINTIFF'S RESPONSE:** Undisputed

9. Wemes disclosed his sexual orientation to CNB during his initial 2011 application process. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 41:19-21, 236:9-18.

**PLAINTIFF'S RESPONSE:** Undisputed. Additionally, it was well-known in CNB's Canandaigua branch that Wemes was a gay man with a male partner. Wemes Dec. ¶ 5; Wemes Dep. 125:13-126:19.

10. Wemes turned down the at-will Custodial Supervisor role offered to him in 2011 for personal reasons. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 41:4-11.

    **PLAINTIFF'S RESPONSE:** Undisputed

11. On October 22, 2014, Wemes submitted a subsequent employment application with CNB to fill a vacancy for the at-will, part-time role of Custodial Supervisor. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 43:2-44:24; *see also* MP Aff. at ¶ 25; *id.* at **Exhibit B**.

    **PLAINTIFF'S RESPONSE:** Undisputed

12. On October 27, 2014, Wemes was offered the at-will, part-time role of Custodial Supervisor. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 52:3-53:13, 56:25-57:12; *see also* MP Aff. at ¶ 26; *see also id.* at **Exhibit C**.

    **PLAINTIFF'S RESPONSE:** Undisputed

13. The job offer made to Wemes on October 27, 2014, was extended by CNB's then Senior Vice President and Chief Human Resources Officer, Michelle Pedzich ("Pedzich"). *See* RTB Aff. at **Exhibit E**, Wemes Dep. 52:3-53:13; *see also* MP Aff. at ¶ 26; *id.* at **Exhibit C**.

    **PLAINTIFF'S RESPONSE:** Undisputed

14. On November 3, 2014, Wemes accepted the offered the at-will, part-time role of Custodial Supervisor. *See* MP Aff. at ¶ 26, *see also id.* at **Exhibit C**.

    **PLAINTIFF'S RESPONSE:** Undisputed.

15. As part of Wemes' onboarding process with CNB, he filled out certain employment-related documentation including, *inter alia*, beneficiary designations for CNB's 401(k) and Employee Stock Ownership Plan programs. *See* RTB Aff. at **Exhibit E**, Wemes Dep 96:5-101:18; *see also* MP Aff. at ¶¶ 27 through 28; *see also id.* at **Exhibits D** and **E**.

    **PLAINTIFF'S RESPONSE:** Undisputed

16. CNB was aware at all relevant times during Wemes' employment of his sexual orientation. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 100:17-23, 108:2-17; 125:126:19; *see also* MP Aff. at ¶ 29; *see also id.* at **Exhibits D** and **E**.

    **PLAINTIFF'S RESPONSE:** Undisputed

17. Throughout his employe with CNB, Wemes' primary work location was located at 72 South Main Street, Canandaigua, New York (the "Main Office"), and 17 Chapin Street Canandaigua, New York ("Operations"), which are connected to one another via a "sky bridge" between the buildings. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 71:8-72:8; *see also* MP Aff. at ¶ 31.

    **PLAINTIFF'S RESPONSE:** Undisputed

18. As part of his job duties, Wemes traveled to other CNB branch locations once or twice a week.

*See* RTB Aff. at **Exhibit E**, Wemes Dep. 73:19-74:23.

    **PLAINTIFF'S RESPONSE:** Undisputed

19. Wemes had access to CNB's vehicles, including its vans. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 74:25-76:25; *see also* MP Aff. at ¶ 31.

    **PLAINTIFF'S RESPONSE:** Disputed in part. Wemes' deposition testimony cited reflects that Wemes had access to CNB's vehicles only with permission from his supervisor, and that the vehicle key was kept in a lockbox. Ingalls does not recall where van keys were located in June 2021. Ingalls 30b6 Dep. 114:22-115:8. Hernandez testified that van keys are in a lockbox in Ingalls' office, but he does not know if Wemes had the code to access it. Hernandez Dep. 32:18-33:15.

    Ingalls testified that CNB had three vans in 2021, and would have saved surveillance footage of Wemes driving a van on June 29, 2021 if it existed. Ingalls 30b6 Dep. 80:16-81:4, 114:2-6, 115:9-19.

    There was only one CNB-owned van in 2021 at the Canandaigua branch, and Wemes did not have the code to access the van key himself. Wemes Dec. ¶ 46.

20. In approximately 2019, Wemes received a promotion, which entailed both increased workplace responsibilities and a change from a part-time to a full-time employment status with CNB. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 61:15-66:25.

    **PLAINTIFF'S RESPONSE:** Undisputed

21. Throughout the course of his employment, Wemes was generally well-regarded by co-workers.

*See* MP Aff. at ¶ 32.

    **PLAINTIFF'S RESPONSE:** Undisputed

22. Wemes received annual increases to his compensation throughout his tenure with CNB. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 58:4-15.

    **PLAINTIFF'S RESPONSE:** Undisputed

23. Wemes received annual discretionary bonuses throughout his tenure with CNB. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 58:21-60:12.

    **PLAINTIFF'S RESPONSE:** Disputed. The testimony reflects Wemes could not recall with certainty whether he received a discretionary bonus every year: "I can't vouch that we got a bonus every year."

24. Wemes also received positive performance reviews throughout his tenure with CNB. *See* RTB Aff. at **Exhibit F**, Pedzich Dep. 16:2-7.

    **PLAINTIFF'S RESPONSE:** Undisputed. Plaintiff's performance reviews "were all rated far above expectations."

25. Wemes never received workplace discipline. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 104:9-14; *see also See* RTB Aff. at **Exhibit F**, Pedzich Dep. 16:8-12.

    **PLAINTIFF'S RESPONSE:** Undisputed.

26. In 2021, Wemes was nominated for CNB's Arthur Hamlin Award by his co-workers. *See* MP

Aff. at ¶ 32; *see also* RTB Aff. at **Exhibit E**, Wemes Dep. 102:17-104:13; *id.* at **Exhibit F**, Pedzich Dep. 25:2-15; *id.* at **Exhibit J**, Best Dep. 13:13-23; *id.* at **Exhibit K**, Wagner Dep. 10:13-24.

    **PLAINTIFF'S RESPONSE:** Undisputed.

27. Several of Wemes' co-workers created a short video as part of the nomination process for the Arthur Hamlin Award and to congratulate Wemes for the same, including, *inter alia,* his Supervisor, Jason Ingalls ("Ingalls"). *See* RTB Aff. at **Exhibit E**, Wemes Dep. 103:5-104:5.

    **PLAINTIFF'S RESPONSE:** Undisputed. *See also* SMF ¶ 130.

28. Ingalls became Wemes' Supervisor in or around February 2021. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 118:10-119:9; *see also id.* at **Exhibit G**, Ingalls 30(b)(6) Dep.12:7-9.

    **PLAINTIFF'S RESPONSE:** Undisputed.

### III. The Alleged Stray Remarks[1]

29. Wemes alleges several discrete acts claimed to have been undertaken by Ingalls after he became Wemes' Supervisor. *See* RTB Aff. at **Exhibit A** at ¶¶ 29 through 34**.**

    **PLAINTIFF'S RESPONSE:** Disputed that these were "discrete acts." *See* SMF ¶¶ 122-130.

30. Ingalls never made the comments that Wemes alleges. *See* RTB Aff. at **Exhibit H**, Ingalls Dep.

---

[1] Plaintiff disputes these were only "alleged stray remarks."

8:24-9:1.

    **PLAINTIFF'S RESPONSE:** Disputed. *See* SMF ¶¶ 122-130.


31.   Wemes alleges that, "[a]t times, Ingalls would log in with [Ingalls'] own credential on the computer in Wemes' cubicle." RTB Aff. at **Exhibit A** at ¶ 29.

    **PLAINTIFF'S RESPONSE:** Undisputed.


32.   During his employment, Wemes was issued a CNB-owned computer. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 79:21-24, 114:23-115:3.

    **PLAINTIFF'S RESPONSE:** Undisputed.


33.   Access to Wemes' CNB-provided workplace computer required a unique username and password. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 80:3-10, 112:15-19.

    **PLAINTIFF'S RESPONSE:** Undisputed.


34.   Ingalls never logged into Wemes' workplace computer. *See* RTB Aff. at **Exhibit J**, Best Dep. 30:19-21.

    **PLAINTIFF'S RESPONSE:** Disputed. *See* Wemes Dep. 113:22-114:13 (Ingalls logged into Wemes' work computer before and after he became his supervisor); Pedzich 30b6 Dep. 88:15-89:14 (a bank employee could use their own credentials to log into and use another bank employee's computer).


35.   Wemes alleges that, "Ingalls said that the picture of [Wemes] and his husband displayed in

[Wemes'] cubicle was inappropriate for work. [Wemes] then asked Ingalls why this picture was inappropriate when there were other cubicles and offices with pictures of opposite-sex spouses." RTB Aff. at **Exhibit A**, ¶ 30.

**PLAINTIFF'S RESPONSE:** Undisputed. *See also* SMF ¶ 125.

36. Wemes admits that he was never made to remove and never removed the photograph of him and his husband on his desk. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 127:9-11.

**PLAINTIFF'S RESPONSE:** Disputed. The deposition testimony cited only confirms Wemes did not remove the picture of him and his husband in opposition to Ingalls' demand, not that he was "never made to remove" the picture.

37. Wemes further admits that his rate of pay was never altered for his allegedly having and maintaining the alleged photograph of him and his husband in his cubicle. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 140:25-141:3.

**PLAINTIFF'S RESPONSE:** Undisputed.

38. Wemes further admits that his working hours were never diminished for his allegedly having and maintaining the alleged photograph of him and his husband in his cubicle. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 141:4-5.

**PLAINTIFF'S RESPONSE:** Undisputed

39. Wemes further admits that he was never subjected to discipline for his allegedly having and maintaining the alleged photograph of him and his husband in his cubicle. *See* RTB Aff. at

**Exhibit E**, Wemes Dep. 140:19-24.

    **PLAINTIFF'S RESPONSE:** Undisputed that CNB never expressly cited the photograph as the reason for any formal discipline.


40.   Wemes alleges that, "Ingalls asked [Wemes] why [a Human Rights Campaign] sticker was displayed [in Wemes' cubicle] and told [Wemes] that 'we don't need that' and that it 'doesn't need to be here.' [Wemes] asked Ingalls why he thought that, and responded that the sticker wasn't hurting anyone." RTB Aff. at **Exhibit A**, ¶ 31.

    **PLAINTIFF'S RESPONSE:** Undisputed. *See also* SMF ¶ 124.


41.   Wemes admits that he was never made to remove and never removed the "Human Rights Campaign" sticker in his cubicle. *See* RTB Aff. at **Exhibit E**, Wemes Dep. Wemes Dep. 188:23-129:4.

    **PLAINTIFF'S RESPONSE:** Disputed. Wemes did not remove the Human Rights Campaign (HRC) sticker in opposition to Ingalls' demand. *See* SMF ¶ 124.


42.   Wemes further admits that his rate of pay was never altered for his allegedly hanging and maintaining the "Human Rights Campaign" sticker in his cubicle. *See* Wemes Dep. 140:5-8.

    **PLAINTIFF'S RESPONSE:** Undisputed.


43.   Wemes further admits that his working hours were never diminished for his allegedly hanging and maintaining the "Human Rights Campaign" sticker in his cubicle. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 140:16-18.

**PLAINTIFF'S RESPONSE:** Undisputed.

44. Wemes further admits that he was never subjected to discipline for his allegedly hanging and maintaining the "Human Rights Campaign" sticker in his cubicle. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 140:19-24.

> **PLAINTIFF'S RESPONSE:** Undisputed that CNB never expressly cited the HRC sticker as the reason for any formal discipline.

45. Wemes alleges that, "[w]hile at a [CNB] social outing, [Wemes] was with a group of employees which included Ingalls. Ingalls was talking about gender pronouns in a mocking manner. [Wemes] responded that gender pronouns should not be a joking matter. In response Ingalls shot [Wemes] a dirty look. The conversation about gender pronouns then stopped." RTB Aff. at **Exhibit A**, ¶ 32.

> **PLAINTIFF'S RESPONSE:** Undisputed. *See also* SMF ¶ 126.

