UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JASON WEMES,

                       Plaintiff,

- against -

THE CANANDAIGUA NATIONAL BANK
& TRUST COMPANY,

                       Defendant.

Case No.: 22-cv-06297 (MAV) (MWP)

## DECLARATION OF JASON WEMES

JASON WEMES, under penalty of perjury, affirms and states as follows:

1.    I am the Plaintiff in this action. I submit this declaration in opposition to Defendant's Motion for Summary Judgment

**Background of employment with CNB**

2.    I was employed by Canandaigua National Bank & Trust Company ("CNB") from approximately 2014 until my termination in July 2021.

3.    I began my employment as a part-time Custodial Supervisor and was later promoted to full-time in the same position.

4.    As Custodial Supervisor, my duties included supervising cleaning staff (many of whom had developmental delays), ensuring all office and common areas were properly cleaned, handling scheduling and workflow, ordering supplies, and performing custodial duties myself.

5.    During the final three years of my employment at CNB, my previous supervisor Brett Elliot rated me "Far Exceeds Expectations" as his overall performance evaluation for 2018-2020."

1

**Jason Ingalls began making homophobic comments**

6. I mainly worked in CNB's Canandaigua office where it was well-known that I was a gay man and had a male partner.

7. In or around February 2021, Jason Ingalls became my direct supervisor.

8. After becoming my supervisor, Mr. Ingalls regularly made several disparaging comments to me because I am a gay man. I believed those comments were illegal.

9. In March 2021 Ingalls pointed to the Human Rights Campaign sticker (blue with a yellow equals sign) I had hanging in my cubicle. Ingalls asked me why this sticker was displayed and told me that "we don't need that" and that it "doesn't need to be here." I asked Ingalls why he thought that, and said that the sticker wasn't hurting anyone. Ingalls responded with a laugh and looked at me like I was an idiot, and walked away.

10. Ingalls told me that a photo of me and my husband displayed in my cubicle – which he directly pointed to – was inappropriate for work. I asked him why this picture was inappropriate when there were other cubicles and offices with pictures of opposite-sex spouses; his responses included laughing and walking away. Before my termination, Ingalls made another similar comment about this picture one week before my suspension on June 30, 2021.

11. In the spring of 2021, after Ingalls became my supervisor, I was with a group of employees at a social outing, which included Ingalls. Some employees were discussing a transgender employee at Bushnell's Basin. Ingalls, in a mocking manner, commented that when he made the employee ID badge he was not sure what gender to specify. Barb Wagner asked Ingalls what his pronouns were in a joking way. I responded that gender pronouns should not be a joking matter. In response Ingalls shot me a dirty look.

12. On or around April 2021, Ingalls and two other individuals were standing and talking near an elevator. I approached the group with a greeting of something like, "Hey, what's going on?" The conversation stopped, and Ingalls said "Jason doesn't like women like that." I got onto the elevator with the group. Then when it was just Ingalls and me in the elevator, I asked him what my personal life had to do with work. Ingalls responded, in sum or substance, "You read into things too much."

13. At other times Ingalls would mock me when I was on the phone by repeating what I had said in a high-pitched voice. The first time Ingalls did this was a few months before he became my supervisor. After I said on the phone, "I had to make an executive decision," Ingalls parroted it in a high-pitch mocking tone – and I also saw him flipping his hand in a stereotypical feminine manner.

14. Another time, a couple weeks after Ingalls became my supervisor, I was on the phone and I could hear Ingalls mocking me in a high-pitched voice. Then I asked him if there was an issue with me. Ingalls responded with an angry look.

15. In 2021 I was nominated to receive the Arthur Hamlin Award, which is given out each year to recognize an exceptional CNB employee. Various people in the Facilities Department that I worked with made a surprise video for this nomination which was played for CNB employees.

16. I received a copy of this video via text message from Kayla Domville, who worked in the Facilities Department, on June 10, 2021, in which Ingalls appears as the only man in a black shit. A true and accurate copy of my text messages with Kayla Domville and the video she texted are attached respectively at **Exhibits 5 and 6**.

**My first encounter with Visingard and Bowerman in the basement on June 29, 2021**

17. On June 29, 2021, I was working at CNB's Canandaigua location. As part of my normal routine, I was in the basement when I saw a man casually dressed and a looking into the safety deposit room through the glass window on the door. I had previously encountered customers in that location looking to get into the safe deposit box room; I would call the teller line to have someone come down and open the door.

18. I did not know at the time, but now understand this man to have been Nathan Bowerman with the Ontario County Sheriff's Office. As I was walking past Bowerman I asked if he needed assistance. He said "no"; I responded, "are you sure?" He said "yes."

19. I turned around to leave he said, in sum or substance, "Actually, I have a question for you. Have you seen this person?" He showed me a picture on his cell phone depicting a heavyset man with black hair, sunglasses, and a thick black beard taking a "selfie" of himself (referred to as the "First Picture").

20. I have brown hair and had never grown a beard during my employment with CNB.

21. I responded that I saw that person at the Green Front Restaurant a few weeks ago, and had likely seen him at CNB previously.

22. Afterwards another man appeared to have come out of the bathroom, who I now understand was Canandaigua Police Department officer Daniel Visingard. Vinsingard showed me his badge and said they were looking for that person because he was attempting to lure a minor into the bathroom. I responded that I would contact the head of security, who was Jason Ingalls. They said that was not necessary because they were going to go back upstairs and look around.

