# G. Silverman Declaration
# Exhibit 2

1    UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF NEW YORK

3    _____

4    JASON WEMES,

5              Plaintiff,

6         vs.         Civil Action No. 6:22-cv-06297

7    THE CANANDAIGUA NATIONAL BANK

8    & TRUST COMPANY,

9              Defendant.

10   _____

11

12        This is the Videotaped Examination of

13        **MATHEW NIELSEN**

14        taken on Tuesday, April 23, 2024, held

15          REMOTELY via ZOOM, commencing at

16        9:03 a.m., concluding at 10:29 a.m.,

17         taken before Tonia L. Tinker, Court

18        Reporter and Notary Public in and for

19              the State of New York.

20

21

22

23

24

25

**APPEARANCES:**


        GREGORY L. SILVERMAN, PLLC

        Attorneys for Plaintiff

             118 Genesee Street

             Geneva, New York  14456

        BY:  GREGORY L SILVERMAN, ESQ.


        UNDERBERG & KESSLER, LLP

        Attorneys for Defendant

             300 Bausch & Lomb Place

             Rochester, New York  14604

        BY:  RYAN T. BIESENBACH, ESQ.


        BOYLAN CODE

        Attorneys for Mathew Nielsen

             11 North Street

             Canandaigua, New York  14424

        BY:  DAVID K. HOU, ESQ.



1    <u>INDEX:</u>

2

3    WITNESS                                        PAGE

4

5    Mathew Nielsen

6                    Examination by Mr. Silverman        6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **<u>INDEX TO EXHIBITS:</u>**

2

3    NUMBER            DESCRIPTION                    PAGE

4

5       1              Subpoena                         9

6       2              Documents Bates stamped

7                      CPD-000001 through 57           31

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## FEDERAL STIPULATIONS:

1
2
3      IT IS HEREBY STIPULATED AND AGREED by and
4  between the attorneys for the respective parties
5  hereto that this deposition may be taken by Counsel
6  for Plaintiff at this time;
7      IT IS FURTHER STIPULATED, that all objections
8  except as to the form of the questions and
9  responsiveness of the answers be reserved until the
10  time of the trial;
11      IT IS FURTHER STIPULATED, that pursuant to
12  Federal Rules of Civil Procedure 30(3)(1) the
13  witness requests to review the transcript and make
14  any corrections to same before any Notary Public;
15      IT IS FURTHER STIPULATED, that if the original
16  deposition has not been duly signed by the witness
17  and returned to the attorney taking the deposition
18  by the time of trial or any hearing in this cause, a
19  certified transcript of the deposition may be used
20  as though it were the original;
21      IT IS FURTHER STIPULATED, that the attorneys
22  for the parties are individually responsible for
23  their certified transcript charges, including any
24  expedite or other related production charges.
25

1          THE STENOGRAPHER:  Good morning.

2     Today is April 23, 2024.  The time is

3     9:03 a.m.

4          We are about to begin the

5     videotaped deposition of Mathew Nielsen

6     in the matter of Jason Wemes v. The

7     Canandaigua National Bank & Trust

8     Company, filed in the United States

9     District Court, Northern District of New

10    York. Case Number 6:22-cv-06297.  This

11    remote deposition is being taken on

12    behalf of the Plaintiff and recorded via

13    Zoom.

14          My name is Tonia Tinker of CSR

15    Court Reporting.  Appearances will be

16    noted on the stenographic record.

17          I will now swear in the witness and

18    we can proceed.

19        M A T H E W   N I E L S E N,

20     having been first duly sworn by a Notary

21     Public within and for the State of New York,

22     was examined and testified as follows:

23    EXAMINATION

24    BY MR. SILVERMAN:

25        Q.  Good morning, Chief.  How are you?

1          A.   Good morning.  Thank you.

2          Q.   Chief Nielsen, can you state your name for

3     the record?

4          A.   Mathew Nielsen, N-I-E-L-S-E-N.

5          Q.   And where are you testifying from this

6     morning?

7          A.   I'm testifying from my office at the City

8     of Canandaigua Police Department at 21 Ontario

9     Street in the city of Canandaigua.

10          Q.   Besides Mr. Hou, who I can see, is there

11     anyone else in the room with you?

12          A.   No, there is not.

13          Q.   Okay.  Chief, I assume that you have been

14     deposed before; is that correct?

15          A.   Yes.

16          Q.   So I just want to briefly go over a few

17     ground rules.  If you can't hear me or understand my

18     question, please let me know and I will repeat or

19     rephrase.

20               Is there any reason you are aware of that

21     you can't provide accurate and truthful testimony

22     today?

23          A.   No.

24          Q.   And if you want to change your answer or

25     add to it, you can do so at any time during this

1    deposition.  And if you need a break, please let me

2    know and we will take one, okay?

3        A.  Okay.

4        Q.  Without telling me what you and your

5    counsel discussed, can you tell me how you prepared

6    for this deposition today?

7        A.  I just reviewed the documents that I had

8    forwarded to David Hou a few weeks back.  It was in

9    response to the subpoena that I received.

10       Q.  I understand.  And those, my understanding,

11   consisted of an incident report and some general

12   orders; is that accurate?

13       A.  Yes, and briefly some email correspondence

14   that was included in that as well.  It was part of

15   the subpoena.

16                MR. HOU:  Just for the record,

17             those were not provided because those

18             were communications between the chief

19             and I that he provided to me as part of

20             a package of quote, unquote, everything

21             he had.  So those were attorney-client

22             privilege communications that I did not

23             forward to you.

24                MR. SILVERMAN:  Thanks for the

25             clarification.

1    BY MR. SILVERMAN:
2         Q.   Did you review any other documents besides
3    what you just described?
4         A.   No.
5         Q.   Have you -- besides your counsel, Mr. Hou,
6    have you spoken to any other individuals in
7    preparation for this deposition?
8         A.   No.
9         Q.   So just to clarify, you have not spoke with
10   who I understand is now retired Daniel Visingard?
11        A.   No, I have not.
12        Q.   I'm going to share my screen.  All right.
13   So are you -- Chief, are you able to see what I
14   shared?
15        A.   Yes, I can.
16        Q.   Okay.  Great.  So I will just represent
17   that this is Exhibit 1 and I will slowly scroll
18   down.  This is the deposition subpoena that I
19   provided to Mr. Hou and he graciously accepted
20   service.  I also emailed this document this morning.
21             Have you seen this document before?
22                  (Exhibit Number 1 was marked for
23                  identification.)
24        A.   I believe so.  It looks like the subpoena I
25   received a few months ago.

1    BY MR. SILVERMAN:

2         Q.   And, Chief, do you understand that you are

3    here to testify on behalf of the police department,

4    not yourself as an individual?

5         A.   Yes, I do.

6         Q.   Okay.  And do you understand -- let me just

7    scroll up -- that you are here to testify regarding

8    the deposition topics laid out in the subpoena?

9         A.   Yes.

10        Q.   And are you the person with the CPD who is

11   most knowledgeable about the topics set forth in the

12   subpoena?

13        A.   Yes.

14        Q.   So, Mr. Nielsen, can you just summarize

15   your job duties as chief?

16        A.   I'm the chief administrator of the police

17   department, which would be I'm responsible for the

18   budgetary expenses of the police department, budget

19   preparation, over site of the policy, development

20   and review, and just a general oversight over the

21   department operations.

22        Q.   Thank you.  And I understand you have been

23   designated by the police department to speak on its

24   behalf regarding the deposition topics laid out in

25   the subpoena?

1        A.   Yes.

2        Q.   Okay.  So I would like to start, this is

3   deposition topic 13 and the general topic is the

4   police department's history and practice of engaging

5   in sting operations.

6             You will see on Page 3, Number 6, I define

7   "sting operation" as the department's conduct of

8   posing as a minor on a dating or social media app

9   for the purposes of communicating with or possibly

10  arresting individuals for potential violations of

11  any law.  So that's how I define sting operation.

12            My question for you for this topic 13 is:

13  When did the department first began the practice of

14  posing as a minor on one of these social media apps

15  for the purposes of investigating or arresting

16  potential suspects?

17       A.   So I've been -- my tenure started in August

18  of 2020 and that practice was in place prior to me

19  taking this position.

20       Q.   Do you know how long that practice was in

21  place before you started?

22       A.   The definitive date, I would say several

23  years.

24       Q.   Okay.  And do you know why the department

25  started engaging in these sting operations?

1      A.   I do not know the -- when or why it
2   started.
3      Q.   Does the department still engage in sting
4   operations like this?
5      A.   We haven't since Detective Visingard
6   retired in January.
7      Q.   Before Detective Visingard retired, were
8   there other members of the department who posed as
9   minors and engaged in these sting operations?
10      A.   I know Detective Visingard was training a
11   newer detective on the procedures of how that is
12   done.
13      Q.   Do you know if that person he was training
14   now participates in sting operations?
15      A.   I'm not aware that he has since Detective
16   Visingard retired.
17      Q.   Do you know, like, what precipitates or
18   what is the reason for an officer with the
19   department to start posing as a minor in a sting
20   operation?
21      A.   The purpose of that is to detect people
22   that would take advantage of children in a sexual
23   way and, I guess, I -- if you can re-ask your
24   question to make sure I'm answering it properly.
25      Q.   Sure.  I appreciate that.

1           So I guess I'm just curious about so, you

2     know, you testified before Detective Visingard

3     retired, he would at times pose as a minor and

4     participate in these sting operations.  I'm

5     wondering, like, what was the practice surrounding

6     when he would do that?  Was it because he had --

7     maybe because there wasn't -- things weren't as busy

8     or did he do this every week?

9           I'm trying to understand what was the

10    impetus for doing -- or for participating in a

11    particular sting operation?

12                    MR. HOU:  Form.  You can answer.

13                    THE WITNESS:  Form, I can answer?

14                    MR. HOU:  Yes.

15    A.    Detective Visingard engaged in these

16    investigations relatively routinely.  I know he was

17    more active in these investigations when he had more

18    available time based on his other assignments.

19    Maybe he had more of a lull in his action with his

20    other types of assignments, so he would spend more

21    time.  Also, too, it was when opportunity presented

22    itself as such, people would engage with him on

23    certain social media platforms.

24    Q.    Understood.  So just to clarify, when

25    Detective Visingard or another member of the

1    department would choose to participate in a

2    particular sting operation was depended on their

3    workload; is that accurate?

4        A.  Partially, yes.  Some of it was also the --

5    when opportunity or people would engage them on

6    these social media sites.

7        Q.  Understood.  Do you know if they have,

8    like, a permanent profile up and people would

9    randomly message them or was this a situation where

10   people only messaged them if they were active

11   themselves?

12              MR. HOU:  Form.  You can answer if

13          you understand.

14       A.  I don't fully understand the question.

15       Q.  Thank you for saying that.  I guess my

16   question is you said some -- at times, potential

17   suspects would message them and that's when they

18   would engage in communicating with potential

19   suspects; is that accurate?

20       A.  Yes.

21       Q.  And I guess my question is:  Do you know if

22   there was a constant or a permanent profile up that

23   people could always communicate with?

24       A.   I believe at times there was a profile they

25   would put up on certain apps -- I will call them

1    apps, social media sites.  It wasn't all of the time
2    because sometimes the accounts would get deactivated
3    for various reasons, but they would design the
4    profile out to put on the social media sites when
5    they had time.
6        Q.  And you said accounts would be deactivated.
7    Would these be department accounts?
8        A.  No.  The detective would establish a --
9    they would establish an account that they would put
10   together, it wouldn't be anything related to the --
11   I guess, have a -- I guess I'm trying to figure out
12   the wording of it.  It wouldn't be something that
13   would have the police department's image or logo or
14   anything on it.
15       Q.  Sure.  They were posing as a minor?
16       A.  Yes.
17       Q.  Okay.  And just to clarify, do you know
18   what apps members of the department used to
19   participate in these sting operations?
20       A.  I don't know the name of all of the apps.
21   I do know Grindr was one that I had heard that they
22   were using a lot.  I think that was one of the
23   primary ones.  I didn't recognize a lot of the apps
24   because they were, like, chat rooms.
25       Q.  Do you know if the department had, in terms

1    of a profile a member of the department would make

2    where they would pose as a minor, do you know if

3    there were multiple profiles on, for example, the

4    Grindr app or was there one main profile for the

5    department to use?

6         A.   I only knew of one general profile that

7    they used.  I don't believe they made several and

8    put them out there.

9         Q.   Do you know the name or the identity or

10   what the profile would have been identified with?

11        A.   I don't know.

12        Q.   Chief, what kind of -- I'm looking at topic

13   15, "Potential criminal laws an individual could

14   violate by only communicating with you while you

15   posed as a minor during a sting operation."

16             So, again, my first question is:  What

17   potential laws could a suspect violate when they

18   were communicating with a member of the department

19   who is posing as a minor?

20        A.   I think just communication wouldn't be in

21   violation of a criminal law.  It would routinely

22   cross the line of violation of the criminal law

23   usually with the dissemination of inappropriate

24   material to a minor, and that's usually where the

25   investigation would start.

1      Q.   Sure.  So I guess I'm trying to understand

2   potentially examples of when, you know, when a

3   potential suspect crosses the line into criminal

4   conduct.  You mentioned sending an inappropriate

5   picture.

6           So is your testimony that by attempting to

7   meet with a -- let me strike that.  Let me start

8   over.

9           So could a potential suspect cross the line

10  into criminal conduct if they affirmatively said to

11  this minor "Yes, let's meet somewhere so we can

12  engage in sexual relations"?

13     A.   Can you state that question again to make

14  sure I fully understand what you're asking?

15     Q.   Of course.  So I'm generally trying to

16  figure out when a suspect's conduct or communication

17  can cross the line into criminality, probable cause

18  for an arrest.