46. The discussion alleged by Wemes occurring at an outing actually concerned CNB installing gender-neutral restrooms and an unknown individual putting a "no pets" sign on the restroom door as a joke. *See* RTB Aff. at **Exhibit K**, Wagner Dep. 20:18-21:9.

> **PLAINTIFF'S RESPONSE:** Disputed. Ingalls joked it was difficult to tell whether a transgender employee was male or female. Barb Wagner, CNB's Operations Director, then asked to Ingalls what his pronouns were, to which there was laughter. Wemes responded that this was not a joking matter, and that conversation subject ended. Wemes Dep. 143:17-145:23; Wemes Dec. ¶ 11; Wagner Dep. 8:24-9:6. *See also* SMF ¶ 126.

47. Wemes admits that that his rate of pay was never altered in relation to the alleged discussion concerning gender pronouns and his alleged response thereto. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 146:3-5.

   **PLAINTIFF'S RESPONSE:** Undisputed.

48. Wemes further admits that his workplace responsibilities were never diminished in relation to the alleged discussion concerning gender pronouns and his alleged response thereto. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 146:9-10.

   **PLAINTIFF'S RESPONSE:** Undisputed.

49. Wemes further admits that he was never subjected to discipline in relation to the alleged discussion concerning gender pronouns and his alleged response thereto. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 140:19-24.

   **PLAINTIFF'S RESPONSE:** Disputed. The portion of Wemes' deposition transcript cited does not concern the discussion concerning gender pronouns.

50. Wemes alleges that, "[o]n around April 2021, [Wemes] was working near Ingalls, who began to make a comment around another co-worker then abruptly stopped, saying that [Wemes] 'didn't like women like that.' [Wemes] then asked Ingalls what his personal life had to do with his work." RTB Aff. at **Exhibit A**, ¶ 33.

   **PLAINTIFF'S RESPONSE:** Undisputed. *See also* SMF ¶ 127.

13

51. Wemes admits that his rate of pay was never altered in relation to Ingall's alleged comment concerning his sexual preferences or his alleged response thereto. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 155:17-20.

    **PLAINTIFF'S RESPONSE:** Undisputed.

52. Wemes further admits that his workplace responsibilities were never diminished in relation to Ingall's alleged comment concerning his sexual preferences or his alleged response thereto. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 155:21-25.

    **PLAINTIFF'S RESPONSE:** Undisputed.

53. Wemes further admits that he was never subjected to discipline for his allegedly having and maintaining the alleged photograph of him and his husband in his cubicle. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 140:19-24.

    **PLAINTIFF'S RESPONSE:** Undisputed that CNB never expressly cited the photograph as the reason for any formal discipline.

54. Wemes alleges that, "[a]t times Ingalls would mock [Wemes] when he was on the phone by repeating what [Wemes] had said in a high-pitched voice." RTB Aff. at **Exhibit A**, ¶ 34.

    **PLAINTIFF'S RESPONSE:** Undisputed. *See also* SMF ¶ 128-29.

55. Ingalls never mocked Wemes in a high-pitched voice. *See* RTB Aff. at **Exhibit J**, Best. Dep. 30:22-24; RTB Aff. at **Exhibit H**, Ingalls Dep. 8:24-9:1.

    **PLAINTIFF'S RESPONSE:** Disputed. Wemes Dep. 156:5-158:12. See also SMF ¶ 128-

29.

56. Notwithstanding, Wemes admits that Ingalls allegedly mocking his voice occurred prior to Ingalls becoming his Supervisor. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 156:5-17.

    **PLAINTIFF'S RESPONSE:** Disputed in part. Ingalls mocked Wemes' voice both before and after Ingalls became Wemes' supervisor. *See* SMF ¶ 128-29.

57. Wemes admits that he never actually complained to CNB of any of the conduct alleged of Ingalls, despite being aware of his ability to do so, and only "pushed back" in response to Ingalls' alleged comments to better understand said comments by asking clarifying questions such as: "Why is this inappropriate"; and "What is going on that I don't know about." *See* RTB Aff. at **Exhibit E**, Wemes Dep. 85:16-86:16 (explaining his understanding of CNB's reporting policies), 118:6-8:

    Q: [D]id you complain to anyone at CNB about Jason Ingalls' allegedly logging into your computer with his credentials?

    A: No.;

129:8-130:15:

    Q: Did you ever complain to anyone about Ingalls's [*sic*] alleged comments about the photograph?

    A: Yes, I did.

    Q: Who did you complain to?

    A: Jason Ingalls.

    Q: Didn't you testify earlier that it – if the complaint was against the Supervisor, could you bring it to HR?

    A: Yes, I did.

Q: Why didn't you bring this complaint to HR?

A: Because the way that the – the comment was made to me by Jason and the situation, I pushed back and said, "Why is this inappropriate?" And "What is going on that I don't know about?" to get a better understanding and answer from Jay Ingalls's comment. That was me – that was me reporting to him, asking for an explanation.

Q: And what, if anything, was the response?

A: There was not much of a response. It was more or less laughing it off and walking away.

Q: And you consider confronting the person you're complaining about to rise to the level of a complaint?

A: The first time I wouldn't really say it was a complaint. It was more of trying to get a better understanding what the issue is. You know. Understanding that "Hey, you're the Supervisor. You should" – you know, "If there is an issue, you should give me a reason for the issue and not just shrug it off.";

141:6-12:

Q: Did you ever complain to anyone about Jason Ingalls' alleged comments about the human rights campaign sticker?

A: [Yes – Jason Ingalls, just not to human resources] – just a comment of – like to Naomi Best – "What is his deal?"

Q: And Naomi was one your subordinates?

A: Yes.;

145:24-146:2:

Q: Did you ever complain to anyone at [CNB] about this – exchange [at the social outing where Ingalls is alleged to have made a transphobic joke]?

A: I did not, no. No;

156:2-4:

Q: Did you complain to anybody at CNB about Ingalls' alleged comment [that Wemes did not like women "like that"]?

A: I did not, no. No.;

159:60-160:10

Q: Did you complain to anybody at [CNB] about paragraph 35 – the allegations that  you're making [that Ingalls mocked him]?

A: I said something to Naomi Best about it.

Q: And again, Naomi is your subordinate?

A: Uh-huh. Yes. I said something to Sean Quinlan, as well.

Q: Was Sean Quinlan a Supervisor?

A: No.

161:22-162:10:

Q: Apart from the instances you have already testified about today where you confronted Jason Ingalls about the behavior that you allege, did you complain to anyone at [CNB] at any time  about potential discrimination?

A: No.

**PLAINTIFF'S RESPONSE:** Disputed in part. Ingalls is an officer of CNB and was Wemes' supervisor. Ingalls 30b6 Dep. 9:11-13; Wemes Dec. ¶ 7. Further, CNB's Policy states in part that: "a complaint regarding Equal Employment Opportunity, should be directed to the employee's or intern's supervisor or to Human Resources," "Supervisors are responsible for immediately reporting and responding to a discrimination complaint," an employee "who has been subjected to behavior that may constitute sexual harassment is encouraged to  report such behavior to a supervisor or Human Resources," and "supervisors who receive a complaint or information about suspected sexual harassment, observe what may be sexually harassing behavior or for any reason suspect  that  sexual  harassment  is occurring,  are  required  to  report  such suspected sexual harassment to Human Resources."

17

MP Aff., **Ex. A** at DEF00213, DEF00219.

58. Ingalls has no workplace history whatsoever concerning discrimination or retaliation in any form. *See* MP Aff. at ¶¶ 34 and 35.

> **PLAINTIFF'S RESPONSE:** Disputed. *See* SMF ¶¶ 123-130, and Wemes' causes of action in this lawsuit.

**IV.  Law Enforcement's Investigation of June 29, 2021,
Wherein Wemes Admits that He was Suspected to have Solicited a Minor for Sex**

    **A.  The Investigation**

59. On June 29, 2021, the Canandaigua Police Department ("CPD"), working in conjunction with the Ontario County Sheriff's Office ("OCSO") (CPD and OCSO collectively "Law Enforcement"), engaged in an undercover criminal investigation concerning the solicitation of a minor for sex (the "Investigation"). *See* RTB Aff. at **Exhibit D**; *see also id.* at **Exhibit M**, Visingard Dep. 13:6-14:24; *id.* at **Exhibit N**, Bowerman Dep. 12:5-13:17, 17:17-24; *id.* at **Exhibit F**, Pedzich Dep. 32:15-19.

> **PLAINTIFF'S RESPONSE:** Undisputed.

60. The Investigation entailed CPD Detective Daniel Visingard ("Detective Visingard") creating a social media profile, posing as a minor child (a fourteen (14) year old boy), and waiting for potential suspects to initiate and engage in conversation with the "fake" profile. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 13:6-14:10; *see also id.* at **Exhibit** N, Bowerman Dep. 13:9-17.

> **PLAINTIFF'S RESPONSE:** Undisputed.

61. At approximately 2 p.m. on June 29, 2021, Detective Visingard began engaging in a text message conversation on the social media app "GRINDR" with another, unknown individual. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 21:3-7; *id.* at **Exhibit N**, Bowerman Dep. 40:10-15; *see also id.* at **Exhibit D**.

    **PLAINTIFF'S RESPONSE:** Undisputed.

62. During Detective Visingard's text message conversation with the unknown individual, he identified himself as a fourteen (14) year old boy. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 19:21-20:15, 26:13-20; *see also id.* at **Exhibit D.**

    **PLAINTIFF'S RESPONSE:** Undisputed.

63. The individual with whom Detective Visingard was communicating sent several messages that were sexual in nature. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 26:13-20; *see also id.* at **Exhibit D**.

    **PLAINTIFF'S RESPONSE:** Undisputed.

64. The individual with whom Detective Visingard was communicating while posing as a fourteen (14) year old boy told Detective Visingard that he wanted to engage in oral sex. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 26:13-20; *see also id.* at **Exhibit D**.

    **PLAINTIFF'S RESPONSE:** Undisputed.

65. The individual with whom Detective Visingard was communicating while he was posing as a fourteen (14) year old boy requested that they meet in a lockable bathroom located in the

basement of the Main Office at 72 South Main St., Canandaigua, New York. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 26:21-27:18; *see also id.* at **Exhibit D**.

> **PLAINTIFF'S RESPONSE:** Disputed. Bowerman testified that the "arrangement was to meet in that basement or lower level bathroom at the bank office on Main Street." Bowerman Dep. 22:6-15.
>
> Additionally, as further set forth below and in Wemes' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Visingard has an interest in the outcome of this case and thus a motive to lie, which would allow a reasonable jury to reject his testimony outright. Specifically, Visingard testified that he wants to help CNB in this lawsuit: after CNB informed him that Wemes had brought a lawsuit over this matter, only then did he first prepare the Incident Report to "help" CNB. Visingard Dep. 52:5-53:7.[2] Additionally, Wemes also testified overhearing Visingard, Ingalls, and Vince Yacuzzo, CNB's Chief Financial Officer, discussing spending personal time together at youth sporting events, being together on a golf course, and wine tastings. SMF ¶ 168.

66. On June 29, 2021, Detective Visingard and OCSO Investigator Nathan Bowerman ("Investigator Bowerman") went to the Main Office in furtherance of the Investigation. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 28:13-29:18; *see also id.* at **Exhibit N**, Bowerman Dep. 22:18-23:22; *id*. at **Exhibit D.**

> **PLAINTIFF'S RESPONSE:** Undisputed.

67. Upon Law Enforcement's arrival at the Main Office, Detective Visingard positioned himself in

---

[2] For ease of reading, Plaintiff avoids repeating that Visingard is an interested witness for each of Defendant's SMF, and asserts this position throughout.

the bathroom located in the basement while Investigator Bowerman, also in the basement, positioned himself near the access door to a stairway. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 28:17-21, 29:13-18; *id.* at **Exhibit N**, Bowerman Dep. 23:8-24:12; *id.* at **Exhibit D**.