23. After they left I went back to work and eventually returned to my desk.

**Second interaction with law enforcement on June 29, 2021**

24.     After I was at my cubicle upstairs in the operations building when Bowerman and Visingard came upstairs to my cubicle to speak with me.

25.     I was concerned about this, and I wanted to ensure there was a recording of our interaction so I brought them into an IT room nearby where there was a security camera in the ceiling.

26.     During my employment at CNB, I could view the bank's security cameras, and knew that this camera in the IT room existed and would be recording.

27.     There Bowerman and Visingard showed Wemes a second picture, which showed the lower portion of the suspect's body with his pants slightly pulled down showing he was wearing purple underwear (referred to as the "Second Picture").

28.     They asked me what color underwear I was wearing; I showed them I was not wearing purple underwear that day.

29.     Ingalls eventually came into the room and asked, in sum or substance, "Who's in charge here and what's going on?" Neither Bowerman nor Visingard verbally responded; Visingard just left the room with Ingalls. This was when I believed that Ingalls was attempting to persuade law enforcement to say I was the suspect. The way Ingalls initially presented himself seemed planned and fake, in part because Visingard just left with him without saying anything, and he had been making regularly homophobic comments to me in the previous months.

30.     While I was in the room alone with Bowman, we engaged in small talk, like if I had any plans over the weekend. He also asked if he could look through my phone. I handed him my phone and he went through my pictures, apps, and saw that Grindr was not on my phone.

5

31. The Second Picture also showed the suspect was wearing a white rectangular badge. Bowerman said the suspect's badge looked similar to mine. I showed that my badge reel had a CNB logo which slid onto my belt; the suspect had a carabiner clip attached to his belt loop. Further, my white ID badge had writing on both sides: my picture and name on the front, and on the back how to return it to CNB if lost and found. The suspect's badge had was all white with no writing on the side in the picture.

32. I never saw a mountain dew can in the Second Picture, and law enforcement never asked me about it.

33. Afterwards Visingard came back with Ingalls. Visingard then told me, in sum or substance, "it doesn't look good for you." I asked what didn't look good for me as I didn't do anything wrong. Visingard responded "we'll see," then he left with Bowerman. I went to my desk and tried to process what was happening.

34. After this, Naomi Best, also one of my subordinates and with the title of lead custodial cleaner, called me on my phone and said that she saw Ingalls and Visingard go outside and look into the windows of my car. Best also told me that she had seen Ingalls and law enforcement go into Ingalls' office to talk. I told Best that I was not the suspect, but that law enforcement said that the suspect's badge looked similar to mine.

35. While I was at my cubicle, I heard and saw Vince Yacuzzo (CNB's Chief Financial Officer), Ingalls, and Visingard standing about 20 feet away and talking being together at youth sporting events and a golf course, Mr. Yacuzzo's new grill, and how they had gone on a wine tasting with their wives and wanted to set up a time to go on another one.

6

**Third interaction with law enforcement**

36. After the second interaction with law enforcement, Visingard and Bowerman came upstairs to speak with me again. Visingard went onto my work computer and looked through my browser history. I invited them to look through my desk; they declined. Visingard said, in sum or substance, that he was 99 percent sure that I was the suspect, and should just come clean to make it easier on myself. I responded that I was not going to admit to something I did not do. They left my cubicle.

37. Later that day, I left the Canandaigua location to Geneva to prepare for CNB's opening of its Geneva branch. I called Ingalls because I had not yet spoken with him about this situation wanted to tell him how I was not the suspect, and did not want to lose my job. After I explained how the pictures did not match me as the suspect, Ingalls said it did not "look good" for me and had to get off the phone.

**I was suspended with pay on June 30, 2021**

38. I worked the next day, June 30, 2021, until the end of my shift. That day we were moving items to the new CNB Geneva branch which was opening for the first time.

39. After my shift ended, I clocked out, but then later received a call to come back to CNB.

40. After I returned Michelle Pedzich and Ingalls were in Ingalls' office. Pedzich said that I was suspended with pay for two due to law enforcement's ongoing investigation, and if anyone asked where I was they would say I was out on leave for a family emergency. Pedzich said that CNB had to allow law enforcement to complete their investigation while CNB did their own internal investigation, and afterwards they would determine whether I was returning.

41. I then handed over to Pedzich my ID badge and badge reel which were the same ones I had used and been wearing the day law enforcement was present.

42. After I was suspended, and before my termination, I learned from Best that Ingalls was telling other CNB employees that I was the suspect.

**CNB terminated me with no written reason**

43. On or around July 12, 2021, I received my termination letter, which did not cite a reason for my termination.

44. On or around July 13, 2021, I emailed Elaine Fox, who was Pedzich's assistant, asking for a reason for my termination in writing. A true and accurate copy of this email is attached as **Exhibit 10**.

45. On or around August 2, 2021, Best called me and said that Ingalls told her that I had blocked or ignored his calls and texts because he was trying to get in touch me. I had not blocked nor received any direct communications from Ingalls since my suspension.

**Other**

46. There was only one CNB-owned van in 2021 at the Canandaigua office where I worked, and I did not have the code to access the van key myself.

47. I am depicted as the individual in the red shirt in the document bates-stamped PF-000189 and marked as Exhibit 3 in the deposition of Daniel Visingard.

48. I never reviewed surveillance footage on June 29 or 30 to determine who the potential suspect could be.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 30, 2025.

*Jason Wemes*

Jason Wemes