19          So my question is:  If a suspect who is

20  communicating with the CPD who is posing as a minor,

21  if that suspect said, "Yes, let's meet somewhere,

22  let's meet at this particular location so we can

23  engage in sexual relations," would that

24  communication be probable cause for an arrest?

25     A.   I guess it's dependent on the situation.  I

1    know in practice the detectives would be looking for

2    some overt act.  That communication could be

3    considered probable cause, but I think the detective

4    would look for more of an overt act of actually

5    showing up at the location to display their intent.

6    It would be case dependent though.  Each scenario

7    would probably have its own nuances that would make

8    them -- to develop that probable cause or reaffirm

9    it before an arrest would be made.

10        Q.  Thank you.

11        A.  Like I said, it would be dependent on each

12   individual scenario.

13        Q.  So if a suspect was communicating with a

14   member of the department posing as a minor, if a

15   suspect said, "Yes, let's meet at this particular

16   location," and then actually showed up where they

17   said to meet, do you believe that would be probable

18   cause for an arrest?

19        A.  It could be.  I guess it would all depend

20   on the evidence involved in the communication, also

21   the proper identification of that person, that would

22   establish the probable cause.  Based on electronic

23   communication and then verifying that the person

24   that showed up is the same person that engaged in

25   that conversation.

1    Q.  What are the potential laws someone might

2    violate if there was probable cause to arrest?  And

3    in this hypothetical, it's simply the suspect is

4    communicating with a member of the department who is

5    posing as a minor, they say, "Let's meet at this

6    specific location, and they actually do go there.

7         What potential laws could they violate in

8    that situation?

9    A.  Well, I guess, depending on the type of

10   encounter that they agreed upon, that would be

11   dependent.  It would be, you know, I think at the

12   most -- the most basic thought I have is an

13   attempted rape charge, but there's a lot of factors

14   involved in that, such as the age that's being

15   portrayed.  And, you know, it could be a situation

16   of, like, attempted sex abuse depending on, like I

17   said, the nature of the -- or the elements involved

18   in each case.  But there's a litany of statutes in

19   that particular sex abuse, you know, rape section of

20   the Penal Law that would apply.

21   Q.  Thank you.  Chief, I want to look at topic

22   14.  It says, "Your history and practice of engaging

23   in sting operations in collaboration with the

24   Ontario County Sheriff's Office."

25        So my question is:  Do you know when the

1    CPD might collaborate with the sheriff's office and
2    under what circumstances?
3         A.  It would be routinely in any of these types
4    of sting operations.  We work collaboratively with
5    them on these types of cases as well as narcotics
6    cases based on undercover personnel are limited in
7    this county.  So we do rely on the Ontario County
8    Sheriff's Office and even at times the Geneva Police
9    Department depending on how many resources are
10   needed for each case that's being investigated.
11        Q.  Thank you.  So I guess I'm just curious
12   about how the communication with the sheriff's
13   office might happen.  Like so, for example, is it
14   where someone with the CPD communicates with the
15   sheriff's office and says, "Hey, are you available
16   for a sting operation on this date," or is there a
17   more structured schedule?
18        A.  It would come down to the detective and the
19   -- or our investigative division supervisor deciding
20   who they may need to assist or when.  And some of
21   these happen relatively quickly depending on the
22   information that's being presented, so that's
23   usually handled, like I said, by the actual
24   detective or the supervisor in charge of the
25   investigative division.

1        Q.   In June of 2021, do you know who the
2    investigative supervisor was?
3        A.   It would have been Sergeant PJ Mastracy.
4    He is still the supervisor of the investigative
5    division.  And if he was unavailable, it would have
6    been Lieutenant Nate Lawrence.
7        Q.   Thank you.  Do you know if the login
8    information for a social media app was shared with
9    the sheriff's office?
10       A.   I don't know the answer to that question.
11       Q.   Okay.  I just want to make sure I clarify
12   also, like, for example, if the department has a
13   specific username and password for a Grindr profile,
14   for example, are you aware if that information was
15   shared with the sheriff's office at any time?
16       A.   I'm not aware if that was shared, but
17   generally the police department -- we handle our own
18   affairs and investigations.  The sheriff's office
19   would be requested for additional manpower for when
20   the sting took place.
21       Q.   Chief, I want to go back to topic 13,
22   "History and practice of engaging in sting
23   operations."  Do you know if there was any kind of
24   training that any member of the department received
25   related to these sting operations?

1        A.  I'm not aware of any formalized training

2    that they had received since they have been going on

3    before my tenure.  I had conversations with

4    Detective Visingard and Sergeant Mastracy in the

5    past about their workings with the district

6    attorney's office as far as criteria that they

7    needed to have in place for prosecutions to take

8    place.

9        Q.  And can you tell me the substance of those

10   conversations?

11       A.  Just me seeking information.  As far as the

12   conversations with the district attorney's office

13   about how they were to engage in the conversations

14   and not to be -- not to be the person leading the

15   conversations in a sexual direction.  In fact,

16   trying to steer the conversations away.

17           And then, leading it up to the suspect to

18   keep -- or to pursue the conversation in a sexual

19   way, but they were -- the detective was not to lead

20   that -- any conversation in that direction upon

21   their own accord.

22       Q.  Understood.  What was the purpose of, I

23   guess, advising officers not to -- or to steer the

24   conversation away from sexual discussions and let

25   the potential suspect bring it back there?

1       A.   Well, I guess to eliminate the argument
2   that they were entrapping the suspect into criminal
3   conduct.
4       Q.   Thank you.  All right.  Chief, I want to
5   look at deposition topic 1, the June 29th sting
6   operation.  And that is defined as the sting
7   operation in Number 7 here that occurred on June 29,
8   2021 which led to the department's presence at
9   Canandaigua's National Bank's Main Street branch and
10  for you to communicate with Jason Wemes.
11          So, Chief, my question is what's the basis
12  of your knowledge about this June 29th sting
13  operation?
14      A.   My basis is the incident report that was
15  drafted by Detective Visingard.
16      Q.   Thank you.  Do you have any other basis of
17  knowledge about the June 29th sting operation
18  besides the incident report?
19      A.   I had a short conversation with Detective
20  Visingard when I first learned of the litigation,
21  which was -- I would have to refer to my notes, but
22  it was when his cell phone was submitted into
23  evidence.  I think it was September of 2022.  But
24  like I said, I would have to refer to my notes for
25  the more approximate date.

1              Before that, it was -- like I said, before
2      that, it was just -- I wasn't aware of all of the
3      details, other than what was written in the incident
4      report and then the short conversation I had with
5      him about the incident and the -- as far as any
6      evidence that might exist.
7              Q.   Thank you.   How did you learn of this
8      litigation?
9              A.   I don't really remember.   I think it
10     started with an email from -- David Hou had
11     forwarded me knowing if I knew of the incident at
12     hand, which I had to research.   But I think that's
13     where it began.
14             Q.   Thank you.   And then, so my understanding
15     is that Mr. Hou informed you of the litigation and
16     then, did you have your conversation with
17     Mr. Visingard afterwards?
18             A.   Yes.
19             Q.   And what do you recall about the sum and
20     substance of that conversation?
21             A.   I asked him if he had preserved any of the
22     communication that happened between Mr. Wemes and
23     Detective Visingard.   He stated that he was unable
24     to preserve the conversation because the
25     conversation occurred within the app of Grindr and

1    it wasn't, like, a conventional text message or

2    communication outside of the app.

3          And Detective Visingard told me that

4    immediately following this sting operation that he

5    was flagged as fraudulent on the app Grindr and his

6    account was deactivated, so he was unable to

7    preserve the conversation.

8          Q.   When you say -- just to clarify that, he

9    told you that his profile account on Grindr was

10   flagged by Grindr as fraudulent?

11         A.   I believe that he said that somebody

12   flagged his account.  I don't know if he used the

13   word fraudulent, but he said his account was flagged

14   and it was deactivated, so he was unable to preserve

15   the conversation.

16         Q.   Did Mr. Visingard tell you when his account

17   was deactivated?

18         A.   He told me it was right after the sting

19   operation that we are speaking about now.

20         Q.   Thank you.  I want to direct your

21   attention, Chief, to deposition topic 9.  It says,

22   "Any requests for additional information you made to

23   Grindr concerning the June 29th sting operation."

24         Are you aware if any subpoena request for

25   information was sent to Grindr from the CPD related

1    to the June 29th sting operation?

2        A.  During that conversation with Detective

3    Visingard, I asked him about that.  And he stated

4    since they didn't make a criminal arrest on it at

5    the time of the subpoena, they weren't able to

6    subpoena it because they didn't make a criminal

7    arrest on it.

8        Q.  Did he tell you why no arrest was made?

9        A.  I don't necessarily remember exactly or the

10   exact conversation.  He had discussed a small amount

11   of confusion when they were trying to locate the

12   person at the bank as the subject of the operation,

13   that they didn't realize that Mr. Wemes was the

14   target.  When he originally approached one of them,

15   which subsequently, I think, unraveled the

16   investigation because they weren't aware that the --

17   well, the target became aware of their presence

18   before they realized who it was.

19       Q.  Could a subpoena to Grindr after this

20   June 29th sting operation, could that have led to

21   relevant evidence related to who this suspect could

22   have been?

23       A.  It's possible.  Detective Visingard, in

24   that conversation, stated that he didn't believe he

25   had enough.  He stated that he was confident that

1    Mr. Wemes was the target of the investigation, but

2    he stated he didn't feel he had enough probable

3    cause at that moment to make an arrest.

4         Q.   Did he state why he felt he didn't have

5    sufficient probable cause?

6         A.   Nothing that I remember, no.

7         Q.   Okay.  Could -- strike that.

8         Chief, I'm looking at deposition topic

9    number 11, "The electronic devices you use in sting

10   operations including those used for the June 29th

11   sting operation."

12        Just to clarify, the phone that you

13   referenced was placed into evidence around September

14   2021.  Is it your understanding that was the phone

15   Mr. Visingard used during the June 29th sting

16   operation or was it a different phone?

17        A.   Yes, if the date is correct.  Like I said,

18   I'm not -- I learned about the investigation several

19   months after it actually occurred or, I guess, when

20   the litigation came about.  When I had the

21   conversation with Detective Visingard about the

22   communication or the nonexistent communication, at

23   that point, I had asked him if he did the

24   communication on his phone, to which he stated yes,

25   he had.

1          And I asked him if the conversation would
2     be on the phone, he stated no, because it was in the
3     app, the Grindr app.  At that point, I wasn't
4     certain if there would be a remnants of the
5     conversation on the phone, so I then purchased
6     Detective Visingard a new phone and had him submit
7     his phone into evidence just for any future
8     analyzation of it.
9          Q.   Thank you.  Has the department taken any
10    attempt to look at the phone and see if any
11    conversations or information related to the
12    June 29th sting operation was reserved?
13         A.   No, we have not looked at the phone.  I
14    left it preserved in its condition in the evidence
15    room pending a decision on how to analyze it.  I
16    didn't want to any allegation of impropriety of how
17    we looked at the phone to become an issue, so it's
18    still preserved in the same condition it was placed
19    in the evidence room.
20         Q.   Okay.  So, Chief, I want to look at
21    deposition topic 18.  This is, "Suspects
22    investigated during a sting who you believe to have
23    committed a crime but were not arrested and why."
24         So my question is:  Is the department aware
25    of any other suspect, potential suspect who the

1    department believed had participated in a crime

2    related to the department posing as a minor in a

3    sting operation, but was not arrested?

4         A.   Am I aware of any specific ones?

5         Q.   Yes.

6         A.   I'm aware of people that were targets of an

7    investigation but not arrested.  Any specific ones,

8    I don't know.  Detective Visingard would probably

9    have a better account of that than I would.

10        Q.   Thank you.  You said that you are aware of

11   some potential targets who are not arrested.  Are

12   you able to tell me who those people might be and

13   why they weren't arrested?

14                  MR. HOU:  Objection to form.

15                  Greg, are you talking about this

16             incident or just generally any sting

17             operation?

18                  MR. SILVERMAN:  Thank you for the

19             clarification, David.  I'm looking for

20             not this sting operation, but generally.

21   BY MR. SILVERMAN:

22        Q.   Any other suspects, potential suspects, who

23   the department believes had committed a crime during

24   the course of a sting operation but were not

25   arrested?

1    A.  Any specific, no.  I mean, in the past, we

2   have had conversations where just me generally

3   asking, you know, what happened with the case and

4   they would just give me a general observation that

5   they didn't have enough probable cause or -- but as

6   far as me asking for specifics and, you know,

7   specific names or even specific reasons why they

8   didn't make the arrest, I generally don't ask those.

9        I trust that the detective is responsible

10  enough to determine if they have probable cause or

11  not.  So it's just general conversation about -- you

12  know, it's me just inquiring about, you know, the

13  general business, I guess, rather than just

14  specifics about every case.

15    Q.  Thank you.  If an officer believes they

16  have probable cause that they committed a crime, but

17  chooses not to arrest based on the belief that they

18  think that the charges might not hold up in court,

19  does the officer have direction not to arrest in

20  that situation?

21    A.  Yes, in some cases they would based on, you

22  know, the strength of their evidence at the time.

23  And also, they a lot of times consult with the

24  district attorney's office based on the amount of

25  evidence they have and whether the district

1    attorney's office would want to pursue prosecution

2    or not.

3         Q.  All right.  So, Chief, I want to turn your

4    attention to Exhibit 2.  So I will tell you that

5    Exhibit 2, these are the documents that Mr. Hou

6    provided me.  I Bates stamped them CPD1 through 57.

7         And I want to turn your attention to, this

8    looks like, General Order 500.  It starts on page

9    Bates stamped CPD32.  And I want to look at -- this

10   would be Page 2 of 9, Number 6.