> **PLAINTIFF'S RESPONSE:** Disputed. Bowerman also testified that he positioned himself "outside of the bathrooms in the lower level." Bowerman Dep. 22:18-21. Bowerman further testified that he was standing "off to the side away from the bathroom entrance" near CNB's "security deposit boxes." Bowerman Dep. 23:13-22.
>
> Additionally, Visingard walked around CNB to ask other employees to show them a picture of the suspect and ask if they had seen him. SMF ¶¶ 138-140; SMF ¶ 180, **Exs. 13, 15**.

68. The GRINDR app allows users to track the physical location and proximity of another user's mobile phone when they are directly communicating. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 32:23-33:9; *id.* at **Exhibit N**, Bowerman Dep. 46:6-7; *id* at **Exhibit D.**

> **PLAINTIFF'S RESPONSE:** Disputed. Bowerman lacked any personal knowledge about Grindr, testifying that he had never used a social media app like Grindr before; it was Visingard who used Grindr that day. Bowerman Dep. 13:9-14:3.
>
> Finally, the accuracy of Grindr's location tracking of users cannot be credited on summary judgment because it is outside the ken of the average layperson, and CNB does not attempt to qualify Visingard and Bowerman as experts. *See Fane v. Zimmer, Inc*., 927 F.2d 124, 131 (2d Cir. 1991) (issues of which "an ordinary person would [not] come into contact" are "beyond the sphere of the ordinary juryman and require[] expert testimony").

69. While in the basement bathroom of the Main Office, Detective Visingard observed the location of the individual with whom he had been communicating approach to within five (5) feet of his location. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 32:8-33:9; *id.* at **Exhibit D.**

 **PLAINTIFF'S RESPONSE:** Disputed.

 Visingard's testimony on this fact is implausible. He testified that he was waiting in the bathroom for "around five minutes," and waited to exit the bathroom "a minute or two" after Wemes went upstairs after interacting with Bowerman in the basement. Visingard Dep. 33:13-34:10. It defies credibility that Visingard, whose mission was to find and arrest a suspected pedophile, would have seen the suspect approaching his location on Grindr to the point he was only five feet away, then moving farther away after departing the location, and Visingard waited one to two minutes before exiting the bathroom.

 Additionally, Visingard testified that he was waiting in the bathroom while Wemes interacted with Bowerman, and could not see or hear them while in there. Visingard Dep. 29:13-30:4; 36:3-15. If true, Visingard would not know where Wemes was located compared with what Grindr purportedly showed on his phone.

70. Wemes appeared in the vicinity where Law Enforcement was in the basement of the Main Office while the GRINDR app showed the individual with whom Detective Visingard had been communicating to be five (5) feet away. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 32:8-33:24; *id*. at **Exhibit D**.

 **PLAINTIFF'S RESPONSE:** Disputed. *See* Pltf.'s Resp. SMF ¶ 69.

 Additionally, Bowerman testified that Visingard, his co-investigator, never told him that

Grindr showed that the suspect was close to him while in the bank. Bowerman Dep. 45:25-46:18.

71. Other than Law Enforcement, Wemes was the only other individual in the basement of the Main Office when the GRINDR app showed the individual with whom Detective Visingard had been communicating to be five (5) feet away. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 32:8-33:24; *id.* at **Exhibit D**.

> **PLAINTIFF'S RESPONSE:** Disputed. The evidence cited for this purported fact does not support the assertion that Wemes was the only other individual in the entire basement of the Main Office. *See also* Pltf.'s Resp. SMF ¶¶ 69, 70. Further, because CNB has not offered any expert testimony on the reliability of Grindr's location data tracking when in a multi-floor building, the suspect could have been above Visingard on another floor.

72. Upon his arrival into the basement of the Main Office from the access door of the internal stairway, Wemes interacted with Investigator Bowerman, who identified himself as Law Enforcement, and Wemes turned around and left the area. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 33:25-36: 7; *id.* at **Exhibit N**, Bowerman Dep. 24:6-25, 41:23-42:4; *id.* at **Exhibit D**.

> **PLAINTIFF'S RESPONSE:** Disputed.
>
> <u>Visingard.</u> Visingard indeed testified to the facts cited in this paragraph. Visingard Dep. 33:25-36: 7. But Visingard also contradicted himself, testifying that he was waiting in the bathroom while Wemes interacted with Bowerman, yet could not see or hear them while in there. Visingard Dep. 29:13-30:4; 36:3-15. Visingard said he exited the bathroom "a minute

or two" after Wemes went upstairs after interacting with Bowerman in the basement. Visingard Dep. 33:13-34:10. He does not know whether Bowerman identified himself as a law enforcement officer during this interaction. Visingard Dep. 36:3-15. Visingard also contradicted himself about his recollection of the conversation he may have had with Bowerman after exiting the bathroom. Visingard Dep. 29:22-30:4 (recalling what Bowerman told Visingard about Bowerman's interaction with Wemes in the basement); 36:16-37:4 (Visingard could not recall what he and Bowerman spoke about "after [he left] the bathroom"). Finally, Visingard's affidavit, filed in support of CNB's summary judgment motion, further contradicts his testimony. Visingard averred that he "observed the location of the suspect approach to within five (5) feet of where I stood," and Wemes was considered a suspect "immediately upon his initial interaction with *myself* and Investigator Bowerman in the basement…." DV Aff. ¶¶ 12-14 (emphasis added).

<u>Bowerman.</u> Bowerman directly contradicts this purported fact. Bowerman testified that when Wemes saw him, Wemes asked if he could help Bowerman and showed his bank identification. Bowerman Dep. 24:4-15. Bowerman then identified himself as a police officer and stated that he was "looking for someone in the building." *Id.* Bowerman also testified that Visingard exited the bathroom and spoke with him and Wemes in the basement. Bowerman Dep. 26:4-8. Bowerman had no recollection whether Visingard spoke to Wemes during this initial interaction. Bowerman Dep. 38:16-20. Bowerman testified that his interaction with Wemes in the basement did not necessarily end, but that Wemes led him and Visingard to the employee side of the bank to view surveillance footage in a "continuous interaction." Bowerman Dep. 26:13-23.

<u>CNB.</u> CNB claims that after a detective showed Wemes his police badge, "Wemes turned

around and promptly left the lower lobby." Declaration of Gregory L. Silverman dated June

30, 2025 ("GLS Dec.") ¶ 3, **Ex. 1** at DEF00452.

<u>Wemes</u>. Wemes' testimony on the scope and extent of his initial interaction with Bowerman

and Visingard in the basement contradicts this purported fact. *See* SMF ¶¶ 131-137.

73. Soon after Wemes left the basement area of the Main Office, the individual with whom

Detective Visingard had been communicating blocked the fake GRINDR profile, which deleted

the content of the conversation. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 34:11-35:11.

**PLAINTIFF'S RESPONSE:** Disputed. <u>Visingard</u> did testify to these facts. He also

testified that after Wemes' initial interaction with Bowerman, the pictures that the suspect

shared of himself in their Grindr conversation were also deleted. Visingard Dep. 35:12-16.

Visingard's Incident Report, however, states that he showed Ingalls and Hernandez pictures

of the suspect after the initial basement encounter. RTB Aff. **Ex. D** ("I advised JI and JH

that a picture was sent to me of a male inside of vehicle. Both Ingalls and Hernandez

identified the vehicle as the one belonging to the CNB. You could see a mountain dew can

in the picture and Ingalls advised me that Wemes is always drinking mountain dew").

<u>Bowerman</u> testified that he did not believe Visingard ever told him that he no longer had

the contents of the pictures on June 29. Bowerman Dep. 45:9-24.

The <u>Canandaigua Police Department</u> (CPD) testified that Visingard told them that his

Grindr account was flagged as fraudulent and his account was later deactivated, so he was

unable to preserve the conversation between himself and the suspect, which occurred after

the investigation at the bank. GLS Dec. ¶ 4, **Ex. 2**, Deposition transcript of City of

Canandaigua Police Department through its designee Chief Matthew Nielsen ("CPD 30b6

Dep.") 24:14-25-19.

Ingalls and Hernandez stated that Visingard showed them pictures of the suspect after he said they were deleted. GLS Dec. ¶ 8 **Ex. 8** at DEF00569-70 ("17:24 - Joe Hernandez introduced himself to Dan Visingard and Nathan Bowerman, investigators from the Ontario County Sheriff's Office"; "The officer showed [Hernandez] two distinct pictures.")

Further contradicting this fact, Ingalls' memo states that law enforcement said that Grindr showed the suspect a few feet away when they were upstairs near Wemes' desk. GLS Dec. ¶ 8 **Ex. 8** at DEF00571. ("Officer stated the last known location of the person was within feet of him when he was in the building near Jason Wemes Desk"). Wemes' desk was on the second floor of the operations building. Wemes Dep. 157:12-18.

Wemes testified that law enforcement showed him the Second Picture after their basement encounter. *See* SMF ¶¶ 160.

74. Law Enforcement concluded that Wemes was the suspect of the Investigation. *See* RTB Aff. at **Exhibit D**; *id.* at **Exhibit N**, Bowerman Dep. 43:17-44:3; *id.* at **Exhibit M**, Visingard Dep. 37:3-9; *see also* DV Aff. at ¶¶ 14 through 15.

**PLAINTIFF'S RESPONSE:** Disputed. Bowerman testified that after his first interaction with Wemes in the basement that Wemes was not a possible suspect. Bowerman Dep. 27:7-12 ("Q. After you spoke with Mr. Wemes in the basement, do you believe that he was a possible suspect? A. Not -- I didn't right away. It was a little while after as we continued the investigation.")

Hernandez does not recall if law enforcement said they believed Wemes was their suspect.

Hernandez Dep. 47:4-7.

75. Law Enforcement concluded that Wemes was the suspect of the Investigation immediately following their initial interaction in the basement of the Main Office. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 37:3-9:

> Q: Did you believe [Wemes] was the suspect at that point?
>
> A: A million percent, yes. There is no doubt in my mind, at all, that [Wemes] is the suspect that was trying to rape a 14-year-old child, in a bathroom, at the bank. No doubt. One million percent.

**PLAINTIFF'S RESPONSE:** Disputed. Visingard's testimony concerning whether he personally interacted with Wemes in the basement, or could see or hear where Wemes was while he was in the bathroom, is contradictory. *See* Pl.'s Resp. SMF ¶¶ 69, 72.

Bowerman, who did testify about this, said he did not believe Wemes was the suspect after he asked Wemes if he had seen the suspect. Bowerman Dep. 27:7-12.

Wemes' testimony shows that law enforcement did not consider him a suspect during this initial interaction when Bowerman at first declined Wemes' offer for help, and then showed him a picture of the suspect's face to inquire whether Wemes had seen the suspect they were looking for. SMF ¶¶ 131-137.

Kristy Merriman, then a CNB assistant branch manager, testified that law enforcement approached her with a picture of an individual who did not look like Wemes, and asked her if she had seen that person, showing that law enforcement did not initially consider Wemes a suspect. SMF ¶¶ 138-140.

Hernandez did not believe Wemes was the suspect based on the suspect's picture. Hernandez Dep. 49:14-19.

76. Law Enforcement made the determination that Wemes was the suspect of the Investigation based on based on several facts:

A. Wemes' location in comparison to the location of the suspect Detective Visingard was communicating with on GRINDR. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 44:7-18 ("I think he, being by the bathroom, when we were supposed to meet is pretty significant. You know. Him saying – the app he's five feet away and, holy mackerel, [Wemes] is five feet away. That's pretty significant"); *id.* at **Exhibit N,** Bowerman Dep. 37:24-38:2, 38:21-39;

> **PLAINTIFF'S RESPONSE:** Disputed. As shown above, Visingard could not have known where Wemes was in the basement based on his testimony that he was waiting out the bathroom without the ability to see or hear anything, and only exited one to two minutes after Wemes had left the area (but how he would know that is subject to dispute). SMF ¶¶ 69-70.
>
> Ingalls testified that law enforcement did not arrest Wemes partly because his job involved him working at the same location as the purported meeting location. Ingalls 30b6 Dep. 87:16-88:12.
>
> Bowerman testified Wemes was not a suspect after their initial interaction, and that Visingard never told him Grindr showed that the suspect was close to him while in the bank. Bowerman Dep. 27:7-12; 45:25-46:18.