11        So this says, "If during the investigative

12   detention it becomes apparent that there is probable

13   cause to believe that the detainee has committed a

14   criminal offense, the detainee shall then be placed

15   under arrest and the procedures for arrest set forth

16   in this policy, including the procedures for a

17   search incident to an arrest shall then be followed

18   by the arresting officers."

19        Do you see that paragraph?

20             (Exhibit Number 2 was marked for

21          identification.)

22        A.  Yes, I do.

23        Q.  Can you tell me what an investigative

24   detention might consist of?

25        A.  Just it could be them detaining a person

1    while they determine, for one, do they have the
2    right person or the person that's the target of the
3    investigation as well as a review of evidence to
4    determine if they established the level of probable
5    cause, over reasonable suspicion to make the arrest.
6         Q.   So just to clarify, could an investigative
7    detention be an officer questioning a potential
8    suspect?
9         A.   Yes.
10        Q.   Can you define what you understand as
11   probable cause?  Strike that.  Let me ask it again.
12            Can you tell me what the definition of
13   probable cause is?
14        A.   Probable cause is when you have enough
15   evidence to believe that a person has committed a
16   crime.
17        Q.   So when I'm reading this policy, do you
18   believe it's accurate that if an officer is
19   questioning a potential suspect and they believe
20   that there is probable cause then this general order
21   says they must arrest the suspect?
22        A.   Can you state that question again?
23        Q.   Sure.  I guess I'm just trying to summarize
24   an understanding of Paragraph 6 on the page marked
25   CPD33.  So if an officer is questioning a potential

1   suspect and they believe they have probable cause,

2   does this general order they must arrest that

3   individual?

4        A.  Well, I guess if they believe they have

5   established probable cause, then they should arrest

6   a person if they detain them.

7        Q.  Thank you.  Okay.  I want to turn your

8   attention to, this is -- I will move up -- General

9   Order 505.  I'm on Exhibit 2, page Bates stamped as

10  CPD41.  And I want to -- here we go.  At the top of

11  Page 2 of 3, let me zoom in, it says, "No arrest

12  shall take place until the officer has completed an

13  investigation and believes that probable cause

14  exists for an arrest."

15            So my question is if -- strike that.

16            What is an officer's direction as to the

17  extent of an investigation?  Like, for example, if

18  they believe that there might be probable cause, I'm

19  not sure, and there might be potential information

20  that could help them gather sufficient information

21  to make an arrest, how much discretion does that

22  officer have whether to pursue further investigation

23  or not?

24        A.  If they believe additional evidence -- they

25  still need additional evidence that they believe

1    they can acquire, then they can seek that

2    information.

3         Q.  Okay.  I want to scroll down here, this is

4    General Order 505.  This is Bates stamped at the

5    bottom CPD43.  This says, on Paragraph E right here,

6    "Unarrest situations," and I'm looking at Number 2.

7    It says, "In cases of a nonarrest or an unarrest

8    incident where countermeasures have been used, the

9    officer will notify a supervisor prior to the

10   release of the subject."

11        Can I ask you, what is a -- this says "in

12   cases of a nonarrest."  What is a nonarrest as this

13   policy contemplates?

14        A.  Your question is what is a nonarrest?

15        Q.  Right.  At the top of Paragraph E it says,

16   "Unarrest situations," and then Paragraph 2 below

17   that says, "In cases of a nonarrest or an unarrest

18   incident."

19        So my question is:  What's the difference

20   between a nonarrest or an unarrest incident?

21        A.  Well, an unarrest would be if you have

22   taken custody of a person and then, during the

23   course of your investigation -- I guess, an example

24   could be, like, a witness recants or changes their,

25   I guess, the information they provided, which would,

1    you know, change the level of -- basically, change

2    the probable cause that you have, you would unarrest

3    a person and release them from custody.

4          And a nonarrest situation would be such as

5    if you have an investigative detention of somebody

6    and during the -- you have detained them for the

7    investigation, but then you never established -- or

8    you don't establish probable cause, then that would

9    be a nonarrest situation where one would actually be

10   taken into custody.

11         The first one would be where you actually

12   made the arrest and then you have to, basically,

13   unarrest them.  Where one is you never crossed the

14   level of actually making an arrest.

15      Q.  Thank you.

16         I'm going to, this is Exhibit 2, go down to

17   this is General Order 725.  And I'm going to go to

18   Page 3 of 4, and Roman 7 right here says,

19   "Intelligence gathering techniques," and then it

20   says, "The following techniques shall be utilized to

21   assist the department's intelligence and gathering

22   process."

23         Number 3 is, "Conduct physical surveillance

24   of suspected criminal activity including the lawful

25   use of audio/visual monitoring."

1              Do you see that?
2         A.  Yes.
3         Q.  So would it be part of the department's
4    intelligence gathering process to, for example, if a
5    potential suspect was in a place where they had a
6    video monitoring or surveillance system to then
7    request access to that to allow the department to
8    determine potential information related to potential
9    criminal activity?
10        A.  Can you say that question again?
11        Q.  Yes, that was a longwinded one.
12             It says, "The following techniques shall be
13   utilized to assist the department's intelligence
14   gathering process."
15             Number 3 says, in part, "The lawful use of
16   audio/visual monitoring."
17             So my question is:  Would it be part of the
18   department's intelligence gathering process when
19   appropriate or relevant if there are -- if a third
20   party has surveillance footage of a potential
21   suspect, would it be part of the department's
22   intelligence gathering process to request to see
23   that surveillance footage?
24        A.  Yes.
25        Q.  Do you know if Mr. Visingard or anyone at

1       the department requested to see surveillance footage

2       related to the June 29th sting operation from

3       Canandaigua National Bank?

4            A.  I don't know.

5            Q.  All right.  Exhibit 2, I would like to turn

6       to, this is General Order 270, "Records Management."

7       This is -- I want to look at the page Bates stamped

8       CPD25.

9                Okay.  And then, on Page 2 of 8, it says,

10      Paragraph Roman 5, "Types of report," it says, "SJS

11      incident report."

12               Do you know what SJS stands for?

13           A.  I don't know the acronym, but it's issued

14      by New York State.  It's a state incident reporting

15      program.

16           Q.  Okay.  And then, the last sentence of that

17      paragraph says, "In all cases, members document all

18      reported offenses whether made by a complainant,

19      victim, or otherwise."

20               Do you see that?

21           A.  Yes.

22           Q.  So would this general order -- so I guess

23      my question is about the timing of the preparation

24      of an incident report.  Are incident reports

25      supposed to be created soon after the event?  Is it

1    okay for an officer to wait a while?  What's the

2    general practice at the department about that?

3        A.  I guess the practice is to complete it as

4    soon as possible, which, depending on caseload of

5    each officer, the caseload and when events occur and

6    priority sometimes dictates how quick the actual

7    report gets completed, but it's supposed to be

8    completed as soon as possible.

9        Q.  Thank you.  I want to go down to the next

10   page Bates stamped CPD26, this is Roman 6-A-1, this

11   is records system components supervisor review.

12            And Paragraph 1 starts, "Upon completing

13   any report, officers shall place the report in the

14   sergeant's review tray in the sergeant's office.

15   The supervisor shall review the report for

16   completeness and accuracy.

17            So as it relates to the June 29th sting

18   operation, the policy, is it your understanding that

19   the policy would require Mr. Visingard to prepare an

20   incident report as soon as possible and then place

21   it in the sergeant's review tray for the sergeant's

22   review?

23       A.  Well, the detectives are in a different

24   wing of the building.  The supervisor review tray is

25   actually in a different section of the building,

1    which is typically used for the road patrol

2    officers.  As far as detectives, they work out of

3    the same office, so generally that would be left in

4    the supervisor's workstation area for review.

5         Q.  Got it.  I'm looking at Paragraphs 2 and 3

6    down here.  Paragraph 2, "Sergeants shall note on

7    the report if review by the investigative division

8    is warranted."

9              How would a sergeant determine whether

10   review by the investigative division is warranted?

11        A.  This section here is typically used by the

12   road patrol.

13        Q.  Oh, okay.

14        A.  This is -- this would be, like, a road

15   patrol sergeant forwarding a report for the

16   investigative division to follow up on, which

17   there's a box at the bottom of the report that they

18   would acknowledge that the report is being forwarded

19   on.  The investigative division -- the investigative

20   division, being this would be a self-generated type

21   of report, would handle the entire investigation.

22        Q.  Thank you.  So just to clarify, I'm back

23   down to CPD26, this is 4.  It says, "Officers must

24   notify the sergeant/OIC of any reports that were not

25   completed prior to the end of shift."

1           So would this directive, would this apply

2     to an officer in a sting operation who was preparing

3     an incident report?

4           A.  Well, this would apply more to the general

5     police officers.  It's in the road patrol.  The

6     detectives under the investigative division, they --

7     based on the details of their investigation, they

8     may not be able to complete investigations by the

9     end of their shift.  Usually they take a lot longer

10    and that would be communicated between the detective

11    and the actual investigative sergeant as far as

12    which reports are still open and pending.

13          And as I said before, with the caseload and

14    the priority list and, you know, the work there,

15    they would have to be prioritized.  It's not likely

16    that every report would be completed by the end of

17    the shift in the investigative division.

18          Q.  Understood.  So this is on page Bates

19    stamped CPD27, this would be 4 of 8 General Order

20    270.  Paragraph 8 says, "Investigating officers do

21    not have the authority to close cases where he or

22    she believes a crime has been committed."

23          Would this provision apply to an incident

24    report completed by an officer after a sting

25    operation?

1          A.   Yes.   And just based on the nature of the

2     investigative office, a lot of these conversations

3     -- well, even with the road patrol, a lot of the

4     reports could be closed by a conversation with the

5     supervisor based on the evidence that they have at

6     hand and, I guess, the -- I guess possible next

7     investigative steps or ability to have any.

8          But usually, there's a conversation between

9     whatever officer or investigator and the supervisor

10    prior to the report being completed.

11         Q.   All right.   Chief, I'm back to CPD47.   This

12    would be General Order 705, Page 4 of 7.   So I'm

13    looking at, this would be, B-6, talking about case

14    status classifications.   And I'm looking at the one

15    that says, "Closed-exception," in Paragraph C.

16         It says, "Closed-exception:   The offender

17    has been identified and no prosecution is initiated.

18    Complainant withdrew complaint."

19         Do you see that?

20         A.   Yes.

21         Q.   Okay.   So Mr. Visingard's incident report,

22    I will note, has case closed by exception.   Would

23    that be an appropriate case status classification if

24    he did not pursue because he felt he lacked probable

25    cause?

1    A.   Yes, I have seen that one used many times

2    in that scenario.

3        Q.   Chief, do you know if there is any metadata

4    or a native file associated with Mr. Visingard's

5    incident report?

6        A.   Metadata?

7        Q.   Yeah, I'm going to scroll up here.  So this

8    is what you provided, this is Bates stamped CPD1,

9    CPD2.  So this is what I understand is his incident

10   report and my question is, like, is this a -- well,

11   let me ask it from the beginning.

12            How is this document created?  For example,

13   are there certain, like, fields that are filled in

14   and then this report is created or does an officer

15   see this report and insert the information within

16   the report?

17            MR. HOU:   Form.

18       A.   I guess I'm confused to your question.

19       Q.   Fair.  That was a good objection, Dave, I

20   appreciate it.

21            Let me ask again.  I'm wondering how --

22   just the physical process of completing an incident

23   report form.  Like, is this a Word document on a

24   computer or how does an officer fill in this

25   information?

1          A.   In the actual program, you enter the

2     program -- sign into the program, you have to

3     generate a new report, there's a tab for new report,

4     and then it's, basically, you fill in the tabs as

5     you go.

6          Q.   So, Chief, I'm looking at Exhibit 2, the

7     incident report Bates stamped at the bottom right

8     CPD1.  It says -- I'm looking at both CPD1 and 2.

9     So at the top, do you see where it says in the

10    middle, "Occurred on Tuesday, June 29, 2021"?

11         A.   Yes.

12         Q.   Okay.  So then if I scroll down, it says,

13    right underneath this narrative section, "Date of

14    action, date written, August 17, 2021."

15              Do you see that?

16         A.   Yes.

17         Q.   Do you know why this incident report was

18    written a little less than two months after the

19    incident?

20         A.   No, I don't.

21         Q.   Would writing a report approximately two

22    months after the incident occurred, would that be

23    consistent with the department's policies and

24    procedures?

25         A.   Generally, no.  I guess it would depend on,

MATHEW NEILSEN by MR. SILVERMAN                    44

```
 1   as I said before, caseload.  And, you know, I'm not
 2   certain about all of the factors involved in this
 3   case as far as if there's any additional
 4   investigative steps or anything like that that
 5   occurred.
 6              MR. SILVERMAN:  Thank you.  I think
 7              I might be all done.  Let me just talk
 8              to my client briefly.
 9              Do you want to take a break,
10              anyone?
11              MR. HOU:  Yeah, we can take five if
12              you want.
13              MR. SILVERMAN:  Let's take five.
14              THE STENOGRAPHER:  We are going off
15              the record at 10:09 a.m.
16              (Brief recess.)
17              THE STENOGRAPHER:  The time is
18              10:17 a.m. and we are back on the
19              record.
20   BY MR. SILVERMAN:
21       Q.  Mr. Nielsen, I just have a few more
22   questions.  I want to share again.  Chief, can you
23   see, this would be -- I shared my screen.  Can you
24   see Page 2 of the incident report marked CPD2?
25       A.  Yes.
```

1        Q.   It says, "Narrative," at the top?

2        A.   Yes.

3        Q.   Thank you.  When was the first time you

4     viewed this incident report?

5        A.   It was, I think, September of, I believe,

6     '21 when I first became aware of the litigation.