B. In a picture the suspect sent to Detective Visingard over the GRINDR platform of their lower body (the "Picture"), a "lanyard" or "badge reel" is visibly attached to a CNB identification badge, which was the same as the lanyard/badge reel worn by Wemes during

his interactions with Law Enforcement. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 42:6-44:18 ("… [o]bviously having that lanyard is a big key to it, because it's literally impossible to have the exact same strings off on your lanyard on the picture that you sent …"); *id.* at **Exhibit N**, Bowerman Dep. 35:9-13 ("… the [P]icture from within the vehicle and the retractable lanyard that was visible … was almost an exact match for the lanyard that [Wemes] had on his belt at the time…"), 38:21-39:3; *id.* at **Exhibit D**; and

     **PLAINTIFF'S RESPONSE:** Disputed.

     <u>Visingard</u> testified that the picture which showed this purported "lanyard" or "badge reel" *only* showed a lanyard around one's neck, not a badge reel attached to a belt like the one Wemes (in the red shirt) was wearing.; Visingard Dep. 43:3-23; GLS Dec. ¶ 9, **Ex. 9**; Wemes Dec. ¶ 47. Further contradicting this purported fact, Visingard testified that the picture never showed "a CNB identification badge" attached. Visingard Dep. 43:16-19 ("Q. Did you recall seeing like an ID attached to a clip, like, attached to a belt loop, like shown in this picture?  A. No."). Visingard's Incident Report contradicts his deposition testimony, where he said he "observed the lanyard, same ID and the exact same string on the ID." RTB Aff. **Ex. D**; Visingard Dep. 42:6-21 (when he wrote in the Incident Report that he saw the "same ID," Visingard really meant the lanyard: "I'm referencing the ID as the lanyard.")

     <u>Bowerman's</u> testimony also contradicts this purported fact. Instead of a lanyard around the neck, Bowerman said that the picture showed a "retractable lanyard viewable in the picture that was clipped to the belt area." Bowerman Dep. 21:2-7; 35:6-13. Bowerman, like Visingard, testified that the picture never showed a CNB identification badge: "I don't think you could see the ID." Bowerman Dep. 21:8-14.

CNB, through Pedzich, testified that there was a "badge reel that was unique to Mr. Wemes," in that "it was not a standard-issued CNB badge reel, that it was of a different design." Pedzich 30b6 Dep. 76:19-77:10. Pedzich never mentioned that CNB was aware a "CNB identification badge" was visible in the suspect's picture. The only individuals associated with the Bank that saw the pictures of the suspect obtained by law enforcement were Wemes, Ingalls, and Hernandez. Pedzich 30b6 26:21-30:6; RTB Aff., **Ex. S**, Nos. 7 and 8. While Wemes returned his badge, CNB destroyed it. Pedzich 30b6 Dep. 50:2-20.

Hernandez. His notes in Ingalls Memo only mentions a "specific badge *zip line*" that was "the same *zip line* Jason Wemes was in possession of." **Ex. 8** at DEF00570 (emphasis added). This memo never mentions that one could see a CNB ID badge. *Id.* Hernandez also testified that CNB provides two options for employees: either a lanyard around the neck, or a badge zip that is hooked onto the belt loop. Hernandez Dep. 19:2-22. Unlike the purported fact above, and contradicting the testimony of Bowerman, Visingard, and Ingalls, Hernandez said the suspect's picture showed numbers on two-thirds of the badge that was visible. Hernandez Dep. 20:11-21:5.

Ingalls contradicted Visingard's "lanyard" testimony, stating that the picture showed a "silver retractable reel that was on a belt on the right side of [Wemes'] body." Ingalls 30b6 Dep. 55:19-25. While CNB gives out badge reels that "are actually branded with a CNB logo on it," the picture did not show a badge reel with a CNB logo. Ingalls 30b6 Dep. 56:21-57:9. Ingalls also testified that the picture showed a white ID badge, but it was not CNB issued, and could not recall if it belonged to Wemes. Ingalls 30b6 Dep. 55:19-56:8. Finally, Ingalls contradicted himself later in

his deposition, testifying that law enforcement communicated to CNB that "the badge reel, the badge itself, and then that clasped that attached to the badge were consistent." Ingalls 30b6 Dep. 74:10-18.

<u>Wemes</u> testified that the suspect had a different badge reel than him. He was wearing a badge reel with a CNB logo that day, which slid onto his belt. The suspect's badge reel did not have a CNB logo, and was connected with a carabiner clip. Further, the suspect's badge was white with no writing. Wemes' badge had his picture and CNB's logo on the front, and the back had written instructions about how to contact CNB if it was found. SMF ¶¶ 160, 164.

C.  Other similarities relating to Wemes and the CNB vehicle that was available to him and parked at the Main Office and the vehicle in a picture sent through GRINDR. *See* RTB Aff. at **Exhibit M**, Visingard Dep.47:4-25; *id.* at **Exhibit N**, Bowerman Dep. 31:23-32:15, 38:21-39:3.

   **PLAINTIFF'S RESPONSE:** Disputed.

   <u>Visingard</u>. The portion of Visingard's testimony cited above states that a picture the suspect sent showed the inside of a vehicle with a mountain dew can; Ingalls identified the vehicle as a CNB van and relayed that Wemes "loves the Mountain Dew." Visingard Dep.47:4-25; RTB Aff. **Ex. D**. Visingard also testified that Ingalls and Hernandez were with him when they checked the CNB van and found a mountain dew can. *Id.* Visingard implausibly did not collect the can as evidence, including for possible finger printing, because "drinking Mountain Dew is not

against the law." Visingard Dep. 48:2-20.

Hernandez testified that he recalled that the suspect's picture showed a "penny on the dash with a mountain dew can." Hernandez Dep. 16:11-17:13. But when Hernandez looked into CNB's van, he only recalled "seeing the penny. I don't recall seeing anything else." Hernandez Dep. 17:4-7. Hernandez did not recall if anyone else was with him when he viewed the van, if he viewed the van on the day law enforcement was present, or the next day. Hernandez Dep. 17:19-19:1.[3]

Ingalls testified that he only viewed Wemes' personal vehicle and only with Visingard, that Wemes' personal vehicle did not match the suspect's picture, and that he never viewed a CNB-owned van with law enforcement. Ingalls 30b6 Dep. 62:25-64:14. As to the mountain dew can, Ingalls did not recall seeing this in the suspect's picture. Ingalls 30b6 Dep. 52:8-55:18. Law enforcement never communicated to Ingalls that the Mountain Dew can was a reason they believed the suspect was Wemes. Ingalls 30b6 Dep. 75:7-76:12. Contrary to Visingard's testimony concerning Wemes' preference for mountain dew, Ingalls testified CNB never communicated to law enforcement any reason why Wemes could have been the suspect. Ingalls 30b6 Dep. 77:3-8.

Bowerman testified that CNB showed law enforcement a CNB-owned van in the parking lot, but does not recall whether a CNB employee came with him and Visingard to look at it. Bowerman Dep. 29:6-19. Bowerman did not cite a penny or mountain dew as items in the suspect's picture that were similar to what he saw in the CNB van. Bowerman Dep. 30:11-31:3.

---

[3] CNB has no valid objection to this testimony.

**B. Wemes Admits that He was Law Enforcement's Suspect**

77. On June 29, 2021, Law Enforcement advised Wemes that he was the suspect the Investigation.

    *See* RTB Aff. at **Exhibit M**, Visingard Dep. 37:3-9; *id.* at **Exhibit N**, Bowerman Dep. 37:18-

    23; *id.* at **Exhibit E**, Wemes Dep. 168:17-169:7:

> Q: So did law enforcement then advise you you [*sic*] were a suspect
> on that day?
>
> A: He – the one investigator said that he was 99.8 percent sure that
> it was me. But he said he was going to subpoena GRINDR and
> kept on saying "You'd just make it easier on yourself if you just
> come clean." I said, "I'm not going to admit to something that I
> did not do and be a scapegoat" is what I told him.
>
> Q: I'm sorry. You said the investigator told you it was 99.8 percent?
> Is that what you said?
>
> A: I believe it was 99.8 percent. I just know he said 99 percent.

> **PLAINTIFF'S RESPONSE:** Undisputed. Additionally, law enforcement did not believe
>
> Wemes was their suspect after their initial basement encounter, and only advised Wemes he
>
> was a suspect after Ingalls became involved. Pl.'s Resp. SMF ¶ 75; SMF ¶¶ 131-137, 155-
>
> 56

78. Wemes admits to his understanding that Law Enforcement identified him at the suspect of the

    Investigation the same day the Investigation occurred. *See* RTB Aff. at **Exhibit E**, Wemes Dep.

    168:17-169:7 ("…the one investigator said that he was 99.8 percent sure that it was me…"),

    175:19-23:

> Q: So to – to repeat the question, as of June 29th, 2021, you were
> aware that you were the suspect of the – of law enforcement's

investigation, correct?

A: Correct.

*id*. at **Exhibit J**, Best Dep. 18:20-19:6:

Q: Did you see Jason Wemes after he left the IT room?

A: Yes.

Q: And did you talk with him about what happened in that room?

A: Yes.

Q: And what did the two of you discuss?

A: He told me that they believed he was someone they were looking for because they recognized his badge and the string was tattered on his badge, and he was cutting it up and putting it in the garbage.

**PLAINTIFF'S RESPONSE:** Undisputed. Additionally, law enforcement did not believe Wemes was their suspect after their initial basement encounter, and only advised Wemes he was a suspect after Ingalls became involved. Pl.'s Resp. SMF ¶ 77.

79. Law Enforcement advised Wemes the reasons why he was believed to be the suspect the day that it initially transpired. *See* RTB Aff. at **Exhibit N**, Bowerman Dep. 37:18-23; *see also* DV Aff. at ¶ 16 ("Plaintiff Jason Wemes was advised that he was considered the suspect of the investigation on June 29, 2021.")

**PLAINTIFF'S RESPONSE:** Disputed. The "day it initially transpired" is vague and indecipherable because this purported fact does not define "it." Additionally, law enforcement did not believe Wemes was their suspect after their initial basement encounter, and only advised Wemes he was a suspect after Ingalls became involved. Pl.'s Resp. SMF ¶ 77.

80. On the day of the Investigation, Wemes told his subordinate, Naomi Best, of his understanding of Law Enforcement's belief that his CNB issued badge and badge-reel were similar to the suspect of the Investigation. *See* RTB Aff. at **Exhibit J**, Best Dep. 20:13-16.

   **PLAINTIFF'S RESPONSE:** Disputed. Wemes told Best that he was not the suspect, but that law enforcement was saying that the suspect's badge looked similar. Wemes Dec. ¶ 35.

81. Immediately following his interaction with Law Enforcement, Wemes destroyed the CNB issued badge and badge-reel that Law Enforcement had used, in part, to identify him as the suspect. *See* RTB Aff. at **Exhibit J**, Best Dep. 19:2-20:7.

   **PLAINTIFF'S RESPONSE:** Disputed. Wemes never did this, and turned in the same badge and badge reel he was wearing on June 29, 2021 to CNB upon his suspension. Wemes Dec. ¶ 41.

### C. Wemes Admits Law Enforcement Advised CNB that He was the Suspect

82. On June 29, 2021, Law Enforcement also advised CNB that Wemes was their suspect. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 40:4-20; *id.* at **Exhibit N**, Bowerman Dep. 41:10-19, 42:24-43:2; *id.* at **Exhibit G**, Ingalls 30(b)(6) Dep. 77:3-8; *id.* at **Exhibit H**, Ingalls Dep. 10:19-21; *id.* at **Exhibit D.**

   **PLAINTIFF'S RESPONSE:** Disputed. Bowerman's cited testimony only describes what Visingard told CNB, not what he independently communicated. Bowerman Dep. 41:10-19, 42:24-43:2 (only explaining what Visingard did).