7        Q.   And did you have any conversations with

8     Mr. Visingard about his preparation of this incident

9     report?

10       A.   No, I think the only conversation we had

11    was about the preservation of the conversation that

12    we have already talked about.

13       Q.   Did you ever speak with Mr. Visingard about

14    his decision not to arrest the potential suspect

15    named in this incident report?

16       A.   Yes.

17       Q.   And do you recall what was said?

18       A.   It was -- you know, I just asked him about

19    his decision not to arrest and it was -- my

20    understanding is his decision not to arrest was

21    based on the -- I guess, the confusion that

22    initially took place when they encountered Mr. Wemes

23    in the hallway and whether they had just -- they had

24    some initial questions about the initial

25    identification at the scene.

1       Q.   Understood.  Do you know what those

2   questions were about the identification?

3       A.   Just some confusion with whether they were

4   talking to the right person, the initial contact in

5   the hallway where, you know, or in a hallway where

6   they weren't certain in the initial encounter when

7   they were, I guess, looking for the right -- which

8   person they were looking for.

9            And it was after that encounter they -- the

10  initial encounter was with Mr. Wemes, but they

11  weren't sure if they had the right person and then

12  later determined that they had.

13      Q.   Okay.  So that, I guess, is part of my

14  question.  So I want to look at this.  Let's see,

15  the third full paragraph down, I will try to zoom

16  in.

17           It starts with, "Myself and Investigator

18  Bowerman ended up speaking with Jason Ingalls who is

19  the bank security manager."  Then it says, "I

20  advised Ingalls of the investigation and he escorted

21  us to speak with Wemes.  I note that Wemes was not

22  at his desk in another wing of the bank.  I spoke

23  with Wemes and he denied ever being on the app

24  Grindr and that he didn't attempt to meet anyone."

25           So, Chief, my question is:  According to

1    this incident report, Mr. Visingard is speaking to
2    Wemes about this investigation.  Would that
3    constitute an investigative detention?
4        A.  I guess I don't know because, you know, I
5    wasn't there.  So I don't know if they just -- they
6    were just speaking in the hallway.  I don't know if
7    they actually detained him or not.
8        Q.  Can I ask you, what -- for example, if they
9    spoke to him alone privately, would that, in your
10   mind, be considered an investigative detention?
11       A.  No.
12       Q.  And what would make -- I guess, what would
13   cause speaking to somebody privately -- or strike
14   that.
15           If an officer speaks to a potential suspect
16   alone privately, what might make that an
17   investigative detention?
18       A.  If the person was free to leave or not.
19       Q.  And are you aware of the -- how it's
20   determined whether someone is free to leave or not?
21       A.  Well, it could be several ways whether if
22   they detain them in handcuffs or if the person tries
23   to leave and they tell them they can't leave at that
24   moment, if they were secured in a police car.  All
25   of that could be factors whether they were actually

1    in an investigative detention.  It's not just one

2    thing, it could be several things.

3         Q.  Understood.  If a police officer says, "I

4    would like to speak with you about my

5    investigation," and that person consents to speaking

6    with the officer, would that be considered an

7    investigative detention?

8         A.  No.

9         Q.  All right.  I want to note, so the same

10   third full paragraph, so Mr. Visingard said he spoke

11   with Wemes, and then he writes, "I note a couple of

12   things in regard to Wemes.  During my text message

13   conversation, Wemes sent me a picture of his lower

14   body.  In the picture, I could see a lanyard with an

15   ID.  I note that the lanyard had a string attached

16   to it on the ID.  While I spoke with Wemes, I

17   observed the same lanyard, same ID, and exact same

18   string on the ID."

19            So, Chief, I know you weren't there, but

20   hypothetically, if this potential suspect sent

21   Mr. Visingard a picture where their identification

22   was showing and that officer saw the exact same ID,

23   same lanyard, and same string on the ID, do you

24   believe that could be considered probable cause to

25   arrest?

1        A.   Not necessarily because, you know, multiple

2    people could have that, I guess.  You know, I don't

3    know what the bank issues for those.  If it was a

4    bank ID, I don't know -- I guess I don't know what

5    is really issued to each employee, so I have no

6    idea.

7        Q.   Okay.  I want to look at the last sentence

8    here, it says, "I advised both Hernandez and Ingalls

9    that there was no doubt in my mind that I was, in

10   fact, communicating with Wemes, but I didn't have

11   enough to charge him."

12        Do you see that?

13        A.   Yes.

14        Q.   Would Mr. Visingard's use of charge here,

15   would that -- would you interpret that as arrest?

16        A.   No, because I guess I don't know all of the

17   evidence that he had at that moment.

18        Q.   Sure.  I guess I'm just asking you to --

19   because I'm confused -- well, I would like some

20   clarification about the word "charge" used in this

21   last sentence.

22        A.   Okay.  You are referring to the word

23   charge?

24        Q.   Yes.  So when Mr. Visingard says, "I didn't

25   have enough to charge him," do you interpret that as

1  I didn't have enough to arrest him?

2      A.   That would be my interpretation, yes.

3      Q.   And if there was no doubt in

4  Mr. Visingard's mind that Mr. Wemes was the suspect,

5  would that be considered probable cause to arrest?

6      A.   Can you say that question again?

7      Q.   Yes.  He says in this last sentence, "I

8  advised both Hernandez and Ingalls that there was no

9  doubt in my mind that I was, in fact, communicating

10  with Wemes."

11          So my question is:  If this -- if

12  Mr. Visingard had no doubt in his mind that he was

13  communicating with Mr. Wemes on this Grindr app,

14  would Mr. Visingard's representation that he had no

15  doubt that he was communicating with Mr. Wemes,

16  would that be considered probable cause sufficient

17  to arrest Mr. Wemes if Mr. Visingard had no doubt he

18  was communicating with Mr. Wemes?

19      A.   I guess I would have to say yes, but it

20  would also be dependent on the, I guess, the

21  elements that the district attorney's office would

22  need to follow through with the prosecution.  I

23  don't know what conversation or which criteria from

24  the DA's office, what had came into play there.  I

25  guess I don't have enough information.

1      Q.   After you spoke with Mr. Visingard about

2    this incident report around September 2021, did you

3    ever speak with him after that about this incident?

4      A.   Not that I remember, no.  I don't think so.

5      Q.   Okay.

6      A.   I will take that back, I did speak to him

7    about if he had any communication with the people at

8    the bank that were listed on the subpoena as far as

9    email or text messages or anything.  That was when I

10   was, I guess, going through the subpoena there to

11   try to find out, you know, if anyone had any

12   conversation regarding this case that I could

13   preserve.

14      Q.   And what did he say?

15      A.   He said, "No."  And I did verify that by

16   going through the email server and I could not find

17   any conversation between Detective Visingard and the

18   people at the bank regarding this case.

19              MR. SILVERMAN:  Okay.  I have no

20          further questions.  We can go off the

21          record.

22              THE STENOGRAPHER:  The time is

23          10:29 and we are off the record.

24              (The deposition of Mathew Nielsen

25          was concluded.)

1    **CERTIFICATION:**

2    STATE OF NEW YORK

3    COUNTY OF STEUBEN

4        I, TONIA L. TINKER, the officer before whom the

5    foregoing deposition was taken, do hereby certify

6    that the witness whose testimony appears in the

7    foregoing deposition was duly sworn by me.

8        I further certify that the testimony of said

9    witness was taken by me in Stenotype and thereafter

10    reduced to typewriting under my supervision.

11        I further certify that the said deposition

12    constitutes a true record of the testimony given by

13    said witness to the best of my ability.

14        I further certify that the said deposition was

15    taken before me at the time and place specified in

16    the notice.

17        I further certify that I am neither counsel

18    for, related to, nor employed by any of the parties

19    to the action in which this deposition was taken,

20    nor financially or otherwise interested in the

21    outcome of the action.

22

23

24        TONIA L. TINKER, Notary Public

25

**'**

'**21** [1] - 45:6

**1**

**1** [5] - 4:5, 9:17, 9:22, 23:5, 38:12
**10:09** [1] - 44:15
**10:17** [1] - 44:18
**10:29** [2] - 1:16, 51:23
**11** [2] - 2:17, 27:9
**118** [1] - 2:5
**13** [3] - 11:3, 11:12, 21:21
**14** [1] - 19:22
**14424** [1] - 2:18
**14456** [1] - 2:6
**14604** [1] - 2:12
**15** [1] - 16:13
**17** [1] - 43:14
**18** [1] - 28:21

**2**

**2** [17] - 4:6, 31:4, 31:5, 31:10, 31:20, 33:9, 33:11, 34:6, 34:16, 35:16, 37:5, 37:9, 39:5, 39:6, 43:6, 43:8, 44:24
**2020** [1] - 11:18
**2021** [6] - 21:1, 23:8, 27:14, 43:10, 43:14, 51:2
**2022** [1] - 23:23
**2024** [2] - 1:14, 6:2
**21** [1] - 7:8
**23** [2] - 1:14, 6:2
**270** [2] - 37:6, 40:20
**29** [2] - 23:7, 43:10
**29th** [11] - 23:5, 23:12, 23:17, 25:23, 26:1, 26:20, 27:10, 27:15, 28:12, 37:2, 38:17

**3**

**3** [6] - 11:6, 33:11, 35:18, 35:23,

36:15, 39:5
**30(3)(1** [1] - 5:12
**300** [1] - 2:11
**31** [1] - 4:7

**4**

**4** [4] - 35:18, 39:23, 40:19, 41:12

**5**

**5** [1] - 37:10
**500** [1] - 31:8
**505** [2] - 33:9, 34:4
**57** [2] - 4:7, 31:6

**6**

**6** [4] - 3:6, 11:6, 31:10, 32:24
**6-A-1** [1] - 38:10
**6:22-cv-06297** [2] - 1:6, 6:10

**7**

**7** [3] - 23:7, 35:18, 41:12
**705** [1] - 41:12
**725** [1] - 35:17

**8**

**8** [3] - 37:9, 40:19, 40:20

**9**

**9** [3] - 4:5, 25:21, 31:10
**9:03** [2] - 1:16, 6:3

**A**

**a.m** [5] - 1:16, 6:3, 44:15, 44:18
**ability** [2] - 41:7, 52:13
**able** [4] - 9:13, 26:5, 29:12, 40:8
**abuse** [2] - 19:16, 19:19
**accepted** [1] - 9:19
**access** [1] - 36:7
**accord** [1] - 22:21
**according** [1] -

46:25
**account** [7] - 15:9, 25:6, 25:9, 25:12, 25:13, 25:16, 29:9
**accounts** [3] - 15:2, 15:6, 15:7
**accuracy** [1] - 38:16
**accurate** [5] - 7:21, 8:12, 14:3, 14:19, 32:18
**acknowledge** [1] - 39:18
**acquire** [1] - 34:1
**acronym** [1] - 37:13
**act** [2] - 18:2, 18:4
**action** [4] - 13:19, 43:14, 52:19, 52:21
**Action** [1] - 1:6
**active** [2] - 13:17, 14:10
**activity** [1] - 35:24, 36:9
**actual** [4] - 20:23, 38:6, 40:11, 43:1
**add** [1] - 7:25
**additional** [5] - 21:19, 25:22, 33:24, 33:25, 44:3
**administrator** [1] - 10:16
**advantage** [1] - 12:22
**advised** [3] - 46:20, 49:8, 50:8
**advising** [1] - 22:23
**affairs** [1] - 21:18
**affirmatively** [1] - 17:10
**afterwards** [1] - 24:17
**age** [1] - 19:14
**ago** [1] - 9:25
**AGREED** [1] - 5:3
**agreed** [1] - 19:10
**allegation** [1] - 28:16
**allow** [1] - 36:7
**alone** [2] - 47:9, 47:16
**amount** [2] - 26:10, 30:24
**analyzation** [1] -

28:8
**analyze** [1] - 28:15
**AND** [1] - 5:3
**answer** [5] - 7:24, 13:12, 13:13, 14:12, 21:10
**answering** [1] - 12:24
**answers** [1] - 5:9
**app** [10] - 11:8, 16:4, 21:8, 24:25, 25:2, 25:5, 28:3, 46:23, 50:13
**apparent** [1] - 31:12
**APPEARANCES** [1] - 2:1
**Appearances** [1] - 6:15
**apply** [4] - 19:20, 40:1, 40:4, 40:23
**appreciate** [2] - 12:25, 42:20
**approached** [1] - 26:14
**appropriate** [2] - 36:19, 41:23
**approximate** [1] - 23:25
**apps** [6] - 11:14, 14:25, 15:1, 15:18, 15:20, 15:23
**April** [2] - 1:14, 6:2
**area** [1] - 39:4
**argument** [1] - 23:1
**arrest** [32] - 17:18, 17:24, 18:9, 18:18, 19:2, 26:4, 26:7, 26:8, 27:3, 30:8, 30:17, 30:19, 31:15, 31:17, 32:5, 32:21, 33:2, 33:5, 33:11, 33:14, 33:21, 35:12, 35:14, 45:14, 45:19, 45:20, 48:25, 49:15, 50:1, 50:5, 50:17
**arrested** [6] - 28:23, 29:3, 29:7, 29:11,

29:13, 29:25
**arresting** [3] - 11:10, 11:15, 31:18
**assignments** [2] - 13:18, 13:20
**assist** [3] - 20:20, 35:21, 36:13
**associated** [1] - 42:4
**assume** [1] - 7:13
**attached** [1] - 48:15
**attempt** [2] - 28:10, 46:24
**attempted** [2] - 19:13, 19:16
**attempting** [1] - 17:6
**attention** [4] - 25:21, 31:4, 31:7, 33:8
**attorney** [2] - 5:17, 8:21
**attorney's** [5] - 22:6, 22:12, 30:24, 31:1, 50:21
**attorney-client** [1] - 8:21
**attorneys** [3] - 2:10, 5:4, 5:21
**Attorneys** [2] - 2:4, 2:16
**audio/visual** [2] - 35:25, 36:16
**August** [2] - 11:17, 43:14
**authority** [1] - 40:21
**available** [2] - 13:18, 20:15
**aware** [15] - 7:20, 12:15, 21:14, 21:16, 22:1, 24:2, 25:24, 26:16, 26:17, 28:24, 29:4, 29:6, 29:10, 45:6, 47:19