83. Law Enforcement further advised CNB that, although Wemes was the suspect, there was

insufficient evidence to press charges. *See* RTB Aff. at **Exhibit N**, Bowerman Dep. 41:10-19;

*id.* at **Exhibit F**, Pedzich Dep. 42:8-23; *id* at **Exhibit M**, Visingard Dep. 40:4-20:

> Q: The incident report says that you and Investigator Bowerman ended up speaking with Jason Ingalls. Do you recall the substance of that conversation with Mr. Ingalls?
>
> A: It was in reference to [Wemes] wanting to rape a child in the bathroom of the bank.
>
> Q: What eventually led to Mr. Ingalls escorting you up to speak to my client?
>
> A: Because he was trying to rape a child.
>
> Q: Is that what you told Mr. Ingalls?
>
> A: I don't remember our exact conversation, but it's involving [Wemes] trying to rape a child in a bathroom.
>
> Q: So would it be fair to say that, generally speaking, you told Mr. Ingalls you believed my client was a suspect at that point?
>
> A: He a million percent was a suspect, yes.;

*id.* at **Exhibit G**, Ingalls 30(b)(6) Dep. 66:18-70:12:

> The officer explained that when they were both in the main office lower level by the bathrooms and safe deposit area, it showed them together. And then, [Wemes] went back to the operations building, and they could see that activity, also, where it showed him at the main office and the suspect was in the operations building. And that's what was told to me. I – I did not view any of that … I'm not positive based on that, but [law enforcement] were pretty adamant that they had the correct suspect.;

*id.* at **Exhibit D** ("I advised both Hernandez and Ingalls that there was no doubt in my mind hat

I was in fact communicating with [Wemes] but I didn't have enough to charge him"); *see also*

DV Aff. at ¶ 17 ("On June 29, 2021, I also advised CNB – specifically, its security personnel

with whom I interacted, Jason Ingalls and Joseph Hernandez – that Wemes was the suspect").

    **PLAINTIFF'S RESPONSE:** Disputed. Visingard is inherently contradictory on the issue of whether there was probable cause to arrest Wemes. His Incident Report states in part: "I advised both Hernandez and Ingalls that there was *no doubt* in my mind that I was in fact communicating with Wemes but I didn't have enough to charge him." RTB Aff. at **Ex. D** (emphasis added).

Further, if Visingard had "no doubt" Wemes was the suspect after questioning him, he violated CPD's General Orders by not arresting him. CPD's General Orders state that if an officer has "reasonable suspicion" a crime has been committed, they "shall conduct an investigative detention." GLS Dec. ¶ 5, **Ex. 3**, at CPD-000032, CPD's General Order 500, III(A)(2). An "investigative detention" is the process of determining whether the person detained is the "person that's the target of the investigation as well as a review of evidence to determine if they established the level of probable cause, over reasonable suspicion to make the arrest." CDP 30b6 Dep. 31:23-32:9. An investigative detention includes questioning of a potential suspect. *Id.*

CPD's General Orders state that if an officer has probable cause, they shall arrest. GLS Dec. ¶ 5, **Ex. 3**, at CPD-000033, General Order 500, III(A)(6) (if it becomes "apparent that there is probable cause to believe that the detainee has committed a criminal offense, the detainee <u>shall</u> then be placed under arrest") (emphasis added); CPD 30b6 Dep. 32:12-16 (probable cause "is when you have enough evidence to believe that a person has committed a crime.")

The testimony cited for Bowerman simply recites what Visingard said, and did not include his personal opinion. Bowerman Dep. 41:10-19

84. Wemes admits to his understanding that Law Enforcement advised CNB that he was the suspect

of the Investigation the day it occurred. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 175:24-176:12

> Q: Were you aware that on June 29th, 2021, that law enforcement had advised CNB that you were the suspect?
>
> A: They talked to Jason Ingalls, yes. I was – I can be 100 percent sure that it was said to them, yes.
>
> Q: You're – I'm sorry. I didn't quite understand that. You're 100 percent sure that law enforcement conveyed that to Jason –
>
> A: Jason Ingalls, yes.
>
> Q: What about Joseph Hernandez?
>
> A: Joseph Hernandez, as well, yes.;

203:10-20:

> Q: So what I'm asking is very specific. Law enforcement gave Jason Ingalls and Joe Hernandez a very specific piece of information that you were the suspect in their investigation.   When Jason Ingalls – if he repeats that at all, how can that be characterized as a lie?
> …
>
> A: So – even though they said I was a suspect – is what the police said – but not by [CNB] – [CNB] never conducted the investigation. So him spreading falsifying information, meaning that I was not the person – I was a suspect which was later, from my understanding – never came to light. So it – it is still spreading a lie, yes. Because it's – I understand that the police are saying I was a suspect, but for Jason to spread it through [CNB] when [CNB] said I wasn't a suspect – so that's why it is considered a lie.

**PLAINTIFF'S RESPONSE:** Disputed in part. Law enforcement did not

believe Wemes was their suspect after their initial basement encounter, and

only advised Wemes he was a suspect after Ingalls became involved. *See*

Pl.'s Resp. SMF ¶ 77

Wemes has consistently alleged from the beginning that Jason Ingalls was

involved in encouraging law enforcement to focus their attention on him.

RTB Aff. **Ex. C** at ¶¶ 8, 10, 12-13; **Ex. O**, Original Compl. at ¶¶ 3-6; **Ex. A**,

First Am. Compl. ¶¶ 3-7. Law enforcement's and Ingalls' testimony on when

Ingalls first encountered law enforcement is inconsistent. *See* SMF ¶¶ 148-

156.


### D. Wemes Admits that, as Security Personnel, Ingalls and Hernandez were Required to Report to CNB that Law Enforcement Considered Him as the Suspect

85. Wemes admits that CNB had no involvement whatsoever in Law Enforcement appearing at the

Main Office or Operations facilities on June 29, 2021. *See* RTB Aff. at **Exhibit E**, Wemes Dep.

215:19-22.

    **PLAINTIFF'S RESPONSE:** Undisputed.


86. At all relevant times, Ingalls was employed by CNB as its Manager of Facilities and Physical

Security. *See* RTB Aff. at **Exhibit G**, Ingalls 30(b)(6) Dep. 11:25-12:4.

    **PLAINTIFF'S RESPONSE:** Undisputed. Additionally, Ingalls is an officer of CNB.

Ingalls 30b6 Dep. 9:11-13.


87. At all relevant times, Joseph Hernandez ("Hernandez") was also employed by CNB as a

Physical Security Officer. *See* RTB Aff. at **Exhibit I**, Hernandez Dep. 8:9-11.

    **PLAINTIFF'S RESPONSE:** Undisputed. Additionally, Hernandez is an officer of CNB.

Hernandez Dep. 49:11-13.

88. Wemes admits that both Ingalls and Hernandez, in their roles as CNB Security Personnel, were required to inform CNB of potentially unlawful activity conducted by an employee, as well as any information learned from Law Enforcement. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 176:22-178:8, 195:5-8, 202:2-7.

> **PLAINTIFF'S RESPONSE:** Undisputed.

### E. Law Enforcement Independently Made the Determination that Wemes was Suspect

89. Ingalls never communicated to Law Enforcement a belief that Wemes could have been the suspect of the Investigation. *See* RTB Aff. at **Exhibit G**, Ingalls 30(b)(6) Dep. 77:3-8; *see also* DV Aff. at ¶ 20 ("No individual at CNB ever communicated to CPD or OCSO that Plaintiff Jason Wemes was the suspect of our investigation or otherwise attempted to lead law enforcement in the direction of suspecting Plaintiff Jason Wemes").

> **PLAINTIFF'S RESPONSE:** Disputed. Visingard's Incident Report states that the suspect sent a picture in which a mountain dew can could be seen, and that "Ingalls advised me that Wemes is always drinking mountain dew." RTB Aff. **Ex. D**; Visingard Dep.47:4-25.

90. Rather, Law Enforcement advised Ingalls that Wemes was the suspect of the Investigation. *See* RTB Aff. at **Exhibit G**, Ingalls 30(b)(6) Dep. 77:3-8; *id.* at **Exhibit M**, Visingard Dep. 40:4-20:

> Q: The incident report says that you and Investigator Bowerman ended up speaking with Jason Ingalls. Do you recall the substance of that conversation with Mr. Ingalls?

A:  It was in reference to your client wanting to rape a child in the
    bathroom of the bank.

Q:  What eventually led to Mr. Ingalls escorting you up to speak to
    my client?

A;  Because he was trying to rape a child.

Q:  Is that what you told Mr. Ingalls?

A:  I don't remember our exact conversation, but it's involving your
    client trying to rape a child in a bathroom.

Q:  So would it be fair to say that, generally speaking, you told Mr.
    Ingalls you believed my client was a suspect at that point?

A:  He a million percent was a suspect, yes.

**PLAINTIFF'S RESPONSE:** Disputed in part. Even assuming it could be credited on

summary judgment that law enforcement advised Ingalls that Wemes was the suspect, it

was because of Ingalls' involvement in the investigation. *See* Pl.'s Resp. SMF ¶ 84.

91.  Ingalls had no impact on the Investigation or the determination that Wemes was the suspect.

*See* DV Aff. at ¶ 23.

**PLAINTIFF'S RESPONSE:** Disputed. *See* Pl.'s Resp. SMF ¶ 90.

92.  Wemes admits that his allegation concerning Ingalls having "tainted" Law Enforcement's

Investigation is based solely on his subjective belief that Ingalls and Detective Visingard are

"best friends." *See* RTB Aff. at **Exhibit E**, Wemes Dep. 216:18-217:16, 222:14-25.

**PLAINTIFF'S RESPONSE:** Disputed. Wemes testified that law enforcement's presence

"was a perfect opportunity [for Ingalls to] get me involved in an investigation that would

get me terminated." Wemes Dep. 219:18-220:1. He also testified that his termination would

benefit Ingalls who would not have to work with him anymore. Wemes Dep. 223:2-19. *See also* Pl.'s Resp. SMF ¶ 84.

93. Neither Detective Visingard nor Investigator Bowerman knew Ingalls prior to Law Enforcement's presence at CNB's Canandaigua offices on June 29, 2021. *See* RTB Aff. at **Exhibit M**, Visingard Dep. 38:10-19; *id.* at **Exhibit N**, Bowerman Dep. 28:7-14; *id.* at **Exhibit H**, Ingalls Dep. 10:6-18; *see also* DV Aff. at ¶¶ 21 through 22.

   **PLAINTIFF'S RESPONSE:** Disputed. Wemes overheard Visingard and Ingalls having conversations which suggested they spent personal time together. *See* SMF ¶ 168.

94. Wemes admits that he has no evidence to support his suspicion or otherwise contradict Law Enforcement's testimony that the determination that he was the suspect of the Investigation was made independently by Detective Visingard and/or Investigator Bowerman. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 223:20-224:8.

   **PLAINTIFF'S RESPONSE:** Disputed. Wemes' response to the question was he had no "physical proof." *See also* Pl.'s Resp. SMF ¶¶ 77, 84, 93; SMF ¶¶ 131-137, 148-156, 177-197.

## V. Wemes' Suspension and Termination

### A. Wemes Admits that His Suspension was the Direct Result of the Investigation

95. On June 30, 2021, a meeting was convened amongst Frank Hamlin (CNB's President and Chief Executive Officer ("Hamlin")), Vincet Yacuzzo (CNB's Executive Vice President and Chief Financial Officer) ("Yacuzzo"), Barbara Wagner (Senior Vice President and Director of

Operations) ("Wagner"), Pedzich, and Ingalls to discuss Wemes and the Investigation. *See* RTB

Aff. at **Exhibit F**, Pedzich Dep. 13:19-20, 45:7-19; *id*. at **Exhibit K**, Wagner Dep. 9:2-3, 11:23-

24, 14:6-22.

> **PLAINTIFF'S RESPONSE:** Undisputed. Additionally, at this meeting it was Ingalls who
>
> communicated to the participants that law enforcement purportedly had no doubt their
>
> suspect was Wemes. Pedzich 30b6 Dep. 46:22-47:8; 48:21-49:2.

96. The purpose of the June 30, 2021 meeting "was to decide was [CNB's] next steps were going

to be based on law enforcement communicating to [it] that they had no doubt that [Wemes] was

the prime suspect in their sex offender investigation." RTB Aff. at **Exhibit F**, Pedzich Dep.

46:24-47:5.