**B**

**B-6** [1] - 41:13
**Bank** [2] - 6:7, 37:3
**BANK** [1] - 1:7
**bank** [7] - 26:12, 46:19, 46:22, 49:3, 49:4, 51:8,

51:18
**Bank's** [1] - 23:9
**based** [10] - 13:18, 18:22, 20:6, 30:17, 30:21, 30:24, 40:7, 41:1, 41:5, 45:21
**basic** [1] - 19:12
**basis** [3] - 23:11, 23:14, 23:16
**Bates** [10] - 4:6, 31:6, 31:9, 33:9, 34:4, 37:7, 38:10, 40:18, 42:8, 43:7
**Bausch** [2] - 2:11
**became** [2] - 26:17, 45:6
**become** [1] - 28:17
**becomes** [1] - 31:12
**began** [2] - 11:13, 24:13
**begin** [1] - 6:4
**beginning** [1] - 42:11
**behalf** [3] - 6:12, 10:3, 10:24
**belief** [1] - 30:17
**believes** [4] - 29:23, 30:15, 33:13, 40:22
**below** [1] - 34:16
**best** [1] - 52:13
**better** [1] - 29:9
**between** [7] - 5:4, 8:18, 24:22, 34:20, 40:10, 41:8, 51:17
**BIESENBACH** [1] - 2:13
**body** [1] - 48:14
**bottom** [3] - 34:5, 39:17, 43:7
**Bowerman** [1] - 46:18
**box** [1] - 39:17
**BOYLAN** [1] - 2:15
**branch** [1] - 23:9
**break** [2] - 8:1, 44:9
**brief** [1] - 44:16
**briefly** [3] - 7:16, 8:13, 44:8
**bring** [1] - 22:25
**budget** [1] - 10:18
**budgetary** [1] -

10:18
**building** [2] - 38:24, 38:25
**business** [1] - 30:13
**busy** [1] - 13:7
**BY** [7] - 2:7, 2:13, 2:19, 9:1, 10:1, 29:21, 44:20

## C

**Canandaigua** [5] - 2:18, 6:7, 7:8, 7:9, 37:3
**CANANDAIGUA** [1] - 1:7
**Canandaigua's** [1] - 23:9
**car** [1] - 47:24
**Case** [1] - 6:10
**case** [11] - 18:6, 19:18, 20:10, 30:3, 30:14, 41:13, 41:22, 41:23, 44:3, 51:12, 51:18
**caseload** [4] - 38:4, 38:5, 40:13, 44:1
**cases** [8] - 20:5, 20:6, 30:21, 34:7, 34:12, 34:17, 37:17, 40:21
**cell** [1] - 23:22
**certain** [6] - 13:23, 14:25, 28:4, 42:13, 44:2, 46:6
**CERTIFICATION** [1] - 52:1
**certified** [2] - 5:19, 5:23
**certify** [5] - 52:5, 52:8, 52:11, 52:14, 52:17
**change** [3] - 7:24, 35:1
**changes** [1] - 34:24
**charge** [7] - 19:13, 20:24, 49:11, 49:14, 49:20, 49:23, 49:25
**charges** [3] - 5:23, 5:24, 30:18
**chat** [1] - 15:24

**chief** [11] - 7:13, 8:18, 10:15, 10:16, 16:12, 19:21, 21:21, 23:4, 27:8, 41:11, 42:3
**Chief** [12] - 6:25, 7:2, 9:13, 10:2, 23:11, 25:21, 28:20, 31:3, 43:6, 44:22, 46:25, 48:19
**children** [1] - 12:22
**choose** [1] - 14:1
**chooses** [1] - 30:17
**circumstances** [1] - 20:2
**City** [1] - 7:7
**city** [1] - 7:9
**Civil** [2] - 1:6, 5:12
**clarification** [3] - 8:25, 29:19, 49:20
**clarify** [8] - 9:9, 13:24, 15:17, 21:11, 25:8, 27:12, 32:6, 39:22
**classification** [1] - 41:23
**classifications** [1] - 41:14
**client** [2] - 8:21, 44:8
**close** [1] - 40:21
**closed** [2] - 41:4, 41:22
**Closed** [2] - 41:15, 41:16
**Closed-exception** [2] - 41:15, 41:16
**CODE** [1] - 2:15
**collaborate** [1] - 20:1
**collaboration** [1] - 19:23
**collaboratively** [1] - 20:4
**commencing** [1] - 1:15
**committed** [6] - 28:23, 29:23, 30:16, 31:13, 32:15, 40:22
**communicate** [2] - 14:23, 23:10

**communicated** [1] - 40:10
**communicates** [1] - 20:14
**communicating** [12] - 11:9, 14:18, 16:14, 16:18, 17:20, 18:13, 19:4, 49:10, 50:9, 50:13, 50:15, 50:18
**communication** [13] - 16:20, 17:16, 17:24, 18:2, 18:20, 18:23, 20:12, 24:22, 25:2, 27:22, 27:24, 51:7
**communications** [2] - 8:18, 8:22
**Company** [1] - 6:8
**COMPANY** [1] - 1:8
**complainant** [2] - 37:18, 41:18
**complaint** [1] - 41:18
**complete** [2] - 38:3, 40:8
**completed** [7] - 33:12, 38:7, 38:8, 39:25, 40:16, 40:24, 41:10
**completeness** [1] - 38:16
**completing** [2] - 38:12, 42:22
**components** [1] - 38:11
**computer** [1] - 42:24
**concerning** [1] - 25:23
**concluded** [1] - 51:25
**concluding** [1] - 1:16
**condition** [2] - 28:14, 28:18
**Conduct** [1] - 35:23
**conduct** [5] - 11:7, 17:4, 17:10, 17:16, 23:3
**confident** [1] - 26:25

**confused** [2] - 42:18, 49:19
**confusion** [3] - 26:11, 45:21, 46:3
**consents** [1] - 48:5
**considered** [6] - 18:3, 47:10, 48:6, 48:24, 50:5, 50:16
**consist** [1] - 31:24
**consisted** [1] - 8:11
**consistent** [1] - 43:23
**constant** [1] - 14:22
**constitute** [1] - 47:3
**constitutes** [1] - 52:12
**consult** [1] - 30:23
**contact** [1] - 46:4
**contemplates** [1] - 34:13
**conventional** [1] - 25:1
**conversation** [27] - 18:25, 22:18, 22:20, 22:24, 23:19, 24:4, 24:16, 24:20, 24:24, 24:25, 25:7, 25:15, 26:2, 26:10, 26:24, 27:21, 28:1, 28:5, 30:11, 41:4, 41:8, 45:10, 45:11, 48:13, 50:23, 51:12, 51:17
**conversations** [10] - 22:3, 22:10, 22:12, 22:13, 22:15, 22:16, 28:11, 30:2, 41:2, 45:7
**correct** [2] - 7:14, 27:17
**corrections** [1] - 5:14
**correspondence** [1] - 8:13
**Counsel** [1] - 5:5
**counsel** [3] - 8:5, 9:5, 52:17

**countermeasures** [1] - 34:8
**COUNTY** [1] - 52:3
**County** [2] - 19:24, 20:7
**county** [1] - 20:7
**couple** [1] - 48:11
**course** [3] - 17:15, 29:24, 34:23
**court** [1] - 30:18
**COURT** [1] - 1:1
**Court** [3] - 1:17, 6:9, 6:15
**CPD** [5] - 10:10, 17:20, 20:1, 20:14, 25:25
**CPD-000001** [1] - 4:7
**CPD1** [4] - 31:6, 42:8, 43:8
**CPD2** [2] - 42:9, 44:24
**CPD25** [1] - 37:8
**CPD26** [2] - 38:10, 39:23
**CPD27** [1] - 40:19
**CPD32** [1] - 31:9
**CPD33** [1] - 32:25
**CPD41** [1] - 33:10
**CPD43** [1] - 34:5
**CPD47** [1] - 41:11
**created** [3] - 37:25, 42:12, 42:14
**crime** [6] - 28:23, 29:1, 29:23, 30:16, 32:16, 40:22
**criminal** [11] - 16:13, 16:21, 16:22, 17:3, 17:10, 23:2, 26:4, 26:6, 31:14, 35:24, 36:9
**criminality** [1] - 17:17
**criteria** [2] - 22:6, 50:23
**cross** [3] - 16:22, 17:9, 17:17
**crossed** [1] - 35:13
**crosses** [1] - 17:3
**CSR** [1] - 6:14
**curious** [2] - 13:1, 20:11
**custody** [3] -

34:22, 35:3, 35:10

## D

**DA's** [1] - 50:24
**Daniel** [1] - 9:10
**date** [5] - 11:22, 20:16, 23:25, 27:17, 43:14
**Date** [1] - 43:13
**dating** [1] - 11:8
**Dave** [1] - 42:19
**DAVID** [1] - 2:19
**David** [3] - 8:8, 24:10, 29:19
**deactivated** [5] - 15:2, 15:6, 25:6, 25:14, 25:17
**deciding** [1] - 20:19
**decision** [4] - 28:15, 45:14, 45:19, 45:20
**Defendant** [2] - 1:9, 2:10
**define** [3] - 11:6, 11:11, 32:10
**defined** [2] - 23:6
**definition** [1] - 32:12
**definitive** [1] - 11:22
**denied** [1] - 46:23
**department** [30] - 10:3, 10:17, 10:18, 10:21, 10:23, 11:13, 11:24, 12:3, 12:8, 12:19, 14:1, 15:7, 15:18, 15:25, 16:1, 16:5, 16:18, 18:14, 19:4, 21:12, 21:17, 21:24, 28:9, 28:24, 29:1, 29:2, 29:23, 36:7, 37:1, 38:2
**Department** [2] - 7:8, 20:9
**department's** [10] - 11:4, 11:7, 15:13, 23:8, 35:21, 36:3, 36:13, 36:18, 36:21, 43:23
**depended** [1] - 14:2

**dependent** [5] - 17:25, 18:6, 18:11, 19:11, 50:20
**deposed** [1] - 7:14
**deposition** [23] - 5:5, 5:16, 5:17, 5:19, 6:5, 6:11, 8:1, 8:6, 9:7, 9:18, 10:8, 10:24, 11:3, 23:5, 25:21, 27:8, 28:21, 51:24, 52:5, 52:7, 52:11, 52:14, 52:19
**described** [1] - 9:3
**DESCRIPTION** [1] - 4:3
**design** [1] - 15:3
**designated** [1] - 10:23
**desk** [1] - 46:22
**details** [2] - 24:3, 40:7
**detain** [2] - 33:6, 47:22
**detained** [2] - 35:6, 47:7
**detainee** [2] - 31:13, 31:14
**detaining** [1] - 31:25
**detect** [1] - 12:21
**Detective** [18] - 12:5, 12:7, 12:10, 12:15, 13:2, 13:15, 13:25, 22:4, 23:15, 23:19, 24:23, 25:3, 26:2, 26:23, 27:21, 28:6, 29:8, 51:17
**detective** [8] - 12:11, 15:8, 18:3, 20:18, 20:24, 22:19, 30:9, 40:10
**detectives** [4] - 18:1, 38:23, 39:2, 40:6
**detention** [9] - 31:12, 31:24, 32:7, 35:5, 47:3, 47:10, 47:17, 48:1, 48:7
**determine** [5] -

30:10, 32:1, 32:4, 36:8, 39:9
**determined** [2] - 46:12, 47:20
**develop** [1] - 18:8
**development** [1] - 10:19
**devices** [1] - 27:9
**dictates** [1] - 38:6
**difference** [1] - 34:19
**different** [3] - 27:16, 38:23, 38:25
**direct** [1] - 25:20
**direction** [4] - 22:15, 22:20, 30:19, 33:16
**directive** [1] - 40:1
**discretion** [1] - 33:21
**discussed** [2] - 8:5, 26:10
**discussions** [1] - 22:24
**display** [1] - 18:5
**dissemination** [1] - 16:23
**district** [5] - 22:5, 22:12, 30:24, 30:25, 50:21
**District** [2] - 6:9
**DISTRICT** [2] - 1:1, 1:2
**division** [10] - 20:19, 20:25, 21:5, 39:7, 39:10, 39:16, 39:19, 39:20, 40:6, 40:17
**document** [5] - 9:20, 9:21, 37:17, 42:12, 42:23
**documents** [3] - 8:7, 9:2, 31:5
**Documents** [1] - 4:6
**done** [2] - 12:12, 44:7
**doubt** [6] - 49:9, 50:3, 50:9, 50:12, 50:15, 50:17
**down** [9] - 9:18, 20:18, 34:3, 35:16, 38:9, 39:6, 39:23, 43:12, 46:15

**drafted** [1] - 23:15
**duly** [3] - 5:16, 6:20, 52:7
**during** [10] - 7:25, 16:15, 26:2, 27:15, 28:22, 29:23, 31:11, 34:22, 35:6, 48:12
**duties** [1] - 10:15