> **PLAINTIFF'S RESPONSE:** Undisputed. Additionally, Jason Ingalls was the only
>
> individual at this meeting who communicated with law enforcement about the investigation.
>
> Pedzich Dep. 45:7-47:16; 48:8-49:2.

97. Pedzich made the recommendation to place Wemes on paid administrative leave pending the

outcome of the Investigation. *See* RTB Aff. at **Exhibit F**, Pedzich Dep. 47:17-48:7.

> **PLAINTIFF'S RESPONSE:** Disputed. Pedzich testified that the purpose of paid
>
> administrative leave was to "let the police investigation play out." Pedzich 30b6 Dep. 47:9-
>
> 16. Further, Pedzich told Wemes CNB was going to conduct their own internal
>
> investigation. Wemes Dep. 184:5-24.

98. The determination to approve Pedzich's recommendation was made by Hamlin. *See* RTB Aff.

at **Exhibit F**, Pedzich Dep. 47:17-48:7.

   **PLAINTIFF'S RESPONSE:** Undisputed that Hamlin was the ultimate decisionmaker.


99. In making the determination to place Wemes on paid administrative leave, CNB was "only

reacting to the information provided by [L]aw [E]nforcement to Mr. Ingalls stating that they –

that [Wemes] was their prime suspect in their sex offender investigation." *See* RTB Aff. at

**Exhibit F**, Pedzich Dep. 48:21-49:2, 70:22-25.

   **PLAINTIFF'S RESPONSE:** Disputed. *See* Pl.'s Resp. SMF ¶¶ 77, 84.


100. At approximately 4:15 p.m. on June 30, 2021, Pedzich and Ingalls called Wemes to inform him

that he was being placed on paid administrative leave pending the outcome of the Investigation.

*See* RTB Aff. at **Exhibit F**, Pedzich Dep. 49:3-14.

   **PLAINTIFF'S RESPONSE:** Disputed. *See* Pltf.'s Response to SMF ¶ 97.


101. Wemes admits to his understanding that CNB suspended him as the direct result of Law

Enforcement's Investigation. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 184:5-24:

   Q: So you were advised on June 30th why you were being
      suspended?

   A: Yes.

   Q: And you understood the reasons why you were being suspended?

   A: They had to go through – [CNB] had to do their due diligence to
      let the law enforcement complete their investigation while [CNB]
      did their internal investigation. And that once everything came to

light, then it would be determined if I was coming back or not.;

185:17-23:

> Q: You were explicitly told on June 30th the reasons for your suspension, though? That is what you just testified, correct?

> A: Yes. They told me that due to the investigation by police, they had to conduct their own internal investigation, as well. That is why I was being put on suspension.;

192:4-16.

> A: … And that the police gave [CNB] the information and said that – or the – [CNB] took what the police had said and made their sole discretion on getting rid of me with their – their statement and what they found.

> Q: And by "they," you mean law enforcement?

> A: Law enforcement. Yes.

> Q: So to summarize and correct me if I'm wrong, it's your understanding that [CNB] acted solely on what law enforcement was advising them?

> A: Yes...

*see also id.* at **Exhibit J**, Best Dep. 25:20-26:5.

**PLAINTIFF'S RESPONSE:** Disputed. *See* Pltf.'s Response to SMF ¶¶ 77, 84.

**B. Wemes Admits that His Termination was the Direct Result of the Investigation**

102. On July 12, 2021, a follow-up meeting was convened to again discuss Wemes and the Investigation. *See* RTB Aff. at **Exhibit F**, Pedzich Dep. 82:13-19; *see also id.* at **Exhibit K**, *Wagner* Dep.17:11-15.

**PLAINTIFF'S RESPONSE:** Disputed. Wagner testified that the decision to terminate Wemes was made the week after June 30, which could not have been on June 12. Wagner

Dep. 18:1-10.

103. Present at the July 12, 2021 meeting were Hamlin, Yacuzzo, Pedzich, Wagner, and Ingalls. *See* RTB Aff. at **Exhibit F**, Pedzich Dep. 82:18-22.

    **PLAINTIFF'S RESPONSE:** Disputed in part. *See* Pl.'s Resp. SMF ¶ 102.

104. All present at the meeting of July 12, 2021 were unanimously in support of the recommendation to terminate Wemes' employment. *See* RTB Aff. at **Exhibit F**, Pedzich Dep. 83:20-84:9.

    **PLAINTIFF'S RESPONSE:** Disputed in part. *See* Pl.'s Resp. SMF ¶ 102.

105. Hamlin made the determination to terminate Wemes' employment. *See* MP Aff. at ¶ 45; *see also* RTB Aff. at **Exhibit F**, Pedzich Dep. 83:20-84:2; *id.* at **Exhibit K**, Wager Dep. 18:19-22.

    **PLAINTIFF'S RESPONSE:** Undisputed that Hamlin was the ultimate decisionmaker.

106. On July 12, 2021, CNB terminated Wemes' employment. *See* RTB Aff. at **Exhibit F**, Pedzich Dep.43:7-8; *see also* MP Aff. at ¶ 46; *see also id.* at **Exhibit F**.

    **PLAINTIFF'S RESPONSE:** Undisputed that CNB provided Wemes with a termination letter dated July 12, 2021 that stated he was terminated. MP Aff. at **Ex. G**. Disputed that CNB made the decision to terminate Wemes' employment on July 12, 2021. *See* Pl.'s Resp. to SMF ¶ 102.

107. Wemes admits to his understanding that his July 12, 2021 termination was the direct result of the Law Enforcement's Investigation. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 188:24-190:20:

Q: Paragraph 1 of your Complaint – Exhibit 1 if you want to look straight at it – it states in paragraph 1, quote, "Before the Bank terminated Plaintiff with no reason," and then it goes on. That's an inaccurate statement, is it not?

A: No.

Q: Well, I mean – you were advised of the reasons for your termination, were you not?

A: I reached out to Michelle [Pedzich] and asked – Michelle. Let me rephrase that. Michelle called me to tell me that I was being let go as an employee and I had requested a reason why on the phone and it was not given to me. So I requested – so I had something in paper form for a reason why.

Q: What day are you referring to that this happened?

A: I'm sorry?

Q: What is the date that you're referring to this happened, you were called?

A: Um, so – so it wasn't even a full week of suspension. I think it was like four days, that I recall. The fourth day or the fifth day is when I got the call from Michelle saying they were terminating my employment. And I asked for a reason. And she said, "Due to the circumstances of the investigation." From what I can remember today. But I did reach out and ask for a – an exact reason, for a paper form and an email to be sent to me as to why I was let go, terminated from the position.

Q: You were looking for that to be relayed in writing to some effect?

A: Yes.

Q: But Michelle Pedzich did relate to you it was because of the circumstances surrounding the investigation – or law enforcement's investigation on June 29th, 2021, is why you were being terminated?

A: Yes. And also part of the internal investigation that was taking place.;

209:22-210:4:

47

Q: How were you advised of your termination?

A: I received a phone call from Michelle saying that they were – we were separating ways. And I asked, "Why?" They said, "Due to the investigation."

*see also* MP Aff. at ¶¶ 47 through 48 and at **Exhibit H**.

> **PLAINTIFF'S RESPONSE:** Disputed in part. Wemes' testimony above reflects that Pedzich informed him was terminated due to law enforcement's investigation and CNB's internal investigation. *See also* Pl.'s Resp. SMF ¶¶ 77, 84.

### IV.  Wemes Received All Compensation to which He is Legally Entitled

108.  At all relevant times during his employment with CNB, Wemes was compensated on an hourly basis. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 227:4-6; *see also* MP Aff. at ¶¶ 30, 41.

> **PLAINTIFF'S RESPONSE:** Undisputed.

109.  Wemes admits that as an hourly employee, he was only entitled to compensation for hours that he actually worked. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 227:7-9.

> **PLAINTIFF'S RESPONSE:** Disputed. Pedzich represented to Wemes that his suspension would be paid. Pedzich 30b6 Dep. 49:3-8.

110.  Wemes received compensation during the term of suspension. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 226:22-227:3; *see also* MP Aff. at ¶¶ 41 through 42, *see also id.* at **Exhibit F**.

> **PLAINTIFF'S RESPONSE:** Undisputed.

111.  Wemes performed no work for CNB after June 30, 2021. *See* RTB Aff. at **Exhibit E**, Wemes

Dep. 226:16-18; *see also* MP Aff. at ¶ 40.

    **PLAINTIFF'S RESPONSE:** Undisputed.


112. On July 12, 2021, Wemes received his final paycheck from CNB and was compensated as follows:

- Wemes received his regular rate of pay for the twenty-eight and 77/100 (28.77) hours of time he actually worked prior to his suspension on June 28, 29, and 30, 2021;

- Wemes received his regular rate of pay for eight (8) hours corresponding to a CNB paid, non-working holiday for July 5, 2021;

- Wemes received his regular rate of pay for seventy-two (72) hours, corresponding to personal time that Wemes was given during his term of suspension; and

- Wemes received his regular rate of pay for fifty-one (51) hours, corresponding to the payout of his accrued but unused vacation time.

*See* RTB Aff. at **Exhibit F**, Pedzich Dep. 54:5-56:7; *see also* MP Aff. at **Exhibit F**.

    **PLAINTIFF'S RESPONSE:** Disputed. Wemes had 49 hours of accrued yet unused vacation time that CNB did not pay. Wemes had 116 hours of vacation time to use in 2021. GLS Dec. ¶ 12, **Ex. 23** at DEF00338. In 2021, before his termination, Wemes only used 16 hours of vacation time. *Id.* at DEF00346. Accordingly, he had 100 hours of accrued but unused vacation time when he was terminated. CNB's termination letter represented that it would Wemes for his "accrued, unused vacation time, will be deposited on July 16, 2021." MP Aff. **Ex. G**. CNB only paid out 51 hours of vacation time upon Wemes' termination. Pedzich 30b6 Dep. 54:5-56:7; GLS Dec. ¶ 12, **Ex. 23** at DF00337.

113.   Wemes did not earn the seventy-two (72) hours of personal time that he was paid. *See* RTB Aff.

at **Exhibit F**, Pedzich Dep. 55:25-57:19; *see also* MP Aff. at ¶ 43.

> **PLAINTIFF'S RESPONSE:** Disputed. Wemes was informed that he would be suspended
>
> with pay for two weeks, or 80 hours. Pedzich 30b6 Dep. 54:5-25.

114.   Wemes was paid his accrued but unused vacation time at termination, even though CNB does

not typically pay the same to employees who separate involuntarily. *See* RTB Aff. at **Exhibit**

**F**, Pedzich Dep. 55:12-24; *see also* MP Aff. at ¶ 24 and at **Exhibit A**, DEF00244, DEF00273,

DEF00277.

> **PLAINTIFF'S RESPONSE:** Disputed in part. *See* Pltf.'s Resp. SMF ¶ 102.

### IV. The Incident Report

115.   On or about August 17, 2021, Detective Visingard completed an incident report with respect to

the Investigation (the "Incident Report"). *See* RTB Aff. at **Exhibit D**.

> **PLAINTIFF'S RESPONSE:** Undisputed.

116.   The Incident Report provides, in pertinent part:

> On June 29, 2021, at approximately 1400 hours I engaged into [*sic*]
> a text message conversation with another male on the social media
> app GRINDR. During my text message conversation I identified
> myself as a 14 year old child. I note that the male I communicated
> with sent me several text messages that were sexual in nature. The
> male advised me that he wanted to have oral sex with me and wanted
> me to meet him in the downstairs bathroom at 72 South Main Street.
>
> Investigator Bowerman (OCSD) and I did approach the area of 72
> South Main Street. I went to the downstairs bathroom while
> Investigator Bowerman conducted surveillance in the stairway area.
> At one point a custodial worker, who was identified as [Wemes],

came into the area and asked Investigator Bowerman if he needed anything. Investigator Bowerman advised [Wemes] that he was allset [*sic*] and [Wemes] left the area. At that point the GRINDR app said the male I was speaking to was 5 feet away and after [Wemes] left the area the male no lon[g]er communicated with me.