## E

**electronic** [2] - 18:22, 27:9
**elements** [2] - 19:17, 50:21
**eliminate** [1] - 23:1
**email** [4] - 8:13, 24:10, 51:9, 51:16
**emailed** [1] - 9:20
**employed** [1] - 52:18
**employee** [1] - 49:5
**encounter** [4] - 19:10, 46:6, 46:9, 46:10
**encountered** [1] - 45:22
**end** [3] - 39:25, 40:9, 40:16
**ended** [1] - 46:18
**engage** [7] - 12:3, 13:22, 14:5, 14:18, 17:12, 17:23, 22:13
**engaged** [3] - 12:9, 13:15, 18:24
**engaging** [4] - 11:4, 11:25, 19:22, 21:22
**enter** [1] - 43:1
**entire** [1] - 39:21
**entrapping** [1] - 23:2
**escorted** [1] - 46:20
**ESQ** [3] - 2:7, 2:13, 2:19
**establish** [4] - 15:8, 15:9, 18:22, 35:8
**established** [3] - 32:4, 33:5, 35:7
**event** [1] - 37:25
**events** [1] - 38:5

**evidence** [16] - 18:20, 23:23, 24:6, 26:21, 27:13, 28:7, 28:14, 28:19, 30:22, 30:25, 32:3, 32:15, 33:24, 33:25, 41:5, 49:17
**exact** [3] - 26:10, 48:17, 48:22
**exactly** [1] - 26:9
**Examination** [2] - 1:12, 3:6
**EXAMINATION** [1] - 6:23
**examined** [1] - 6:22
**example** [9] - 16:3, 20:13, 21:12, 21:14, 33:17, 34:23, 36:4, 42:12, 47:8
**examples** [1] - 17:2
**except** [1] - 5:8
**exception** [3] - 41:15, 41:16, 41:22
**Exhibit** [9] - 9:17, 9:22, 31:4, 31:5, 31:20, 33:9, 35:16, 37:5, 43:6
**EXHIBITS** [1] - 4:1
**exist** [1] - 24:6
**exists** [1] - 33:14
**expedite** [1] - 5:24
**expenses** [1] - 10:18
**extent** [1] - 33:17

## F

**fact** [3] - 22:15, 49:10, 50:9
**factors** [3] - 19:13, 44:2, 47:25
**fair** [1] - 42:19
**far** [8] - 22:6, 22:11, 24:5, 30:6, 39:2, 40:11, 44:3, 51:8
**FEDERAL** [1] - 5:1

**Federal** [1] - 5:12
**felt** [2] - 27:4, 41:24
**few** [4] - 7:16, 8:8, 9:25, 44:21
**fields** [1] - 42:13
**figure** [2] - 15:11, 17:16
**file** [1] - 42:4
**filed** [1] - 6:8
**fill** [2] - 42:24, 43:4
**filled** [1] - 42:13
**financially** [1] - 52:20
**first** [7] - 6:20, 11:13, 16:16, 23:20, 35:11, 45:3, 45:6
**five** [2] - 44:11, 44:13
**flagged** [4] - 25:5, 25:10, 25:12, 25:13
**follow** [2] - 39:16, 50:22
**followed** [1] - 31:17
**following** [3] - 25:4, 35:20, 36:12
**follows** [1] - 6:22
**footage** [3] - 36:20, 36:23, 37:1
**FOR** [1] - 1:2
**foregoing** [2] - 52:5, 52:7
**Form** [1] - 13:13
**form** [6] - 5:8, 13:12, 14:12, 29:14, 42:17, 42:23
**formalized** [1] - 22:1
**forth** [2] - 10:11, 31:15
**forward** [1] - 8:23
**forwarded** [3] - 8:8, 24:11, 39:18
**forwarding** [1] - 39:15
**fraudulent** [3] - 25:5, 25:10, 25:13
**free** [2] - 47:18, 47:20
**full** [2] - 46:15, 48:10

**fully** [2] - 14:14, 17:14
**FURTHER** [4] - 5:7, 5:11, 5:15, 5:21
**future** [1] - 28:7

## G

**gather** [1] - 33:20
**gathering** [6] - 35:19, 35:21, 36:4, 36:14, 36:18, 36:22
**General** [7] - 31:8, 33:8, 34:4, 35:17, 37:6, 40:19, 41:12
**general** [12] - 8:11, 10:20, 11:3, 16:6, 30:4, 30:11, 30:13, 32:20, 33:2, 37:22, 38:2, 40:4
**generally** [8] - 17:15, 21:17, 29:16, 29:20, 30:2, 30:8, 39:3, 43:25
**generate** [1] - 43:3
**generated** [1] - 39:20
**Genesee** [1] - 2:5
**Geneva** [2] - 2:6, 20:8
**given** [1] - 52:12
**graciously** [1] - 9:19
**great** [1] - 9:16
**Greg** [1] - 29:15
**GREGORY** [2] - 2:3, 2:7
**Grindr** [13] - 15:21, 16:4, 21:13, 24:25, 25:5, 25:9, 25:10, 25:23, 25:25, 26:19, 28:3, 46:24, 50:13
**ground** [1] - 7:17
**guess** [38] - 12:23, 13:1, 14:15, 14:21, 15:11, 17:1, 17:25, 18:19, 19:9, 20:11, 22:23, 23:1,

27:19, 30:13,
32:23, 33:4,
34:23, 34:25,
37:22, 38:3,
41:6, 42:18,
43:25, 45:21,
46:7, 46:13,
47:4, 47:12,
49:2, 49:4,
49:16, 49:18,
50:19, 50:20,
50:25, 51:10

## H

**hallway** [4] -
45:23, 46:5,
47:6
**hand** [2] - 24:12,
41:6
**handcuffs** [1] -
47:22
**handle** [2] -
21:17, 39:21
**handled** [1] -
20:23
**hear** [1] - 7:17
**heard** [1] - 15:21
**hearing** [1] - 5:18
**held** [1] - 1:14
**help** [1] - 33:20
**HEREBY** [1] - 5:3
**hereby** [1] - 52:5
**hereto** [1] - 5:5
**Hernandez** [2] -
49:8, 50:8
**history** [2] - 11:4,
19:22
**History** [1] - 21:22
**hold** [1] - 30:18
**HOU** [8] - 2:19,
8:16, 13:12,
13:14, 14:12,
29:14, 42:17,
44:11
**Hou** [7] - 7:10,
8:8, 9:5, 9:19,
24:10, 24:15,
31:5
**hypothetical** [1] -
19:3
**hypothetically** [1]
- 48:20

## I

**ID** [7] - 48:15,
48:16, 48:17,
48:18, 48:22,
48:23, 49:4

**idea** [1] - 49:6
**identification** [6] -
9:23, 18:21,
31:21, 45:25,
46:2, 48:21
**identified** [2] -
16:10, 41:17
**identity** [1] - 16:9
**image** [1] - 15:13
**immediately** [1] -
25:4
**impetus** [1] -
13:10
**impropriety** [1] -
28:16
**inappropriate** [2]
- 16:23, 17:4
**incident** [33] -
8:11, 23:14,
23:18, 24:3,
24:5, 24:11,
29:16, 31:17,
34:8, 34:18,
34:20, 37:11,
37:14, 37:24,
38:20, 40:3,
40:23, 41:21,
42:5, 42:9,
42:22, 43:7,
43:17, 43:19,
43:22, 44:24,
45:4, 45:8,
45:15, 47:1,
51:2, 51:3
**included** [1] -
8:14
**including** [4] -
5:23, 27:10,
31:16, 35:24
**INDEX** [2] - 3:1,
4:1
**individual** [4] -
10:4, 16:13,
18:12, 33:3
**individually** [1] -
5:22
**individuals** [2] -
9:6, 11:10
**information** [15] -
20:22, 21:8,
21:14, 22:11,
25:22, 25:25,
28:11, 33:19,
33:20, 34:2,
34:25, 36:8,
42:15, 42:25,
50:25
**informed** [1] -
24:15
**Ingalls** [4] - 46:18,

46:20, 49:8,
50:8
**initial** [1] - 45:24,
46:4, 46:6,
46:10
**initiated** [1] -
41:17
**inquiring** [1] -
30:12
**insert** [1] - 42:15
**Intelligence** [1] -
35:19
**intelligence** [5] -
35:21, 36:4,
36:13, 36:18,
36:22
**intent** [1] - 18:5
**interested** [1] -
52:20
**interpret** [2] -
49:15, 49:25
**interpretation** [1]
- 50:2
**investigated** [2] -
20:10, 28:22
**Investigating** [1] -
40:20
**investigating** [1] -
11:15
**investigation** [16]
- 16:25, 26:16,
27:1, 27:18,
29:7, 32:3,
33:13, 33:17,
33:22, 34:23,
35:7, 39:21,
40:7, 46:20,
47:2, 48:5
**investigations** [4]
- 13:16, 13:17,
21:18, 40:8
**investigative** [24]
- 20:19, 20:25,
21:2, 21:4,
31:11, 31:23,
32:6, 35:5, 39:7,
39:10, 39:16,
39:19, 40:6,
40:11, 40:17,
41:2, 41:7, 44:4,
47:3, 47:10,
47:17, 48:1,
48:7
**Investigator** [1] -
46:17
**investigator** [1] -
41:9
**involved** [4] -
18:20, 19:14,
19:17, 44:2

**IS** [5] - 5:3, 5:7,
5:11, 5:15, 5:21
**issue** [1] - 28:17
**issued** [2] - 37:13,
49:5
**issues** [1] - 49:3
**IT** [5] - 5:3, 5:7,
5:11, 5:15, 5:21
**itself** [1] - 13:22

## J

**January** [1] - 12:6
**JASON** [1] - 1:4
**Jason** [3] - 6:6,
23:10, 46:18
**job** [1] - 10:15
**June** [14] - 21:1,
23:5, 23:7,
23:12, 23:17,
25:23, 26:1,
26:20, 27:10,
27:15, 28:12,
37:2, 38:17,
43:10

## K

**keep** [1] - 22:18
**KESSLER** [1] -
2:9
**kind** [2] - 16:12,
21:23
**knowing** [1] -
24:11
**knowledge** [2] -
23:12, 23:17
**knowledgeable**
[1] - 10:11

## L

**lacked** [1] - 41:24
**laid** [2] - 10:8,
10:24
**lanyard** [4] -
48:14, 48:15,
48:17, 48:23
**last** [4] - 37:16,
49:7, 49:21,
50:7
**law** [3] - 11:11,
16:21, 16:22
**Law** [1] - 19:20
**lawful** [2] - 35:24,
36:15
**Lawrence** [1] -
21:6
**laws** [4] - 16:13,
16:17, 19:1,

19:7
**lead** [1] - 22:19
**leading** [2] -
22:14, 22:17
**learn** [1] - 24:7
**learned** [2] -
23:20, 27:18
**leave** [4] - 47:18,
47:20, 47:23
**led** [2] - 23:8,
26:20
**left** [2] - 28:14,
39:3
**less** [1] - 43:18
**level** [3] - 32:4,
35:1, 35:14
**Lieutenant** [1] -
21:6
**likely** [1] - 40:15
**limited** [1] - 20:6
**line** [4] - 16:22,
17:3, 17:9,
17:17
**list** [1] - 40:14
**listed** [1] - 51:8
**litany** [1] - 19:18
**litigation** [5] -
23:20, 24:8,
24:15, 27:20,
45:6
**LLP** [1] - 2:9
**locate** [1] - 26:11
**location** [4] -
17:22, 18:5,
18:16, 19:6
**login** [1] - 21:7
**logo** [1] - 15:13
**Lomb** [1] - 2:11
**longwinded** [1] -
36:11
**look** [9] - 18:4,
19:21, 23:5,
28:10, 28:20,
31:9, 37:7,
46:14, 49:7
**looked** [2] -
28:13, 28:17
**looking** [12] -
16:12, 18:1,
27:8, 29:19,
34:6, 39:5,
41:13, 41:14,
43:6, 43:8, 46:7,
46:8
**looks** [2] - 9:24,
31:8
**lower** [1] - 48:13
**lull** [1] - 13:19

## M

**main** [1] - 16:4
**Main** [1] - 23:9
**Management** [1] -
37:6
**manager** [1] -
46:19
**manpower** [1] -
21:19
**marked** [4] - 9:22,
31:20, 32:24,
44:24
**Mastracy** [2] -
21:3, 22:4
**material** [1] -
16:24
**Mathew** [2] - 2:16,
3:5, 6:5, 7:4,
51:24
**MATHEW** [1] -
1:13
**matter** [1] - 6:6
**mean** [1] - 30:1
**media** [7] - 11:8,
11:14, 13:23,
14:6, 15:1, 15:4,
21:8
**meet** [8] - 17:7,
17:11, 17:21,
17:22, 18:15,
18:17, 19:5,
46:24
**member** [6] -
13:25, 16:1,
16:18, 18:14,
19:4, 21:24
**members** [3] -
12:8, 15:18,
37:17
**mentioned** [1] -
17:4
**message** [4] -
14:9, 14:17,
25:1, 48:12
**messaged** [1] -
14:10
**messages** [1] -
51:9
**metadata** [2] -
42:3, 42:6
**middle** [1] - 43:10
**might** [11] - 19:1,
20:1, 20:13,
24:6, 29:12,
30:18, 31:24,
33:18, 33:19,
44:7, 47:16
**mind** [5] - 47:10,
49:9, 50:4, 50:9,

50:12
**minor** [14] - 11:8, 11:14, 12:19, 13:3, 15:15, 16:2, 16:15, 16:19, 16:24, 17:11, 17:20, 18:14, 19:5, 29:2
**minors** [1] - 12:9
**moment** [3] - 27:3, 47:24, 49:17
**monitoring** [3] - 35:25, 36:6, 36:16
**months** [4] - 9:25, 27:19, 43:18, 43:22
**morning** [5] - 6:1, 6:25, 7:1, 7:6, 9:20
**most** [3] - 10:11, 19:12
**move** [1] - 33:8
**MR** [17] - 6:24, 8:16, 8:24, 9:1, 10:1, 13:12, 13:14, 14:12, 29:14, 29:18, 29:21, 42:17, 44:6, 44:11, 44:13, 44:20, 51:19
**multiple** [2] - 16:3, 49:1
**must** [3] - 32:21, 33:2, 39:23