Myself and Investigator Bowerman ended up speaking with Jason Ingalls who is the bank security manager. I advised Ingalls of the investigation and he escorted us to speak with [Wemes]. I note that [Wemes] was not at his desk in another wing of the bank. I spoke with [Wemes] and he denied ever being on the app GRINDR and that he didn't attempt to meet anyone. I note a couple of things in regards to [Wemes]. During my text message conversation [Wemes] sent me a picture of his lower body. In the picture I could see a lanyard with an ID. I note that the lanyard had a string attached to it on the ID. While I spoke with [Wemes] I observed the same lanyard, same ID and the exact same string on the ID.

**After speaking with [Wemes] I again spoke with Ingalls and security officer Joseph Hernandez. I advised Ingalls and Hernandez that a picture was sent to me of a male inside of vehicle. Both Ingalls and Hernandez identified the vehicle as the one belonging to [CNB]. You could see a [M]ountain [D]ew can in the picture and Ingalls advised me that [Wemes] is always drinking [M]ountain [D]ew. I advised both Hernandez and Ingalls that there was no doubt in my mind that I was in fact communication with [Wemes] but I didn't have enough to charge him.**

RTB Aff. at **Exhibit D**. (emphasis added).

> **PLAINTIFF'S RESPONSE:** Disputed. Visingard's entire Incident Report
>
> is pertinent.

117. Wemes reviewed the Incident Report prior to commencing his pending instant action against

CNB. *See* RTB Aff. at **Exhibit E**, Wemes Dep. 172:16-19.

> **PLAINTIFF'S RESPONSE:** Undisputed.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

118. Wemes was employed by CNB as a Custodial Supervisor from 2014 until his termination in July 2021. Declaration of Jason Wemes dated June 30, 2025 ("Wemes Dec.") ¶¶ 2-3.

119. Wemes' duties as a Custodial Supervisor included scheduling and supervising cleaning staff (many of whom had developmental delays), ensuring office and common areas were properly cleaned, ordering supplies, and performing custodial duties himself. Wemes Dec. ¶ 4.

120. During the final three years of Wemes' employment at CNB, his previous supervisor Brett Elliot gave him "Far Exceeds Expectations" as his overall performance evaluation for 2018-2020. Wemes Dec. ¶ 5. GLS Dec. ¶ 3, **Ex. 1** at DEF00498-538.

**Wemes' supervisor Jason Ingalls repeatedly made homophobic comments**

121. Wemes mainly worked in CNB's Canandaigua office, where it was well-known that he was a gay man with a male partner. Wemes Dec. ¶ 6.

122. In or around February 2021, Jason Ingalls became Wemes' direct supervisor. Wemes Dec. ¶ 7.

123. Afterwards, Ingalls made several disparaging comments to Wemes because he was a gay man. Wemes Dec. ¶ 8.

124. In March 2021 Ingalls pointed to a Human Rights Campaign sticker (blue with a yellow equals sign) Wemes had hanging in his cubicle. Ingalls asked Wemes why this sticker was displayed and told him that "we don't need that" and that it "doesn't need to be here." Wemes asked Ingalls why he thought that, and said that the sticker wasn't hurting anyone. Ingalls responded with a laugh and looked at Wemes like he was an idiot, and walked away. Wemes Dec. ¶ 9.

125. Ingalls also told Wemes that a photo of him and his husband displayed in Wemes' cubicle – which Ingalls directly pointed to – was inappropriate for work. Wemes asked him why this picture was inappropriate when there were other cubicles and offices with pictures of opposite-

sex spouses; Ingalls responded by laughing and walking away. Before Wemes' termination, Ingalls made another similar comment about this picture one week before Wemes' suspension on June 30, 2021. Wemes Dec. ¶ 10. Ingalls would also say he "needed a bigger box for all this stuff," insinuating that Wemes would be leaving his job. Wemes Dep. 130:16-131:4.

126. In the spring of 2021, Wemes was with a group of employees at a social outing, which included Ingalls. Some employees were discussing a transgender employee at Bushnell's Basin. Ingalls, in a mocking manner, commented that when he made the employee ID badge he was unsure what gender to specify. Barb Wagner asked Ingalls what his pronouns were in a joking way. Wemes responded that gender pronouns should not be a joking matter. In response Ingalls shot Wemes a dirty look. Wemes Dec. ¶ 11.

127. In or around April 2021, Ingalls and two other individuals were standing and talking near an elevator. Wemes approached the group with a greeting, in sum or substance, "Hey, what's going on?" The conversation stopped, and Ingalls said, "Jason doesn't like women like that." Wemes got onto the elevator with the group. Then when the group had left and Wemes and Ingalls were alone in the elevator, Wemes asked Ingalls what his personal life had to do with work. Ingalls responded, in sum or substance, "You read into things too much." Wemes Dec. ¶ 12.

128. At other times Ingalls would mock Wemes when he was on the phone by repeating what Wemes had said in a high-pitched voice. The first time Ingalls did this was a few months before Ingalls became Wemes' supervisor. After Wemes said on the phone, "I had to make an executive decision," Ingalls parroted it in a high-pitch mocking tone and flipped his hand in a stereotypical feminine manner. Wemes Dec. ¶ 13.

129. Another time, a couple weeks after Ingalls became supervisor, Wemes was on the phone and could hear Ingalls mocking him in a high-pitched voice. Then Wemes asked Ingalls if there was

an issue with him. Ingalls responded with an angry look. Wemes Dec. ¶ 14.

130. In 2021 Wemes was nominated to receive the Arthur Hamlin Award, which is given out each year to recognize an exceptional employee. GLS Dec. ¶ 6, **Ex. 4**. Various people in CNB's Facilities Department made a surprise video for this nomination which was played for CNB employees. Wemes received a copy of this video via text message from Kayla Domville on June 10, 2021. Wemes Dec. ¶¶ 15, 16, **Exs. 5 and 6.** In the video Ingalls appears as the only man in black shit and the only person to mispronounce his last name as "Wee-mees" so it sounded like "weenies," the slang word for penis.

**During their first encounter Bowerman and Visingard showed Wemes a picture of the suspect and asked if he had seen him**

131. While at work on June 29, 2021 Wemes was in the basement as part of his normal routine when he encountered a man casually dressed looking into the safety deposit room through the glass window on the door. Wemes had previously encountered customers in that location looking to get into the safe deposit box room; he would call the teller line to have someone come down and open the door. Wemes Dec. ¶ 17.

132. Wemes did not know at the time, but now understands this man to have been Nathan Bowerman with the Ontario County Sheriff's Office. Wemes asked Bowerman if he needed assistance. Bowerman said "no"; Wemes responded, "are you sure?"; he said "yes." Wemes Dec. ¶ 18.

133. Wemes turned around to go into another door, but Bowerman said "Actually, I have a question for you. Have you seen this person?" He showed Wemes a picture on his cell phone depicting a heavyset man with black hair, sunglasses, and a thick black beard taking a "selfie" of himself (referred to as the "First Picture"). Wemes Dec. ¶ 19.

134. Bowerman testified that Wemes approached him and said "Can I help you with something?" Bowerman Dep. 24:1-15. Bowerman responded by identifying himself as a police officer and

stated that he was looking for someone in the building. *Id.*

135. Wemes has brown hair and had never grown a beard during his employment with CNB. Wemes Dec. ¶ 20.

136. Wemes said he had seen that person at the Green Front Restaurant a few weeks ago, and had likely seen him at CNB previously. Wemes Dec. ¶ 21.

137. Afterwards another man appeared to have come out of the bathroom, who Wemes now understands to have been Canandaigua Police Department officer Daniel Visingard. Visingard showed Wemes his badge and said they were looking for that person because he was attempting to lure a minor into the bathroom. Wemes said he would contact the head of security, Jason Ingalls. They said that was not necessary because they were going to go back upstairs and look around. Wemes Dec. ¶ 22. Wemes went back to work. Wemes Dec. ¶ 23.

**The suspect "definitely" did not look like Wemes**

138. Kristy Merriman was an assistant branch manager in 2021. GLS Dec. ¶ 7, **Ex. 7**, Deposition transcript of Kristy Merriman on September 30, 2024 ("Merriman Dep.") 9:24-25.

139. Merriman testified that an undercover law enforcement officer came to her while at work, identified themselves, showed her a picture on a phone, and asked her if she had seen that person at the bank. Merriman Dep. 10:24-10; 13:3-8.

140. Merriman testified that the individual in the picture did not resemble Wemes. Merriman Dep. 13:15-17.

141. Jason Ingalls prepared a memo concerning law enforcement's presence at CNB. GLS Dec. ¶ 8, **Ex. 8**. Ingalls said potions of this memo were authored by Hernandez, including under "Joe H Notes." Ingalls 30b6 Dep. 21:19-25:5.

142. Ingalls' memo states that: "Two pictures were exchanged during the text conversation via the

Grindr App.  One picture was of a heavy-set white male with a hat, sunglasses, full beard driving a car." **Ex. 8** at DEF00569.

143.  Under "Joe H Notes" Ingalls' memo states in part:

> Dan had specific pictures asking if I knew who a person was in a picture and asking if it could be Jason Wemes. I looked over the picture and couldn't identify who the person was in the picture but <u>it definitely did not look like Jason Wemes</u>.

**Ex. 8** at DEF00569 (emphasis added).

144.  Hernandez did not believe Wemes was the suspect based on the "picture of the person," and did not request a copy of the pictures the suspect sent law enforcement. Hernandez Dep. 46:12-21, 49:14-19.

145.  Ingalls testified that he could see the face of the suspect in the picture, he agreed that it "definitely" did not look like Wemes. Ingalls 30b6 Dep. 50:12-51:15. He could not recall if law enforcement asked him if that person could be Wemes, or why he did not request a copy of the suspect's pictures. Ingalls 30b6 Dep. 51:10-12, 79:23-80:15.

146.  Bowerman testified that the suspect sent two pictures, one of which was a "selfie-style photo" where the suspect's face was showing. Bowerman Dep. 19:2-20:17. The "selfie" of the suspect did not look like Wemes. Bowerman Dep. 39:10-24.

147.  Visingard testified that the suspect sent three to four pictures, but never sent a picture of his face. Visingard Dep. 31:3-11.

**Ingalls, Visingard, and Bowerman contradict each other about when Ingalls first interacted with law enforcement.**

148.  After Merriman told law enforcement that she had not seen the person in the picture, she called Jason Ingalls to inform him of what happened. Merriman Dep. 13:18-14:4.

149.  Ingalls' memo states in part, under "Joe H Notes," that:

> I received a phone call from Kristy Merriman, assistant branch manager of main

office at approximately 4:45pm….Jason Ingalls was in the office and answered my phone putting the phone on speaker….I overheard Jason and Kristy talk about someone in the branch flashing a badge and mentioned they were here looking for a potential child abductor.  I was still working out an issue with the power outage with Gwen and at that same time <u>Jason left the office I presumed him to be heading over to address the situation</u>.

**Exhibit 8** at DEF00568 (emphasis added);

150. Ingalls testified that Merriman told him law enforcement showed her a picture of the suspect, but does not recall if she said what the suspect looked like. Ingalls 30b6 Dep. 29:22-30:15.

151. Ingalls testified that after Merriman told him about her interaction with law enforcement, he looked down Main St. for two male officers, returned inside, and Merriman told him the officers were downstairs in the safe deposit lobby. Ingalls 30b6 Dep. 31:7-32:8.

152. Ingalls testified that he went to the safe deposit lobby, did not see anyone there, was walking around the bank trying to find them, and then at "some point, I ended up on the second floor" and saw law enforcement near Wemes' cubicle. Ingalls 30b6 Dep. 32:13-34:20.[4]

153. Ingalls' memo, under "Joe H Notes," states that "I found out later that the investigators ran into Tim Tepedino and Tim brought the investigators up to Jason Wemes desk." GLS Dec. ¶ 8, **Ex. 8** at DEF00570.

154. Tim Tepedino, an individual with Autism, a seizure disorder, and anxiety, has no recollection of what happened that day. RTB Aff., **Ex. Y**. at Nos. 2, 6-13.

155. Visingard's Incident Report states that "Myself and Investigator Bowerman ended up speaking with Jason Ingalls who is the bank security manager.  I advised Ingalls of the investigation and he escorted us up to speak with Wemes." RTB Aff. **Ex. D**; Visingard Dep. 38:20-39:14.