### N

**N-I-E-L-S-E-N** [1] - 7:4
**name** [4] - 6:14, 7:2, 15:20, 16:9
**named** [1] - 45:15
**names** [1] - 30:7
**narcotics** [1] - 20:5
**Narrative** [1] - 45:1
**narrative** [1] - 43:13
**Nate** [1] - 21:6
**NATIONAL** [1] - 1:7
**National** [3] - 6:7, 23:9, 37:3
**native** [1] - 42:4
**nature** [2] - 19:17,
41:1
**necessarily** [2] - 26:9, 49:1
**need** [4] - 8:1, 20:20, 33:25, 50:22
**needed** [2] - 20:10, 22:7
**never** [2] - 35:7, 35:13
**new** [3] - 28:6, 43:3
**NEW** [2] - 1:2, 52:2
**New** [7] - 1:19, 2:6, 2:12, 2:18, 6:9, 6:21, 37:14
**newer** [1] - 12:11
**next** [2] - 38:9, 41:6
**NIELSEN** [1] - 1:13
**Nielsen** [8] - 2:16, 3:5, 6:5, 7:2, 7:4, 10:14, 44:21, 51:24
**nonarrest** [8] - 34:7, 34:12, 34:14, 34:17, 34:20, 35:4, 35:9
**nonexistent** [1] - 27:22
**North** [1] - 2:17
**Northern** [1] - 6:9
**Notary** [4] - 1:18, 5:14, 6:20, 52:24
**note** [6] - 39:6, 41:22, 46:21, 48:9, 48:11, 48:15
**noted** [1] - 6:16
**notes** [2] - 23:21, 23:24
**nothing** [1] - 27:6
**notice** [1] - 52:16
**notify** [2] - 34:9, 39:24
**nuances** [1] - 18:7
**NUMBER** [1] - 4:3
**Number** [7] - 6:10, 9:22, 11:6, 23:7, 31:10, 31:20, 34:6
**number** [3] - 27:9, 35:23, 36:15

### O

**objection** [2] - 29:14, 42:19
**objections** [1] - 5:7
**observation** [1] - 30:4
**observed** [1] - 48:17
**occur** [1] - 38:5
**Occurred** [1] - 43:10
**occurred** [5] - 23:7, 24:25, 27:19, 43:22, 44:5
**OF** [3] - 1:2, 52:2, 52:3
**offender** [1] - 41:16
**offense** [1] - 31:14
**offenses** [1] - 37:18
**office** [16] - 7:7, 20:1, 20:13, 20:15, 21:9, 21:15, 21:18, 22:6, 22:12, 30:24, 31:1, 38:14, 39:3, 41:2, 50:21, 50:24
**Office** [2] - 19:24, 20:8
**officer** [21] - 12:18, 30:15, 30:19, 32:7, 32:18, 32:25, 33:12, 33:22, 34:9, 38:1, 38:5, 40:2, 40:24, 41:9, 42:14, 42:24, 47:15, 48:3, 48:6, 48:22, 52:4
**officer's** [1] - 33:16
**officers** [6] - 22:23, 31:18, 38:13, 39:2, 40:5, 40:20
**Officers** [1] - 39:23
**one** [15] - 8:2, 11:14, 15:21, 15:22, 16:4, 16:6, 26:14, 32:1, 35:9,
35:11, 35:13, 36:11, 41:14, 42:1, 48:1
**ones** [3] - 15:23, 29:4, 29:7
**Ontario** [3] - 7:8, 19:24, 20:7
**open** [1] - 40:12
**operation** [28] - 11:7, 11:11, 12:20, 13:11, 14:2, 16:15, 20:16, 23:6, 23:7, 23:13, 23:17, 25:4, 25:19, 25:23, 26:1, 26:12, 26:20, 27:11, 27:16, 28:12, 29:3, 29:17, 29:20, 29:24, 37:2, 38:18, 40:2, 40:25
**operations** [13] - 10:21, 11:5, 11:25, 12:4, 12:9, 12:14, 13:4, 15:19, 19:23, 20:4, 21:23, 21:25, 27:10
**opportunity** [2] - 13:21, 14:5
**order** [3] - 32:20, 33:2, 37:22
**Order** [7] - 31:8, 33:9, 34:4, 35:17, 37:6, 40:19, 41:12
**orders** [1] - 8:12
**original** [2] - 5:15, 5:20
**originally** [1] - 26:14
**otherwise** [2] - 37:19, 52:20
**outcome** [1] - 52:21
**outside** [1] - 25:2
**oversight** [1] - 10:20
**overt** [2] - 18:2, 18:4
**own** [3] - 18:7, 21:17, 22:21

### P

**package** [1] - 8:20
**Page** [7] - 11:6,
31:10, 33:11, 35:18, 37:9, 41:12, 44:24
**page** [6] - 31:8, 32:24, 33:9, 37:7, 38:10, 40:18
**PAGE** [2] - 3:3, 4:3
**Paragraph** [7] - 32:24, 34:5, 34:15, 34:16, 37:10, 38:12, 41:15
**paragraph** [6] - 31:19, 37:17, 39:6, 40:20, 46:15, 48:10
**Paragraphs** [1] - 39:5
**part** [7] - 8:14, 8:19, 36:3, 36:15, 36:17, 36:21, 46:13
**partially** [1] - 14:4
**participate** [3] - 13:4, 14:1, 15:19
**participated** [1] - 29:1
**participates** [1] - 12:14
**participating** [1] - 13:10
**particular** [5] - 13:11, 14:2, 17:22, 18:15, 19:19
**parties** [3] - 5:4, 5:22, 52:18
**party** [1] - 36:20
**password** [1] - 21:13
**past** [2] - 22:5, 30:1
**patrol** [5] - 39:1, 39:12, 39:15, 40:5, 41:3
**Penal** [1] - 19:20
**pending** [2] - 28:15, 40:12
**people** [11] - 12:21, 13:22, 14:5, 14:8, 14:10, 14:23, 29:6, 29:12, 49:2, 51:7, 51:18
**permanent** [2] - 14:8, 14:22
**person** [20] - 10:10, 12:13, 18:21, 18:23, 18:24, 22:14, 26:12, 31:25, 32:2, 32:15, 33:6, 34:22, 35:3, 46:4, 46:8, 46:11, 47:18, 47:22, 48:5
**personnel** [1] - 20:6
**phone** [12] - 23:22, 27:12, 27:14, 27:16, 27:24, 28:2, 28:5, 28:6, 28:7, 28:10, 28:13, 28:17
**physical** [2] - 35:23, 42:22
**picture** [4] - 17:5, 48:13, 48:14, 48:21
**PJ** [1] - 21:3
**place** [11] - 11:18, 11:21, 21:20, 22:7, 22:8, 33:12, 36:5, 38:13, 38:20, 45:22, 52:15
**Place** [1] - 2:11
**placed** [2] - 27:13, 28:18, 31:14
**Plaintiff** [4] - 1:5, 2:4, 5:6, 6:12
**platforms** [1] - 13:23
**play** [1] - 50:24
**PLLC** [1] - 2:3
**point** [2] - 27:23, 28:3
**Police** [2] - 7:8, 20:8
**police** [10] - 10:3, 10:16, 10:18, 10:23, 11:4, 15:13, 21:17, 40:5, 47:24, 48:3
**policies** [1] - 43:23
**policy** [6] - 10:19, 31:16, 32:17, 34:13, 38:18, 38:19
**portrayed** [1] - 19:15
**pose** [2] - 13:3, 16:2

**posed** [2] - 12:8, 16:15
**posing** [9] - 11:8, 11:14, 12:19, 15:15, 16:19, 17:20, 18:14, 19:5, 29:2
**position** [1] - 11:19
**possible** [5] - 26:23, 38:4, 38:8, 38:20, 41:6
**possibly** [1] - 11:9
**Potential** [1] - 16:13
**potential** [24] - 11:10, 11:16, 14:16, 14:18, 16:17, 17:3, 17:9, 19:1, 19:7, 22:25, 28:25, 29:11, 29:22, 32:7, 32:19, 32:25, 33:19, 36:5, 36:8, 36:20, 45:14, 47:15, 48:20
**potentially** [1] - 17:2
**practice** [10] - 11:4, 11:13, 11:18, 11:20, 13:5, 18:1, 19:22, 21:22, 38:2, 38:3
**precipitates** [1] - 12:17
**preparation** [4] - 9:7, 10:19, 37:23, 45:8
**prepare** [1] - 38:19
**prepared** [1] - 8:5
**preparing** [1] - 40:2
**presence** [2] - 23:8, 26:17
**presented** [2] - 13:21, 20:22
**preservation** [1] - 45:11
**preserve** [4] - 24:24, 25:7, 25:14, 51:13
**preserved** [3] - 24:21, 28:14, 28:18
**primary** [1] -

15:23
**prioritized** [1] - 40:15
**priority** [2] - 38:6, 40:14
**privately** [3] - 47:9, 47:13, 47:16
**privilege** [1] - 8:22
**probable** [28] - 17:17, 17:24, 18:3, 18:8, 18:17, 18:22, 19:2, 27:2, 27:5, 30:5, 30:10, 30:16, 31:12, 32:4, 32:11, 32:13, 32:14, 32:20, 33:1, 33:5, 33:13, 33:18, 35:2, 35:8, 41:24, 48:24, 50:5, 50:16
**Procedure** [1] - 5:12
**procedures** [4] - 12:11, 31:15, 31:16, 43:24
**proceed** [1] - 6:18
**process** [6] - 35:22, 36:4, 36:14, 36:18, 36:22, 42:22
**production** [1] - 5:24
**profile** [10] - 14:8, 14:22, 14:24, 15:4, 16:1, 16:4, 16:6, 16:10, 21:13, 25:9
**profiles** [1] - 16:3
**program** [4] - 37:15, 43:1, 43:2
**proper** [1] - 18:21
**properly** [1] - 12:24
**prosecution** [3] - 31:1, 41:17, 50:22
**prosecutions** [1] - 22:7
**provide** [1] - 7:21
**provided** [6] - 8:17, 8:19, 9:19, 31:6, 34:25, 42:8
**provision** [1] -

40:23
**Public** [4] - 1:18, 5:14, 6:21, 52:24
**purchased** [1] - 28:5
**purpose** [2] - 12:21, 22:22
**purposes** [2] - 11:9, 11:15
**pursuant** [1] - 5:11
**pursue** [4] - 22:18, 31:1, 33:22, 41:24
**put** [4] - 14:25, 15:4, 15:9, 16:8

## Q

**questioning** [3] - 32:7, 32:19, 32:25
**questions** [5] - 5:8, 44:22, 45:24, 46:2, 51:20
**quick** [1] - 38:6
**quickly** [1] - 20:21
**quote** [1] - 8:20

## R

**randomly** [1] - 14:9
**rape** [2] - 19:13, 19:19
**rather** [1] - 30:13
**re** [1] - 12:23
**re-ask** [1] - 12:23
**reading** [1] - 32:17
**reaffirm** [1] - 18:8
**realize** [1] - 26:13
**realized** [1] - 26:18
**really** [2] - 24:9, 49:5
**reason** [2] - 7:20, 12:18
**reasonable** [1] - 32:5
**reasons** [2] - 15:3, 30:7
**recants** [1] - 34:24
**received** [4] - 8:9, 9:25, 21:24, 22:2
**recess** [1] - 44:16

**recognize** [1] - 15:23
**record** [8] - 6:16, 7:3, 8:16, 44:15, 44:19, 51:21, 51:23, 52:12
**recorded** [1] - 6:12
**Records** [1] - 37:6
**records** [1] - 38:11
**reduced** [1] - 52:10
**refer** [2] - 23:21, 23:24
**referenced** [1] - 27:13
**referring** [1] - 49:22
**regard** [1] - 48:12
**regarding** [4] - 10:7, 10:24, 51:12, 51:18
**related** [10] - 5:24, 15:10, 21:25, 25:25, 26:21, 28:11, 29:2, 36:8, 37:2, 52:18
**relates** [1] - 38:17
**relations** [2] - 17:12, 17:23
**relatively** [2] - 13:16, 20:21
**release** [2] - 34:10, 35:3
**relevant** [2] - 26:21, 36:19
**rely** [1] - 20:7
**remember** [4] - 24:9, 26:9, 27:6, 51:4
**remnants** [1] - 28:4
**remote** [1] - 6:11
**REMOTELY** [1] - 1:15
**repeat** [1] - 7:18
**rephrase** [1] - 7:19
**report** [39] - 8:11, 23:14, 23:18, 24:4, 37:10, 37:11, 37:24, 38:7, 38:13, 38:15, 38:20, 39:7, 39:15, 39:17, 39:18, 39:21, 40:3, 40:16, 40:24,

41:10, 41:21, 42:5, 42:10, 42:14, 42:15, 42:16, 42:23, 43:3, 43:7, 43:17, 43:21, 44:24, 45:4, 45:9, 45:15, 47:1, 51:2
**reported** [1] - 37:18
**Reporter** [1] - 1:18
**Reporting** [1] - 6:15
**reporting** [1] - 37:14
**reports** [4] - 37:24, 39:24, 40:12, 41:4
**represent** [1] - 9:16
**representation** [1] - 50:14
**request** [3] - 25:24, 36:7, 36:22
**requested** [2] - 21:19, 37:1
**requests** [2] - 5:13, 25:22
**require** [1] - 38:19
**research** [1] - 24:12
**reserved** [2] - 5:9, 28:12
**resources** [1] - 20:9
**respective** [1] - 5:4
**response** [1] - 8:9
**responsible** [3] - 5:22, 10:17, 30:9
**responsiveness** [1] - 5:9
**retired** [5] - 9:10, 12:6, 12:7, 12:16, 13:3
**returned** [1] - 5:17
**review** [13] - 5:13, 9:2, 10:20, 32:3, 38:11, 38:14, 38:15, 38:21, 38:22, 38:24, 39:4, 39:7, 39:10
**reviewed** [1] - 8:7
**road** [5] - 39:1,