156. When Ingalls was shown the language quoted above in Visingard's Incident Report, Ingalls did not recall whether it was accurate or if he disagreed with that narrative. Ingalls 30b6 Dep. 35:18-

---

[4] CNB has no valid objection to this testimony.

38:14.[5]

**Wemes' second interaction with law enforcement**

157.  After their first interaction, Bowerman and Visingard came upstairs to Wemes' cubicle to speak with him. Wemes Dec. ¶ 24.

158.  Wemes was concerned about this, and wanted to ensure there was a recording of their interaction so he brought them into an IT room nearby where there was a security camera in the ceiling. Wemes Dec. ¶ 25.

159.  Because he had access to surveillance footage, Wemes knew this security camera worked and was functioning. Wemes Dec. ¶ 26.

160.  There Bowerman and Visingard showed Wemes a second picture, which showed the lower portion of the suspect's body with his pants slightly pulled down showing he was wearing purple underwear (referred to as the "Second Picture"). Wemes Dec. ¶ 27.

161.  Wemes showed them he was not wearing purple underwear. Wemes Dec. ¶ 28.

162.  Ingalls then came into the room and asked, in sum or substance, "Who's in charge here and what's going on?" Neither Bowerman nor Visingard verbally responded; Visingard just left the room with Ingalls. After this Wemes believed that Ingalls was trying to persuade law enforcement to say he was the suspect. The way Ingalls initially presented himself seemed planned because Visingard just left with Ingalls without saying anything, and because Ingalls had been regularly making homophobic comments to him in the previous months. Wemes Dec. ¶ 29.

163.  While in the room alone with Bowerman, Wemes and him engaged in small talk. Bowerman also asked to look through Wemes' phone, which Wemes gave him. Bowerman then looked

---

[5] CNB has no valid objection to this testimony.

through Wemes' pictures and apps, and saw that Grindr was not on his phone. Wemes Dec. ¶ 30.

164. The Second Picture also showed the suspect was wearing a white rectangular badge. Bowerman said the suspect's badge and badge reel looked similar to Wemes'. Wemes then showed that his badge reel had a CNB logo which slid onto his belt; the suspect had a carabiner clip attached to his belt loop. Further, Wemes' white ID badge had writing on both sides: his picture and name on the front, and on the back how to return it to CNB if lost and found. The suspect's badge had was all white with no writing on the side in the picture. Wemes Dec. ¶ 31.

165. Wemes never saw a mountain dew can in the Second Picture, and law enforcement never asked him about it. Wemes Dec. ¶ 32.

166. Afterwards Visingard returned with Ingalls. Visingard then told Wemes, in sum or substance, "it doesn't look good for you." Wemes asked what didn't look good for him because he had not done anything wrong. Visingard responded "we'll see," then he left with Bowerman. Wemes went to his desk and tried to process what was happening. Wemes Dec. ¶ 33.

167. After this, Naomi Best, also one of Wemes' subordinates and with the title of lead custodial cleaner, called his phone and said that she saw Ingalls and Visingard go outside and look into the windows of Wemes' car. Best also told me that she had seen Ingalls and law enforcement go into Ingalls' office to talk. Wemes Dec. ¶ 34.

168. After this second interaction with law enforcement, Wemes heard and saw Vince Yacuzzo, Ingalls, and Visingard standing about 20 feet away and talking about being together at youth sporting events and a golf course, Mr. Yacuzzo's new grill, and how they had gone on a wine tasting with their wives and wanted to set up a time to go on another one. Wemes Dec. ¶ 35.

**Wemes' third interaction with law enforcement**

169. After the second interaction with law enforcement, Bowerman and Visingard again came upstairs to speak with Wemes. Visingard then went onto Wemes' work computer and looked through his browser history. Wemes invited them to look through his desk; they declined. Visingard said, in sum or substance that he was 99 percent sure Wemes was the suspect, and Wemes should just make it easier on himself and come clean. Wemes responded that he was not going to admit to something he did not do. Law enforcement then left. Wemes Dec. ¶ 36.

170. Later that day Wemes called Ingalls to tell him how he was not the suspect and did not want to lose his job. After Wemes explained how the pictures did not match him as the suspect, Ingalls said it did not "look good" for him and he had to get off the phone. Wemes Dec. ¶ 37.

**Wemes was suspended with pay on June 30, 2021**

171. Wemes worked the next day, June 30, until the end of his shift to move items to the new CNB Geneva branch which was opening for the first time. Wemes Dec. ¶ 38.

172. At the end of Wemes' shift Pedzich asked to meet with him and Ingalls. There Pedzich said Wemes was suspended for two weeks with pay because of law enforcement's ongoing investigation. Pedzich said that CNB had to allow law enforcement to complete their investigation while CNB did their own internal investigation, and afterwards they would determine whether he was returning. Wemes Dec. ¶¶ 39-40.

173. Wemes then handed over to Pedzich his ID badge and badge reel, which were the same ones he had used and been wearing the day law enforcement was present. Wemes Dec. ¶ 41.

174. After Wemes was suspended, and before his termination, Best told him that Ingalls was telling other CNB employees that I was the suspect. Wemes Dec. ¶ 42.

175. On July 13, 2021 Wemes emailed Elaine Fox, who was Pedzich's assistant, to request a reason

for his termination. Wemes Dec. ¶ 44, **Ex. 10**.

176. On or around August 2, 2021, Best called Wemes and said that Ingalls told her that Wemes had

   blocked or ignored his calls and texts because he was trying to get in touch with Wemes. Wemes

   had not blocked nor received any direct communications from Ingalls since his suspension.

   Wemes Dec. ¶ 16, **Ex. 5** at PF-000313; ¶ 45

**CNB's contradictions concerning its review of surveillance footage, and failure to preserve relevant videos**

177. CNB conducted its own internal investigation of this incident during Wemes' suspension. MP

   Aff., **Ex. H** (Pedzich told Wemes that "based on our own internal investigation, that we decided

   it was time to part ways.")

178. CNB typically preserves all information, including video surveillance footage, concerning an

   employee investigation. Pedzich 30b6 101:21-102:8.

179. CNB believes it is important to preserve evidence, which includes relevant video surveillance

   footage, when conducting an investigation. Ingalls 30b6 16:25-20:25. Before being

   automatically deleted, CNB maintains surveillance footage for 90 days. Pedzich Dep. 103:18-

   23; 105:22-106:2.

180. The Bank disclosed eleven separate videos of surveillance footage captured at CNB on June 29,

   2021. GLS Dec. ¶ 10, **Exs. 11 through 21**.

181. Those videos were compiled by Ingalls and Hernandez on June 29 or 30. Pedzich 30b6 99:11-

   100:6, 108:5-9; Ingalls 30b6 Dep. 40:13-41:7 (Ingalls reviewed footage before Wemes'

   suspension on June 30); 98:23-99:5.

182. Hernandez said that he was involved in capturing and saving the surveillance footage, and did

   not capture it before Wemes' termination on July 12. Hernandez Dep. 35:4-6; 35:22-36:4.

   Hernandez said he preserved surveillance footage on or around August 24, 2021, but did not do

so afterwards. Hernandez Dep. 43:1-4.

183. The Bank circulated a litigation hold notice on August 6, 2021 to, among others, Jason Ingalls and Michelle Pedzich. GLS Dec. ¶ 11, **Ex. 22**. The letter instructs that "any and all physical or electronic documentation relating to [Wemes] and his employment or the termination remain intact until otherwise notified." *Id.* The memo attached defines electronic documentation as including "video recordings." *Id.* at DEF01778.

184. After receiving this litigation hold notice, CNB either did not preserve, or does not recall if any additional surveillance footage was preserved. Ingalls 30b6 95:3-97:11.[6]

185. Ingalls read the email and the attachment, and responded that he received it. Ingalls 30b6 94:10-95:2.

186. No one asked Hernandez to save surveillance footage concerning Wemes' potential litigation. Hernandez Dep. 39:15-25.

187. Ingalls does not recall reviewing his cell phone to see if he had any relevant text messages. Ingalls 30b6 97:13-15.

188. Ingalls does not recall searching his email for any relevant evidence. Ingalls 30b6 98:14-22.

**CNB failed to capture critical surveillance footage.**

189. Law enforcement's path to speak with Merriman and show her the picture of the suspect would have been captured by the platform entrance camera. Ingalls 30b6 Dep. 101:21-103:11.

190. Ingalls path to speak with Merriman after she called him about law enforcement's presence would have been captured by a "handful" of cameras. Ingalls 30b6 Dep. 101:2-20.

191. After Ingalls spoke with Merriman and he went to search for law enforcement, he testified at least three different cameras would have captured his movements. Ingalls 30b6 Dep. 103:12-

---

[6] CNB has no valid objection to this testimony.

104:15.[7]

192. Ingalls testified that he did not recall his path leading to his initial encounter with law enforcement, but it could have been captured by at least five cameras. Ingalls 30b6 Dep. 106:12-107:8.

193. Law enforcement's actions, after their initial encounter with Wemes in the basement to their interaction with him on the second floor, would have been captured by at least three cameras. Ingalls 30b6 Dep. 107:9-108:16.[8]

194. At least four CNB surveillance cameras would have also captured when law enforcement and Ingalls went outside to look at the vehicles. Ingalls 30b6 Dep. 108:22-109:19.

195. Law enforcement and Ingalls' arrival at his office would have been captured by at least one camera. Ingalls 30b6 Dep. 109:20-110:2.

196. Law enforcement's departure from the bank on June 29, 2001 would have been captured because CNB has cameras at all of its entrances and exits. Ingalls 30b6 Dep. 110:18-7.[9]

197. Ingalls appears in the light blue polo in **Ex. 21**. Ingalls 30b6 Dep. 43:18-9. He does not recall what occurred in the video. *Id.* Nor does he recall what he and Visingard spoke about before this video occurred, or what happened between 16:57 (**Ex. 20**) and 17:06 (**Ex. 21**) in the timeline. Ingalls 30b6 Dep. 44:14-45:16.

**Reviewing surveillance footage with law enforcement**

198. In response to Wemes' interrogatory asking CNB to describe any actions taken to review surveillance footage captured on June 29, 2021 which could have recorded the suspect, CNB responded that it reviewed no footage because it "was advised by law enforcement that Plaintiff

---

[7] CNB has no valid objection to this testimony.
[8] CNB has no valid objection to this testimony.
[9] CNB has no valid objection to this testimony.

was their suspect." RTB Aff. Ex. S. at ¶ 17.

199. Ingalls was assisting law enforcement in determining who could be the suspect. Ingalls 30b6 Dep. 46:5-13.

200. Pedzich testified that Ingalls told her he and law enforcement viewed surveillance footage around June 29 or 30. Pedzich 30b6 107:14-21.

201. Ingalls does not recall whether he reviewed surveillance footage with law enforcement, whether they requested to see footage, or whether he offered law enforcement the opportunity to review footage. Ingalls 30b6 Dep. 45:18-46:3; 47:2-25.

**Communications with law enforcement after June 29**

202. Ingalls, as CNB "point person" with law enforcement, communicated with law enforcement once or twice during Wemes' suspension. Pedzich 30b6 Dep. 42:24-44:24.

203. Only Ingalls and Hernandez communicated with law enforcement on behalf of CNB. RTB Aff. **Ex. S** at No. 12.

204. Bowerman testified that he had no communications about this investigation after June 29. Bowerman Dep. 44:9-12.

205. Visingard first said the "only other contact" he had with "any bank staff was when he received a" call from an attorney for the bank informing him that Wemes filed suit. Visingard Dep. 51:15-52:12. But then he changed his mind, saying he's not sure whether he spoke with Ingalls or Hernandez after he left the bank. *Id.*

**GREGORY L. SILVERMAN, ESQ., PLLC**

Dated: June 30, 2025      By:    s/ Gregory L. Silverman
                                             118 Genesee St.
                                             Geneva, NY  14456
                                             Tel: 585-480-6686
                                             greg@silverman-law.com
                                             Attorney for Plaintiff Jason Wemes