39:12, 39:14, 40:5, 41:3
**Rochester** [1] - 2:12
**Roman** [3] - 35:18, 37:10, 38:10
**room** [3] - 7:11, 28:15, 28:19
**rooms** [1] - 15:24
**routinely** [3] - 13:16, 16:21, 20:3
**Rules** [1] - 5:12
**rules** [1] - 7:17
**RYAN** [1] - 2:13

## S

**saw** [1] - 48:22
**scenario** [3] - 18:6, 18:12, 42:2
**scene** [1] - 45:25
**schedule** [1] - 20:17
**screen** [2] - 9:12, 44:23
**scroll** [5] - 9:17, 10:7, 34:3, 42:7, 43:12
**search** [1] - 31:17
**section** [4] - 19:19, 38:25, 39:11, 43:13
**secured** [1] - 47:24
**security** [1] - 46:19
**see** [18] - 7:10, 9:13, 11:6, 28:10, 31:19, 36:1, 36:22, 37:1, 37:20, 41:19, 42:15, 43:9, 43:15, 44:23, 44:24, 46:14, 48:14, 49:12
**seek** [1] - 34:1
**seeking** [1] - 22:11
**self** [1] - 39:20
**self-generated** [1] - 39:20
**sending** [1] - 17:4
**sent** [3] - 25:25, 48:13, 48:20
**sentence** [4] - 37:16, 49:7,

49:21, 50:7
**September** [4] - 23:23, 27:13, 45:5, 51:2
**Sergeant** [2] - 21:3, 22:4
**sergeant** [3] - 39:9, 39:15, 40:11
**sergeant's** [4] - 38:14, 38:21
**sergeant/OIC** [1] - 39:24
**Sergeants** [1] - 39:6
**server** [1] - 51:16
**service** [1] - 9:20
**set** [2] - 10:11, 31:15
**several** [5] - 11:22, 16:7, 27:18, 47:21, 48:2
**sex** [2] - 19:16, 19:19
**sexual** [6] - 12:22, 17:12, 17:23, 22:15, 22:18, 22:24
**shall** [8] - 31:14, 31:17, 33:12, 35:20, 36:12, 38:13, 38:15, 39:6
**share** [2] - 9:12, 44:22
**shared** [5] - 9:14, 21:8, 21:15, 21:16, 44:23
**Sheriff's** [2] - 19:24, 20:8
**sheriff's** [6] - 20:1, 20:12, 20:15, 21:9, 21:15, 21:18
**shift** [3] - 39:25, 40:9, 40:17
**short** [2] - 23:19, 24:4
**showed** [2] - 18:16, 18:24
**showing** [2] - 18:5, 48:22
**sign** [1] - 43:2
**signed** [1] - 5:16
**Silverman** [1] - 3:6
**SILVERMAN** [12] - 2:3, 2:7, 6:24, 8:24, 9:1, 10:1,

29:18, 29:21, 44:6, 44:13, 44:20, 51:19
**simply** [1] - 19:3
**site** [1] - 10:19
**sites** [3] - 14:6, 15:1, 15:4
**situation** [7] - 14:9, 17:25, 19:8, 19:15, 30:20, 35:4, 35:9
**situations** [2] - 34:6, 34:16
**SJS** [2] - 37:10, 37:12
**slowly** [1] - 9:17
**small** [1] - 26:10
**social** [7] - 11:8, 11:14, 13:23, 14:6, 15:1, 15:4, 21:8
**someone** [3] - 19:1, 20:14, 47:20
**sometimes** [2] - 15:2, 38:6
**somewhere** [2] - 17:11, 17:21
**soon** [4] - 37:25, 38:4, 38:8, 38:20
**speaking** [6] - 25:19, 46:18, 47:1, 47:6, 47:13, 48:5
**speaks** [1] - 47:15
**specific** [7] - 19:6, 21:13, 29:4, 29:7, 30:1, 30:7
**specifics** [2] - 30:6, 30:14
**specified** [1] - 52:15
**spend** [1] - 13:20
**spoken** [1] - 9:6
**stamped** [10] - 4:6, 31:6, 31:9, 33:9, 34:4, 37:7, 38:10, 40:19, 42:8, 43:7
**stands** [1] - 37:12
**start** [4] - 11:2, 12:19, 16:25, 17:7
**started** [5] - 11:17, 11:21, 11:25, 12:2, 24:10
**starts** [3] - 31:8,

38:12, 46:17
**state** [5] - 7:2, 17:13, 27:4, 32:22, 37:14
**State** [3] - 1:19, 6:21, 37:14
**STATE** [1] - 52:2
**States** [1] - 6:8
**STATES** [1] - 1:1
**status** [2] - 41:14, 41:23
**statutes** [1] - 19:18
**steer** [2] - 22:16, 22:23
**STENOGRAPHER** [4] - 6:1, 44:14, 44:17, 51:22
**stenographic** [1] - 6:16
**Stenotype** [1] - 52:9
**steps** [2] - 41:7, 44:4
**STEUBEN** [1] - 52:3
**still** [5] - 12:3, 21:4, 28:18, 33:25, 40:12
**sting** [41] - 11:5, 11:7, 11:11, 11:25, 12:3, 12:9, 12:14, 12:19, 13:4, 13:11, 14:2, 15:19, 16:15, 19:23, 20:4, 20:16, 21:20, 21:22, 21:25, 23:5, 23:6, 23:12, 23:17, 25:4, 25:18, 25:23, 26:1, 26:20, 27:9, 27:11, 27:15, 28:12, 28:22, 29:3, 29:16, 29:20, 29:24, 37:2, 38:17, 40:2, 40:24
**STIPULATED** [5] - 5:3, 5:7, 5:11, 5:15, 5:21
**STIPULATIONS** [1] - 5:1
**Street** [4] - 2:5, 2:17, 7:9, 23:9
**strength** [1] - 30:22

**strike** [5] - 17:7, 27:7, 32:11, 33:15, 47:13
**string** [3] - 48:15, 48:18, 48:23
**structured** [1] - 20:17
**subject** [2] - 26:12, 34:10
**submit** [1] - 28:6
**submitted** [1] - 23:22
**subpoena** [13] - 8:9, 8:15, 9:18, 9:24, 10:8, 10:12, 10:25, 25:24, 26:5, 26:6, 26:19, 51:8, 51:10
**Subpoena** [1] - 4:5
**subsequently** [1] - 26:15
**substance** [2] - 22:9, 24:20
**sufficient** [3] - 27:5, 33:20, 50:16
**sum** [1] - 24:19
**summarize** [2] - 10:14, 32:23
**supervision** [1] - 52:10
**supervisor** [10] - 20:19, 20:24, 21:2, 21:4, 34:9, 38:11, 38:15, 38:24, 41:5, 41:9
**supervisor's** [1] - 39:4
**supposed** [2] - 37:25, 38:7
**surrounding** [1] - 13:5
**surveillance** [5] - 35:23, 36:6, 36:20, 36:23, 37:1
**suspect** [24] - 16:17, 17:3, 17:9, 17:19, 17:21, 18:13, 18:15, 19:3, 22:17, 22:25, 23:2, 26:21, 28:25, 32:8, 32:19, 32:21, 33:1, 36:5, 36:21, 45:14,

47:15, 48:20, 50:4
**suspect's** [1] - 17:16
**suspected** [1] - 35:24
**Suspects** [1] - 28:21
**suspects** [5] - 11:16, 14:17, 14:19, 29:22
**suspicion** [1] - 32:5
**swear** [1] - 6:17
**sworn** [2] - 6:20, 52:7
**system** [2] - 36:6, 38:11

## T

**tab** [1] - 43:3
**tabs** [1] - 43:4
**target** [4] - 26:14, 26:17, 27:1, 32:2
**targets** [2] - 29:6, 29:11
**techniques** [3] - 35:19, 35:20, 36:12
**tenure** [2] - 11:17, 22:3
**terms** [1] - 15:25
**testified** [2] - 6:22, 13:2
**testify** [2] - 10:3, 10:7
**testifying** [2] - 7:5, 7:7
**testimony** [5] - 7:21, 17:6, 52:6, 52:8, 52:12
**text** [3] - 25:1, 48:12, 51:9
**THE** [7] - 1:2, 1:7, 6:1, 13:13, 44:14, 44:17, 51:22
**themselves** [1] - 14:11
**thereafter** [1] - 52:9
**third** [3] - 36:19, 46:15, 48:10
**timing** [1] - 37:23
**Tinker** [2] - 1:17, 6:14
**TINKER** [2] - 52:4, 52:24

**TO** [1] - 4:1
**Today** [1] - 6:2
**today** [2] - 7:22, 8:6
**together** [1] - 15:10
**TONIA** [2] - 52:4, 52:24
**Tonia** [2] - 1:17, 6:14
**took** [2] - 21:20, 45:22
**top** [4] - 33:10, 34:15, 43:9, 45:1
**topic** [10] - 11:3, 11:12, 16:12, 19:21, 21:21, 23:5, 25:21, 27:8, 28:21
**topics** [3] - 10:8, 10:11, 10:24
**training** [4] - 12:10, 12:13, 21:24, 22:1
**transcript** [3] - 5:13, 5:19, 5:23
**tray** [3] - 38:14, 38:21, 38:24
**trial** [2] - 5:10, 5:18
**tries** [1] - 47:22
**true** [1] - 52:12
**Trust** [1] - 6:7
**trust** [1] - 30:9
**TRUST** [1] - 1:8
**truthful** [1] - 7:21
**try** [2] - 46:15, 51:11
**trying** [7] - 13:9, 15:11, 17:1, 17:15, 22:16, 26:11, 32:23
**Tuesday** [2] - 1:14, 43:10
**turn** [4] - 31:3, 31:7, 33:7, 37:5
**two** [2] - 43:18, 43:21
**type** [2] - 19:9, 39:20
**types** [3] - 13:20, 20:3, 20:5
**Types** [1] - 37:10
**typewriting** [1] - 52:10
**typically** [2] - 39:1, 39:11

## U

**unable** [3] - 24:23, 25:6, 25:14
**Unarrest** [2] - 34:6, 34:16
**unarrest** [6] - 34:7, 34:17, 34:20, 34:21, 35:2, 35:13
**unavailable** [1] - 21:5
**under** [4] - 20:2, 31:15, 40:6, 52:10
**UNDERBERG** [1] - 2:9
**undercover** [1] - 20:6
**underneath** [1] - 43:13
**understood** [6] - 13:24, 14:7, 22:22, 40:18, 46:1, 48:3
**United** [1] - 6:8
**UNITED** [1] - 1:1
**unquote** [1] - 8:20
**unraveled** [1] - 26:15
**up** [13] - 10:7, 14:8, 14:22, 14:25, 18:5, 18:16, 18:24, 22:17, 30:18, 33:8, 39:16, 42:7, 46:18
**username** [1] - 21:13
**utilized** [2] - 35:20, 36:13

## V

**various** [1] - 15:3
**verify** [1] - 51:15
**verifying** [1] - 18:23
**via** [2] - 1:15, 6:12
**victim** [1] - 37:19
**video** [1] - 36:6
**videotaped** [1] - 6:5
**Videotaped** [1] - 1:12
**viewed** [1] - 45:4
**violate** [4] - 16:14, 16:17, 19:2, 19:7

**violation** [2] - 16:21, 16:22
**violations** [1] - 11:10
**Visingard** [33] - 9:10, 12:5, 12:7, 12:10, 12:16, 13:2, 13:15, 13:25, 22:4, 23:15, 23:20, 24:17, 24:23, 25:3, 25:16, 26:3, 26:23, 27:15, 27:21, 28:6, 29:8, 36:25, 38:19, 45:8, 45:13, 47:1, 48:10, 48:21, 49:24, 50:12, 50:17, 51:1, 51:17
**Visingard's** [5] - 41:21, 42:4, 49:14, 50:4, 50:14
**vs** [1] - 1:6

## W

**wait** [1] - 38:1
**warranted** [2] - 39:8, 39:10
**ways** [1] - 47:21
**week** [1] - 13:8
**weeks** [1] - 8:8
**Wemes** [22] - 6:6, 23:10, 24:22, 26:13, 27:1, 45:22, 46:10, 46:21, 46:23, 47:2, 48:11, 48:12, 48:13, 48:16, 49:10, 50:4, 50:10, 50:13, 50:15, 50:17, 50:18
**WEMES** [1] - 1:4
**WESTERN** [1] - 1:2
**wing** [2] - 38:24, 46:22
**withdrew** [1] - 41:18
**WITNESS** [2] - 3:3, 13:13
**witness** [7] - 5:13, 5:16, 6:17, 34:24, 52:6, 52:9, 52:13
**wondering** [2] -

13:5, 42:21
**Word** [1] - 42:23
**word** [3] - 25:13, 49:20, 49:22
**wording** [1] - 15:12
**workings** [1] - 22:5
**workload** [1] - 14:3
**workstation** [1] - 39:4
**writes** [1] - 48:11
**writing** [1] - 43:21
**written** [3] - 24:3, 43:14, 43:18

## Y

**years** [1] - 11:23
**YORK** [2] - 1:2, 52:2
**York** [7] - 1:19, 2:6, 2:12, 2:18, 6:10, 6:21, 37:14
**yourself** [1] - 10:4

## Z

**Zoom** [1] - 6:13
**ZOOM** [1] - 1:15
**zoom** [2] - 33:11, 46:15