**G. Silverman Declaration
Exhibit 3**

| 1. Agency<br>CANANDAIGUA POLICE DEPARTMENT | 2. Div/Precinct<br>PATROL | New York State<br>INCIDENT REPORT | 3. ORI<br>NY0342900 | 5. Case No.<br>2127340 | 6. Incident No.<br>55252 |
|---|---|---|---|---|---|

| 7,8,9. Date Reported (Day, Date, Time)<br>TUESDAY 06/29/2021 14:00 | 10,11,12. Occurred On/From (Day, Date, Time)<br>TUESDAY 06/29/2021 14:00 | 13,14,15. Occurred To (Day, Date, Time)<br>TUESDAY 06/29/2021 18:00 |
|---|---|---|

| 16. Incident Type<br>SEX OFNS-SEX OFFENSES | 17. Business Name<br>CANANDAIGUA NATIONAL BANK AND TRUST |
|---|---|

**19. Incident Address (Street Name, Bldg. No., Apt. No.)**
72 SOUTH MAIN STREET

**20. City/State/Zip**
CANANDAIGUA NEW YORK 14424

| 21. Location Code (TSLED)<br>CANANDAIGUA CITY 3529 | 23. No. of Victims<br>1 | 24. No. of Suspects<br>1 | 26. Victim also Complainant?<br>No |
|---|---|---|---|

**Location Type**
OTHER BUSINESS OFFICE

**18. Weapon(s) Used**
PERSONAL WEAPONS (EG, HANDS, FEET, TEETH, ETC)

| 22. OFF. No. | LAW. SECTION | SUB | CL | CAT | DEG | ATT | NAME OF OFFENSE | CTS |
|---|---|---|---|---|---|---|---|---|
| 1. | PL 130.45 | 01 | D | F | 2 | A | CRIMINAL SEX ACT-2ND: ACTOR 18 YRS OR MORE/VICTIM UNDER 1 | 1 |

## ASSOCIATED PERSONS

| 25. TYPE | Name (Last, First, Middle, Title) | DOB | Street Name<br>Bldg, Apt No., City, State, Zip | Res Phone<br>Bus Phone |
|---|---|---|---|---|
| SUSPECT | WEMES, JASON A | 11/16/1984 | 72 SOUTH MAIN STREET<br>CANANDAIGUA NY 14424 | |
| VICTIM | DOE, JOHN | | NY | |
| PERSON INTERVIEWED | HERNANDEZ, JOSEPH A | 12/04/1986 | 72 SOUTH MAIN STREET<br>CANANDAIGUA NY 14424 | (585) 394-4260 |
| PERSON INTERVIEWED | INGALLS, JASON A | 10/08/1969 | 72 SOUTH MAIN ST<br>CANANDAIGUA NY 14424 | (585) 734-3378<br>(585) 393-6051 |
| LAW ENFORCEMENT OFFICER | BOWERMAN, NATE | | 74 ONTARIO STREET<br>CANANDAIGUA NY 14424 | |
| LAW ENFORCEMENT OFFICER | VISINGARD, D | | 21 ONTARIO STREET<br>CANANDAIGUA NY 14424 | (585) 396-5044 |

## VICTIM

| Name | 27. DOB | 28. Age | 29. Gender | 30. Race | 31. Ethnicity | 32. Handicap | 33. Residence Status |
|---|---|---|---|---|---|---|---|
| DOE, JOHN | | | MALE | WHITE | NOT HISPANIC | NO | RESIDENT |

| Victim DID receive information on Victim's Rights and Services pursuant to New York State Law  ☒ Yes   ☐ No |
|---|

**Exhibit**

**2**

04/23/24    TLT

CPD-000001

## SUSPECT

| Person ID # | 34. Type/No. | | 35. Name (Last, First, Middle) |
|---|---|---|---|
| 59528 | SUSPECT | | WEMES, JASON, A |

| 37. Apparent Condition | | | 38. Address (Street Name, Bldg., Apt. No., City, State, Zip) |
|---|---|---|---|
| | | | 72 SOUTH MAIN STREET  CANANDAIGUA, NY 14424 |

| 39a. Home Phone | 39b. Work Phone | 40. Social Security | 41. DOB | 42. Age | 43. Gender | 44. Race |
|---|---|---|---|---|---|---|
| | | | 11/16/1984 | 36 | MALE | WHITE |

| 45. Ethnicity | 46. Skin | 47. Occupation |
|---|---|---|
| NOT HISPANIC | | |

| 48. Height | 49. Weight | 50. Hair | | 51. Eyes | 52. Glasses | 53. Build |
|---|---|---|---|---|---|---|
| | | | | | | |

| 54. Employer/School | 55. Employer Address |
|---|---|
| | |

| 56. Scars/Marks/Tattoos /Description |
|---|
| |

| 36. Alias/Nickname/Maiden Name | | |
|---|---|---|
| Last Name | First Name | Middle Name |
| | | |

## NARRATIVE

| Date of Action | Date Written | Officer Name & Rank |
|---|---|---|
| 08/17/2021 | 08/17/2021 | VISINGARD, DANIEL (DET.) |

**Narrative**

Incident report written by Detective Daniel S. Visingard.

On June 29, 2021, at approximately 1400 hours I engaged into a text message conversation with another male on the social media app GRINDR. During my text message conversation I identified myself as a 14 year old child. I note that the male I communicated with sent me several text messages that were sexual in nature. The male advised me that he wanted to have oral sex with me and wanted me to meet him in the downstairs bathroom at 72 South Main Street.

Investigator Bowerman (OCSO) and I did approach the area of 72 South Main Street. I went to the downstairs bathroom while Investigator Bowerman conducted surveillance in the stairway area. At one point a custodial worker, who was identified as Jason Wemes, came into the area and asked Investigator Bowerman if he needed anything. Investigator Bowerman advised Wemes that he was allset and Wemes left the area. At that point the GRINDR app said the male I was speaking to was 5 feet away and after Wemes left the area the male no loner communicated with me.

Myself and Investigator Bowerman ended up speaking with Jason Ingalls who is the bank security manager. I advised Ingalls of the investigation and he escorted us to speak with Wemes. I note that Wemes was no at his desk in another wing of the bank. I spoke with Wemes and he denied ever being on the app GRINDR and that he didn't attempt to meet anyone. I note a couple of things in regards to Wemes. During my text message conversation Wemes sent me a picture of his lower body. In the picture I could see a lanyard with an ID. I note that the lanyard had a string attached to it on the ID. While I spoke with Wemes I observed the same lanyard, same ID and the exact same string on the ID.

After speaking with Wemes I again spoke with Ingalls and security officer Joseph Hernandez. I advised Ingalls and Hernandez that a picture was sent to me of a male inside of vehicle. Both Ingalls and Hernandez identified the vehicle as the one belonging to the Canandaigua National Bank. You could see a mountain dew can in the picture and Ingalls advised me that Wemes is always drinking mountain dew. I advised both Hernandez and Ingalls that there was no doubt in my mind that I was in fact communicating with Wemes but I didn't have enough to charge him.

Case closed by exception-Detective Daniel S. Visingard.

## ADMINISTRATIVE

| 74. Inquiries | 75. NYSPIN Message No. | 76. Complainant Signature |
|---|---|---|
| | | |

| 77. Reporting Officer Signature (Include Rank) | 78. ID No. | 79. Supervisor Signature (Include Rank) | 80. ID |
|---|---|---|---|
| | 822 | | 824 |
| DET. DANIEL VISINGARD | | SGT PETER MASTRACY | |

| 81. Status | | 82. Status Date | 83. Notified/TOT |
|---|---|---|---|
| CLOSED BY INVESTIGATION | | 08/17/2021 | |

02/29/2024  12:49:23

CPD-000002

2/29/2024

# Canandaigua PD
# Department Case Report
### Department Case Number: 2127340

Related Case # 's:

## Case Information

Case Officer: 822 - Dan Visingard
Offense Date/Time: 06/29/2021 - 14:00Hrs
Offense Location: 72 South Main Street
Offense Type: 130.45 - Criminal sexual act 2nd
Expiration Date: 06/29/2022
Jurisdiction: City of Canandaigua
Court Date:
Disposition:
Disposition Date:
Case Comments:

## Case Names

**Name Type: Owner**

Name: Visingard, Daniel                Sex: M    Race: W    DOB:            Home Phone#:
Address: 21 Ontario Street                                                  ID#:
         Canandaigua, NY 14424
Additional Name Information:

## Case Items

**Item Number: 001**

Container #: 64 - 59A                              Process: Hold for investigative purposes
Current Custody: Stored in Location - Shelf - 59 - Container: 59A
Collection Date/Time: 09/17/2021 - 15:27Hrs
Collected By: 822 - Dan Visingard                 Collection Purpose: Evidence
Collection Location: 21 Ontario Street
Packaging/Quantity/Item Type: One (1) envelope marked - 1 - Phone
Detail Description: black iphone
Owner: Daniel Visingard

Item Notes:

---

Case Officer Signature                    Date                Supervisor Signature

Page 1 of 1

CPD-000003

# City of Canandaigua
# Police Department
### General Order

| General Order: 225 | Subject: Cellular Phone Use |
|---|---|
| Authority: Chief Jonathan P. Welch | Effective Date: January 1, 2009 |
| Rescinds: All Previously Issued Directives | |

## I. PURPOSE:

The purpose of this policy is to provide Canandaigua Police officers with guidelines for the proper use of cellular phones and use of cellular phones when operating City of Canandaigua Police Vehicles.

## II. POLICY:

It is the policy of the Canandaigua Police Department to use cellular telephones in the course of police operations to enhance departmental communication. Cellular phones may be used by officers to conduct official business when the use of radio communication or hard line telephones is inappropriate, unavailable or inadequate to meet communication needs and when the cellular phone is used in accordance with this policy.

## III. DEFINITIONS:

*Disruptive activity:* Any time that cellular phone operations would be considered disruptive, such as in meetings, trainings sessions, court or public places when their use would reasonably be deemed annoying and intrusive.
*Distraction:* Any time the use of a cellular phone would unnecessarily or unreasonably divert the attention of an officer from official duties and/or cause a potentially hazardous situation.

## IV. PROCEDURES:

A substitute for radio communication designated for transmission through the department's emergency communication center. Approved cellular telephone usage includes but is not limited to the following types of communications:
   a. Conveyance of sensitive or restricted information.
   b. Undercover operations.
   c. Cellular telephones are an augmentation to the department's communication system.
   d. Communication beyond normal radio range may require cell phone use.
   e. Incidents in which direct contact with an officer and the public is critical.
   f. Incidents in which use of a hard line telephone would be appropriate but where one is not available.

**Department Owned Cellular Phones**

1. Cellular phones are authorized for official police business. Exceptions may be made for family situations or personal matters that require attention and where alternative forms of communication are not suitable or easily available.
2. Cellular phones may be used in off-duty capacities only for the conduct of police-related business or during departmentally managed off duty law enforcement assignments.
3. Cellular phone numbers should not normally be provided to members of the public. Exceptions may be made when immediate future contact between an officer and a victim, witness, or other person may be critical.
4. Personnel may not provide the cellular phone number of any member of this agency to a member of the public without the cell phone user's authorization.
5. Officers should not use the department owned phone for car-to-car communication when other means are available and appropriate.
6. Police reports may not be taken using the cellular phone. The phone may be used to contact the victim or complainant and arrange a meeting time and place but not to expedite service.
7. When possible, officers should pull off the highway in a safe location when using cellular phones. Officers are not exempt from the Vehicle and Traffic Law unless they are actively engaged in official police communication.

**Personal Cellular Phones**

1. Use of personal cellular phones either in voice or data transmission while on duty should be restricted to essential communications and should be limited in length. Such communication shall not cause any type of distraction. Engagement in multiple or extended conversations unrelated to police business or similar use that interferes with the performance of duty is prohibited.
2. Use of personal cellular telephones is governed by the same safety restrictions as provided for departmentally owned cell phones.
3. Personal or departmentally issued cellular phones should not be used if they may disruptive to others. Photo/text messaging capabilities are prohibited unless they can be clearly linked to the conduct of official police business.

# City of Canandaigua
# Police Department
### General Order

| | |
|---|---|
| **General Order:** 265 | **Subject:** Storage of Property and Evidence |
| **Authority:** Chief Stephen Hedworth | **Effective Date:** January 1, 2009 |
| **Rescinds:** All Previously Issued Directives | Revised 9/02/09, 6/17/11, 8/16/12, 3/8/16, 5/9/19, 11/7/19, 2/13/20 |

## I. BACKGROUND

The consequences of the mismanagement of the property function can result in the unsuccessful prosecution of court cases, embarrassment to the agency, and loss of public confidence. These consequences may be avoided through the exercise of proper supervisory and management attention, and to the adherence to statutory requirements.

## II. POLICY

It shall be the policy of this Department to provide for the proper and lawful management and control of found, recovered and evidentiary property and any other property in the custody of this Department. Procedures with respect to the handling, security and disposition of property will be strictly adhered to in conformance with local, state, and federal regulations. As such, personnel assigned to handle property / evidence within the department will, within one year of appointment, attend a property / evidence room management course which meets the standards set by the Municipal Police Training Council.

## III. PROCEDURE

### A. PROPERTY CLASSIFICATION

Property held by the Canandaigua Police Department shall be classified as follows:

1. Departmental property purchased by the Police Department for the operation and administration of the Department.

2. Property acquired by the Department through conversion of evidence and/or found property in accordance with State or Federal Law.

3. Property held in evidence in criminal investigations either current or disposed, but retained in accordance with the statute of limitations, court directives or other stipulations.

4. Property being held as found pending identification of the legal owner or claimed by the finder or disposition by the Department through action or conversion in accordance with State Law.

5. Property being held by the Department for safekeeping.

6. Property received, seized or otherwise acquired by the Department through legal process.

## B. RESPONSIBILITY

All evidence and found property items are the responsibility of the Property Clerk. Any property or evidence retained by the Department shall be done so by the Property Clerk who may be assisted in clerical and minor tasks as assigned and approved by the Chief of Police. To ensure that all property stored by the Department is properly controlled; it must be stored in one of the following designated secured areas:

1. Property/Evidence Rooms one (1) or two (2);

2. Property intake temporary storage devices (Temporary Storage) which include the temporary lockers, temporary refrigerator, Interview room #2, or the garage bay for extremely oversized items.

3. Property/Evidence long term refrigerator inside room two (2);

4. Vehicle and Bicycle Impound;

5. Extended or Large Evidence Storage (Cells 3 and 4)

Circumstances may dictate an alternative storage area due to the nature of the property, such as large items or hazardous materials. Alternative storage facilities may be utilized, but must be approved by the Property Clerk and/or Chief of Police prior to placement.

- The Property Clerk will have the responsibility of maintaining all appropriate records which reflect the status of all property held by the Department. These records will be stored within the Department's Porter Lee Beast Computerized Evidence Management System (BEAST) and will be regularly backed up within the Department and City systems. The Property Clerk will be held accountable for control of all property accepted by or stored in the agency's Property and Evidence Storage Areas.

## C. INSPECTIONS AND AUDITS

1. The Property Clerk or his designee shall notify the Chief of Police within 5 working days if deficiencies are found or if procedures need to be modified, deleted or newly implemented.

2. The Chief of Police shall designate supervisory personnel not directly involved in the security of non-agency property and evidence to conduct both an annual sample audit and a sample inventory of such property.

3. Such audit or inventory shall be unannounced, not within 4 months of each other and include a sampling of money, firearms, controlled substances, and high-value items each time they are conducted. A report of such audit or inventory detailing the date and the property items that were audited or inventoried shall be completed by the supervisory personnel assigned and be submitted to the Chief of Police.

   a. A property and evidence audit is defined as a review and examination of property inventory and all related documentation to ensure compliance with the established written directives and will sample a minimum of five (5) percent of the total inventory or fifty (50) items, whichever is less.

   b. A property and evidence inventory is defined as matching a piece of property to a list and will sample at a minimum ten (10) percent of the total inventory or one hundred (100) items, whichever is less.

   c. A single property and evidence audit of ALL property shall meet the audit and inventory requirements as noted in paragraphs a and b above.

4. When a new Property Clerk is designated, a sample audit as stated in 3a above will be conducted. The audit shall include a random sampling of items to include drugs, monies, firearms and other items to insure that records are current and properly annotated. This will be conducted jointly by the newly designated Property Clerk and the outgoing Property Clerk. A report of the audit will be completed and distributed to the Chief of Police and both the incoming and outgoing property clerks.

## D. ACCESS TO PROPERTY AND EVIDENCE STORAGE AREAS

Access to the Property and Evidence storage areas shall be limited to the following:

1. Property Rooms including Cells 3 and 4 – The Property Clerk and their assistant.

2. Property Temporary Storage - all sworn personnel, when unsecured.

3. Vehicle and Bicycle Impound Area - all sworn personnel.

4.  Any additional personnel as authorized by the Chief of Police.

## E. OFFICERS SECURING PROPERTY/EVIDENCE

1.  On the receipt of property or collection of evidence by the Investigating Officer, the officer shall complete a property receipt and provide a copy to the owner, if known or the finder of the property. The original receipt will be submitted with the property to the property clerk.

2.  The Investigating Officer will keep the property or evidence solely in their custody until the item is placed in secure Temporary Storage to insure a proper and complete chain of custody.

3.  All property or evidence that is in the possession of the Investigating Officer will be secured into Temporary Storage prior to the end of the shift in which it was obtained.

4.  The Investigating Officer is responsible for insuring all required information is completed within the BEAST prior to the submission into Temporary Storage. Information that must be included is:

    a.  The date, time and location the property came into possession of the Investigating Officer.

    b.  The date and time the property was submitted to Temporary Storage.

    c.  The name of the Temporary Storage device the property was submitted to.

    d.  A complete description of the property item to include the make, model, color and serial number, if available, of the property and the gross weight if the property is a drug.

    e.  Completion of the currency breakdown on the items tab in BEAST for a money item submitted. This will result in the display of the number of each denomination of currency or coin submitted and results in a currency total.

    f.  The source (from whom) the property was collected to include their name, address, phone number and if they are the suspect, owner or finder of the property. The owner of the property must always be linked to the property if the owner is known.

    g.  The name of the Investigating Officer that collected or received the item(s).

    h.  The name of the submitting officer if different than the collecting or receiving officer.

    i.  Case number.

    j.  Incident or offense type, and property type (e.g. evidence, safekeeping or found property)

5. All property taken into custody by an employee shall, at the time of submission, be properly sealed and marked in the evidence containers provided. Evidence seals shall be marked with the officer's initials and date for future identification. Marking will be done in a manner that will not damage the evidence in any way or prevent processing by technicians or allow the mark to be accidentally or readily removed. Once the item(s) are properly sealed and marked, the BEAST bar coded property / evidence item tag will be applied to the upper right hand corner of the package. The Evidence Storage and Submission Manual in the Property Intake Area will guide officers through the packaging requirements.

6. Evidence Tags and Property/Evidence Forms, used in cases where property or evidence is taken from a juvenile, should be completed with all pertinent information EXCEPT that where the suspect's name appears, the word "JUVENILE" should also be included.

7. Evidence photographs will be saved to the Evidence Photo File and logged into the BEAST in accordance with the procedure posted in the evidence intake area.

8. When placing a firearm, power tool, electronic device or other serialized item into evidence, an inquiry shall be made by the Investigating Officer in the Ejustice Portal to determine if the item has been reported stolen. In the case of a firearm, the Investigating Officer shall specifically perform a search by serial number in Ejustice Portal under property/Gun/Stolen Gun. Other serialized property will be searched under Property/Article. A copy of the response to the inquiry will be submitted with the SJS incident report.

9. Drugs, money and jewelry shall be packaged and submitted independently from any other property or evidence by the Investigating Officer as these items must be stored in a separate secured location within the property room. All drugs, money and jewelry shall be placed in thermo-seal evidence bags and be thermo-sealed. The thermo-sealed bag shall be initialed and dated on the heat seal by the submitting officer and whenever possible, a witness, preferably a supervisor. The heat-sealed bag shall then be placed in a manila envelope and sealed in accordance with paragraph 5 above. The net and gross weight for all drugs shall be written in marker on the outside of the package. The Property Clerk will not accept these items unless submitted in this manner. The following should also be noted:

   a. All money must be counted prior to submission by a minimum of two officers one of which is preferably a supervisor. Any discrepancy in the two counts shall require a third count to verify the actual amount of money submitted. Each officer that completes a count MUST initial and date the heat seal.

   b. All narcotics and dangerous drugs shall be field tested within the Department's capability prior to sealing, using Department field-testing kits.

   c. The submitting officer shall count all controlled substances, including capsules and tablets and note such on the item description tab in the BEAST prior to submission.

d. All containers of narcotics and dangerous drugs shall be inspected for tampering by the Property Clerk as a safeguard against the substitution of material having the same weight.

e. If drugs are taken into custody under circumstances other than arrests or investigations (e.g., found, abandoned), it shall be noted on the submission envelope and in the BEAST by the submitting officer that the drugs are to be destroyed.

9. Blood and urine samples or other perishable items, which require refrigeration, will be secured in one of the metal boxes storage compartments inside the Temporary Storage Refrigerator. Once the compartment is secured, the key will be deposited in the locked storage compartment via the slot in the door of the compartment.

10. Employees will take into custody blood or body fluid stained property only when needed for evidence. Blood or body fluid stained evidence needs to be dried completely before packaging and placement into evidence. Generally these items can be secured in Interview Room #2 on the provided drying rack. A leak-proof barrier shall be placed on the floor directly underneath the item while it is being dried. Officers shall lock the door and seal the room with an evidence tape seal for integrity. There may be times when Interview Room #2 is not available. In these cases, officers shall seek guidance from the duty sergeant as to where the wet items can be stored and dried securely. All items of evidence contaminated with body fluids or blood will, after drying, be placed into paper bags one item per bag and be tagged with a red biohazard sticker. The investigating officer is responsible for the drying of items, placing the items in bags, entering the items into the BEAST and labeling the evidence appropriately.

11. When a bicycle is taken in by the Department as found or recovered, the Investigating Officer will secure it in the Bicycle Impound. If the bicycle is evidence, it will be secured in Interview Room #2 which will then be locked with an evidence tape seal placed on the door. A property entry will be made in the BEAST by the Investigating Officer stating as much information on the bike as possible (i.e. serial number, make, model, color, etc.) A BEAST barcode property tag will be secured on the bicycle around the control wires with the barcode visible.

12. All vehicles towed at the direction of the Department and taken into control shall be handled in accordance with General Order 560 Motor Vehicle Impoundment. Any property removed from a vehicle shall be submitted to the Property Room and shall be so noted on the Vehicle Impound Inventory Sheet. Whenever possible, the trunk and storage compartments shall be inspected for unsuitable property, valuables or contraband. In addition to the Vehicle Impound sheet, the vehicle and any property submitted to the Property Room will be entered into the BEAST and an incident report must be completed. The BEAST barcode property tag for the vehicle will be placed on the impound envelope.

13. Once properly packaged, the Investigating Officer will then secure the evidence in Temporary Storage for transfer/pickup by the Property Clerk. The Property Clerk or their assistant shall be

the only person(s) to have keys to access property in Temporary Storage.

14. If the property or evidence is an object of such size or large quantity that it cannot be reasonably secured to maintain the chain of custody, the Duty Supervisor shall decide if the Property Clerk shall be notified and recalled to duty to take immediate custody of the property.

15. When evidence is seized and a criminal prosecution is anticipated, the submitting officer shall be responsible for the completion of the Laboratory Analysis request form. The laboratory submission report forms on the desktop of the BEAST computer shall be used for submission to the New York State Police Crime Lab, NMS Lab or another lab as required. The laboratory submission form will be placed in the designated lab submission sheet storage device located within the property intake area and serve as notification to the Property Clerk's Office that such evidence is to go to the lab for analysis. Failure of the submitting officer to follow this procedure will result in the evidence not being analyzed at the designated lab in a timely manner.

## F.  LOST/FOUND PROPERTY

1. Police Officers shall accept and retain custody of found property or instruments deposited with them. Officers may retain custody of the lost/found property during their shift in an attempt to locate the rightful owner. If the rightful owner is located, submission to the property room is not required, however if the rightful owner is not located prior to the end of the officer's shift, they must submit the property to the Property Room and complete an incident report.

2. Lost or found property submitted to the custody of the Property Room shall be packaged, labeled and stored in the same manner as evidence submissions.

3. If the found or lost property is a firearm, power tool, electronic device, serialized item or of significant value, the Reporting Officer shall ensure that a File 25 Teletype message is sent via E-Justice Portal advising of the find, and if applicable, a special file check shall be made.

4. Non-sworn personnel shall not take custody of found property. They will notify dispatch so that an officer can respond and take custody of the property.

5. Lost/found property will not, for any reason, be stored or left in the dispatch area.

## G.  PROPERTY HELD FOR SAFEKEEPING

1. It is Department Policy not to routinely accept personal property from the public for safekeeping. However, a supervisor may authorize the acceptance of personal property for safekeeping when they deem it absolutely necessary. The Department is obligated to accept firearms for safekeeping when an individual surrenders a firearm for disposal, when an individual is awaiting a valid pistol permit or in any situation where, in a supervisor's judgment, not accepting a firearm would create a hazardous condition.

2. When determined by a supervisor that the personal property of an individual is to be accepted by the Department for safekeeping it shall require a written report describing the circumstances surrounding the incident.

3. All property accepted for safekeeping shall be processed and packaged in the same manner as evidence or lost / found property prior to being submitted to the Property Room.

   a. When accepting property for safekeeping, a property receipt shall be completed, a copy of which will be provided to the owner, and the original shall be retained and submitted to the Property Clerk via the designated storage device in the property intake area.

   b. The accepting officer will enter the property into the BEAST as safekeeping.

4. If the property being accepted for safekeeping is a firearm, an inquiry shall be made by the Investigating Officer in the Ejustice Portal to determine if the firearm has been reported stolen. The Investigating Officer shall specifically perform a search by serial number in Ejustice Portal under property/Gun/Stolen Gun. A copy of the response shall be placed with the incident report.

## H. DUTIES OF PROPERTY CLERK – SUBMITTED EVIDENCE/PROPERTY

1. Upon receipt of the evidence/property, the Property Clerk will check that the items were submitted correctly and that all forms were properly filled out. If there are errors or omissions found with the items or paperwork, the Property Clerk has the right to refuse the submission. Reasons that submissions can be rejected include but are not limited to:

   a. Improper packaging

   b. Damaged or leaking packaging

   c. Improper or lack of labeling

   d. Failure to initial or date seals

   e. Incomplete or incorrectly completed paperwork

   f. Drug, money or jewelry submitted in packaging with other items

2. Items rejected by the Property Clerk will be returned as follows:

   a. The submitted items will be placed back into a Temporary Storage Device.

   b. The Property Clerk will secure the Temporary Storage Device with the pad lock assigned to

the Investigating Officer and which only the officer has the combination or key to.

    c.  The Property Clerk will email the Investigating Officer and write in detail the reason for the rejection of the item and the location of the rejected item(s).

    d.  Once the Investigating officer retrieves the items and corrects the submission errors, they will resubmit the item to Temporary Storage.

3.  The Property Clerk will take custody of items submitted to the Property Room and secure them in an appropriate location in the Property Room(s). The location will be noted within the BEAST.

4.  The BEAST electronic record of all submitted property / evidence will be maintained in accordance with schedule MU-1 or other applicable laws.

## I.  TRANSFER OF EVIDENCE

1.  After being secured in the Property Room, evidence will only be transferred or released to:

    a.  The Chief of Police, Property Clerk, Criminal Investigations Division Sergeant, or his designee, in conjunction with criminal investigations.

    b.  An Evidence Technician for processing.

    c.  A laboratory for analysis.

    d.  The District Attorney or Case Officer for the purpose of Court.

    e.  The victim when, evidence has been authorized for release by the officer of record, the court, and/or the prosecuting attorney or evidence that has been authorized by the DA for return to its rightful owner. Photos of the evidence returned to the victim or owner will be taken if the case is not disposed of. Such release shall be governed by Article 450 of the New York State Penal Law.

2.  When evidence is transferred or released by the Property Clerk's office, an entry will be made within the BEAST. The receiving person shall sign the Property Receipt and this document will be scanned into the BEAST case file.

3.  When evidence is transferred or released by the Property Clerk's office and the seal on the evidence container must be broken for any reason the employee, prior to resubmission, must:

    a.  Reseal the container and initial upon the seal, or

    b.  Secure the evidence and the old container in the new container, and initial the seal, or

    c.  Utilize a new container and seal with initials, if conditions dictate.

5.  The Property Clerk or their designee shall transfer, if necessary, evidence to the New York State Police Crime Lab, NMS Labs, Computer Forensics Laboratory, SABIS or other testing facility as required.  In every possible case, a sworn police officer shall be utilized for the transfer. Exceptions shall include transfer to SABIS for fingerprints being sent via certified mail, NMS Labs items which are shipped overnight via Federal Express and in some cases to the New York State Police Crime Lab via UPS.  All evidence being removed from the property room will require an electronic transfer movement entry within the BEAST. Items taken to the lab will have an accompanying lab sheet that the transporting officer will sign upon submission to the lab. A copy of such sheet shall be returned to the Property Clerk to be scanned into the case file within the BEAST.  Employees shall return evidence delivered from the lab to the Property Clerk, who shall note the return transfer movement within the BEAST.

6.  Evidence will not be transported by an off-duty employee, except in critical situations and then only with the permission of the Property Clerk and/or the Chief of Police.

7.  Evidence transferred to a laboratory for analysis will retain custody of the evidence after analysis until such time that it is reclaimed by the Property Clerk or his/her designee for storage in the Property Room.  A copy of the analysis request form shall be forwarded to the Property Clerk who shall maintain a file of items returned from the lab.  The lab results are later mailed to the Police Department and are filed accordingly by Records staff.

8.  The Property Clerk or their sworn designee will receive evidence returned from the lab or other testing facilities.  Such receipt shall be logged within the BEAST with a transfer movement entry.  Each package or item will be checked to ensure that it is properly sealed and identified before acceptance.

9.  When evidence is required to be transferred for trial, the Property Clerk will work with the District Attorney's Office or the case officer to insure that the evidence is transferred in a timely and orderly fashion.  The following procedure will be used to transfer evidence:

    a.  If the D.A. makes a request to transfer property to the D.A.s office, the Property Clerk will locate the evidence, make an electronic transfer movement within the BEAST and then personally deliver the evidence to the requesting D.A. The D.A. will sign a property receipt for the evidence which the Property Clerk will return to the department and scan into the BEAST case file.  Once property is transferred to the D.A.s Office, the custody of the property will reside in the D.A.s Office and will no longer be tracked by the police department.  In the event that the property is returned by the D.A.s office, the BEAST case file can be reopened by the Property Clerk.

b. If the Case Officer makes a request for evidence for court, the Property Clerk will locate the evidence and secure it in a Temporary Storage Device with a lock that is only accessible by the Case Officer. The property clerk will make an electronic transfer movement of the evidence items from the evidence room to Temporary Storage within the BEAST and notify the Case Officer of the evidence location. The Case Officer, when ready to go to court, will:

   i. Access the Temporary Storage Device to retrieve the evidence.

   ii. Utilizing the BEAST, scan the barcode on each item of evidence and then scan the quick sheet barcode for "out to court" thereby completing a chain of custody movement that the evidence has gone out to court.

c. At the completion of court, the Case Officer, will return the evidence items to the Property Clerk for storage in the property room as follows:

   i. Verify all seals on the item(s) are intact. If the seal was broken for display in court, the Case Officer must properly reseal, date and initial the package. If it is not possible to reseal the original package, the evidence and the old container must be sealed, with initials and date, in a new container as if it were a new submission. The new package requires a new barcode item label from the BEAST be applied.

   ii. Once the seal is verified, the Case Officer will scan the barcode of the Temporary Storage Device that the evidence will be submitted to and then scan the barcode of each individual item of evidence that they are returning. This will complete the chain of custody movement back from court and into Temporary Storage.

   iii. The Property Clerk will retrieve the evidence from Temporary Storage and return it to long term storage in the property room. A transfer movement entry will be created within the BEAST.

d. The Case Officer will not transfer to or leave evidence with the D.A.s Office. The Case Officer shall return all evidence to the Property Clerk and notify the clerk that the D.A. requests transfer to their office. The Property Clerk will then arrange transfer of the evidence to the D.A. Office and obtain a signed property receipt as noted above which will be scanned into the BEAST case file.

10. Evidence returning from the D.A.'s Office will be received by the Property Clerk. Such receipt shall be logged within the BEAST with a transfer movement entry. Each package or item will be checked to ensure that it is properly sealed and identified before acceptance.

## J. STORAGE OF PROPERTY / EVIDENCE

1. The Property Clerk will ensure all property items are held in a secure location and take all steps,

within reason, to maintain the integrity of the original packaging and safeguard the property from damage. In the event that a property item or its packaging are found to be damaged, appear tampered with, become contaminated or cross-contaminated, the Property Clerk will immediately notify the Chief of Police. The Property Clerk shall complete an incident report detailing the circumstances of the damage, tampering or contamination and how it may have occurred. The report, if the item was damaged and the damage was only to the original packaging, will include how the damage was repaired and the package resealed.

2. The Property Clerk will secure all money, precious metals, jewelry, gemstones, narcotics, drugs and firearms in a separately locked secure area within the Property Rooms.

3. Property, which requires special care, such as hazardous materials, may be kept by the police in public or private facilities, which the police deem appropriate for the purpose of preserving it.

4. Perishable food items should not be kept with other evidence in an effort to avoid infestation of pests. Perishable property shall be sold by the city as soon as possible in such manner as may be reasonable in the circumstance.

## K. RETENTION BY THE POLICE

1. The Property Clerk will regularly review the Property Room and the BEAST to determine the proper time for destruction or disposal of property and evidence. Disposal of property helps to maintain an orderly property room and ensure that there is space for storage as needed.

2. Items of evidence will be disposed of within six months after legal requirements have been met, if possible. Case Officers, not the Property Room staff, are responsible for making determination of when property and evidence are to be disposed of. To assist in this process, the Property Clerk will at least annually print out disposition tracer sheets from the BEAST and distribute them to the Case Officers. Case officers will review their cases and utilize the following methods for making determinations of destruction or disposal;

   a. Review of Police reports to determine if an arrest was made.

   b. Contact with City and County Court staff to determine the case status and to get the case dispositions.

   c. Contact with the D.A.'s office for review of the case. If the case is still open or pending appeal the evidence is to be held. If the case is closed destruction approval can be obtained from the D.A.

   d. If no arrest was made, contact the CID Sergeant on Felony cases or review CPL Article 30.10 on violation / misdemeanor case to determine if the case requires follow up or is beyond the statute of limitations.

    e.  Other methods as may be necessary as determined by the Duty Supervisor or Operations Commander

3.  Lost/found property shall be retained in the custody of this Department for the following periods, unless sooner delivered to the owner; however, final disposition of found/recovered property will be attempted within six months after legal requirements have been met. Disposition shall be guided by the Personal Property Law of New York State.

    a.  Property having a value of less than one hundred dollars, or proceeds of property having such value - **three months**.

    b.  Property having a value of one hundred dollars or more, but less than five hundred dollars, or proceeds of property having such value - **six months**.

    c.  Property having a value of five hundred dollars or more, but less than five thousand dollars, or proceeds thereof - **one year.**

    d.  Property having a value of five thousand dollars or more, or proceeds thereof - **three years.**

4.  Motor vehicles that have come into the custody of the Police Department will be held as dictated by General Order 560.

## IV. DISPOSAL OF PROPERTY AND EVIDENCE

### A. DESTRUCTION OF DRUGS

1.  All drug items identified for destruction will be destroyed under controlled conditions as follows:

    a.  The items will be boxed up by the Property Clerk and the clerk's assistant or other member of the department.

    b.  The box(s) will be sealed with tape which will be initialed and dated by both the Property Clerk and the assisting employee. Each sealed box will be retained until the date of destruction.

    c.  The Property Clerk and another sworn member shall deliver the sealed box(s) to either the Property Clerk of the Ontario County Sheriff's Office to be included with their drugs for destruction or Covanta where it will be placed into the incinerator.

    d.  On the date of the destruction, a disposal entry shall be made within the BEAST. A Property Receipt will be printed and signed by the disposing officers if the boxes go to the Covanta

incinerator or by the Property Clerk of the Ontario County Sheriff's Department when the boxes are turned over to them for destruction. This receipt with signature(s) will be scanned into the BEAST case file.

e.  Once the box has been turned over to the Property Clerk of the Ontario County Sheriff's Office or incinerated, the Property Clerk or his designee shall complete an Incident Report accounting for the disposal actions. A sheet listing all cases that were destroyed shall be attached and forwarded to the Chief of Police for his review and approval.

## B. DISPOSAL OF FIREARMS

1.  If the firearm was used in the commission of a crime it must be destroyed at the conclusion of the case and any remaining appeals unless the owner petitions a judge of the Ontario County Court and receives a destruction waver. If the firearm is to be destroyed it will be destroyed in a manner consistent with applicable laws of New York State Law by rendering it unusable by means of cutting or shearing the barrel or action of the firearm.

2.  In cases where the firearm was taken as a result of a domestic situation, clearance from a Judge is necessary to release it back to the owner.

3.  For instances in which a firearm was taken as a result of a mental hygiene case, the owner must produce a letter from a physician, psychologist or psychiatrist in order to release said firearms.

4.  Any firearms that are taken in for safekeeping will only be returned to the individual, if they are the lawful owner, whom originally placed the firearm in safekeeping or to a Federal Firearms Licensed (FFL) dealer.

5.  In the case of firearms taken in from deceased person cases or in which the lawful owner requests the firearm be turned over to another party, the following procedure will be followed:

    a.  Run a check on the firearm via Ejustice Portal to determine if the firearm was reported as lost or stolen. If lost or stolen, the firearm cannot be released. Contact will be made with the agency originally reporting the loss or theft and returned as necessary.

    b.  Contact the owner or family member who is the executor of the estate or has an order from probate directing that they can be the recipient of the firearm(s) if they want the firearm(s) returned to them.

    c.  If they meet the above standards and want the firearm or want it turned over to another person (notarized letter from the owner, executor or owner as determined by probate court directing that the firearm be turned over to other person required), they will need to contact a Federal Firearms Licensed (FFL) dealer to make the transfer.

    d. Once they have made contact with the FFL, provide to the police department the contact information of the designated FFL to verify that such arrangements have been made with them and request that the FFL contact the Property Clerk for transfer.

    e. On receipt of a call from the designated FFL, arrange a time for the FFL to respond to the police department to take custody of the firearm(s). The FFL will then need to follow the established procedures under state law to transfer the weapons to the receiving party.

6. If, within one year, the individual whom placed the firearm(s) into safekeeping with the police Department, pursuant to Section 265.20 of the Penal Law, has not claimed it or has not made arrangements to turn the firearm(s) over to a licensed firearm dealer, the firearm(s) will be designated a nuisance firearm and the Property Clerk will commence action to destroy them pursuant to New York State Penal Law Section 400.05.

7. Firearms may be turned over to the Police Department in situations where the firearm will be used for official purposes.

8. The Property Clerk will make a destruction entry within the BEAST on the date that any firearms are disposed of and complete an incident report, which will be forwarded to the Chief of Police, documenting such destruction. If the firearm(s) are turned over to an FFL for transfer to an owner, the Property Clerk will print a property receipt that will be signed by the receiving FFL. The signed receipt will be scanned into the BEAST case file.

## C. DESTRUCTION OF OTHER EVIDENCE OR PROPERTY

1. When it has been determined that evidence or property is no longer needed for evidentiary purposes or the time frame has been met for lost / found property, the Property Clerk may dispose of the item(s) and an appropriate entry will be made within the BEAST. Some examples of disposal methods include but are not limited to the following:

    a. Evidence or Property will be returned to its rightful owner if they are known.

    b. Evidence or Property can be converted to use by the City.

    c. Evidence or Property can be sold at public auction.

    d. Evidence or Property can be destroyed at the local level by the Property Clerk.

    e. Pornographic material must be inventoried and destroyed under strict controlled circumstances with an assistant as a witness.

    f. Fireworks are to be destroyed in accordance with Penal Law 405.05

2. After disposing of any item of evidence or property, the BEAST electronic record will be retained for 5 years or other period of time as designated by schedule MU-1.

## D. LOST OR FOUND PROPERTY

1. Every attempt will be made to return property to the rightful owner. If, at any time, the police have reason to believe that a person has interest in found property or in a found instrument in their possession and have reason to know his whereabouts, they shall give notice of the finding and the location to such person.

2. If the property has not been delivered to the owner three months before the expiration of the time periods detailed in section III, paragraph L, sub-paragraph 2 above as determined by Personal Property Law section 253 subdivision 7, the Property Clerk shall give notice to the owner, if known; and, to any person who has an interest in the property; and, to all persons who have made claim to the property; and, to the finder that the property, if not collected, will be sold at public auction.

3. Property found in a place other than a public street or highway, requires that the person in charge of such premises be notified. Such notice shall be in writing and served personally or by Certified Mail to the last known address of the person to whom it is sent and shall state in substance:

   a. That if within three months after the date of personal service or mailing of the notice, the owner does not claim the property, and if at the end of such three months no action is pending to determine rights to such property, written action of which notice was served upon the police having custody of the property, the property will be delivered to the finder, or if he established his right, to a person entitled to assert the right of the finder as provided in Sec. 256 of Personal Property Law.

   b. That if at the expiration of three months and ten days after the date of the personal service or mailing of the notice, the owner has not claimed the property and the finder, or person entitled to assert the right of the finder as provided in Sec. 256 of Personal Property Law, has not demanded delivery of it, and no action is pending to determine rights to such property, notice of which was served upon the police having custody of the property, it will be sold at public auction; and

   c. In cases of property in custody of the Chief of Police, the proceeds of the sale will be deposited with the City Treasurer.

4. When lost or found property is returned to the owner, his agent or to the finder in accordance with Sec. 254 of the Personal Property Law, a Property Receipt will be completed and contain the signature of the person to whom the property is returned. This receipt will be scanned into the BEAST case file and a return to owner property movement within the BEAST will be made.

5. If such property is turned over to the finder, or other party of interest, cross out "Owner" and type or print in "Finder" or "Other Party of Interest" on the Property Receipt. When the property is turned over to the finder or other party of interest type or print a brief explanation of the transaction on the bottom of the form. The singed Property Receipt will be scanned into the BEAST case file and a return to owner movement will be made to indicate final disposition of the property.

6. Found property having no value may be destroyed by the city.

## E. PROPERTY SOLD AT AUCTION

1. Perishable property or property having only salvage value may be sold by the City in such manner which would be reasonable under the circumstances.

2. Any property may be sold at public auction, as outlined in Personal Property Law section 263, when the expenses reasonably incurred in dealing with it, including expenses of taking custody, transportation, storage, and appraisal, any special expense attributable to administration of this article with respect to the particular property, amount to more than one half the amount reasonably estimated as the net sum likely to be realized by sale at public auction.

3. If property is sold as provided in Personal Property Law Sec. 263-3, the proceeds remaining after deducting the amount of reasonable expenses of dealing with the property prior to the sale, including any items of expense mentioned in paragraph 2, shall be dealt with as lost property having the value of the property sold.

4. Inventories of properties disposed of shall be made available to the Chief of Police upon his request.

5. Public sale or auction will be held under direction of the office of the Property Clerk after the required 48 hours notice is advertised in a newspaper of the county where the sale is held. The Chief of Police may authorize other auction means if applicable.

## F. TITLE TO LOST PROPERTY

The title to lost property that has been deposited with the police shall vest in the finder, or other person entitled to assert the rights of the finder, as provided in Sec. 256 of the Personal Property Law when the property is delivered to him in accordance with Sec. 254 of the Personal Property Law and shall vest in the buyer when the property is sold, as provided in Sec. 253, Personal Property Law.

## G. MOTOR VEHICLES AND PLATES

1. Disposal of Impounded Motor Vehicles will be handled under the provisions of General Order

560 which is based on Vehicle and Traffic Law section 1224.

2.  Disposal of License Plates

All license plates shall be removed and held for 30 days after which such plates shall be destroyed. A list of all the license plates that have been destroyed the previous 30 days shall be forwarded to the Department of Motor Vehicles at the address listed below. This list shall be submitted each month and shall contain the name of the last registered owner of said license plates. All Certificates of Registration, (pre 1973 vehicles) if in possession of the Property Clerk, may simply be destroyed and so noted on the Abandoned Vehicle Check List. All Certificates of Title, (post 1973 vehicles) if in the possession of the Property Clerk, must be attached to the Salvage Certificate Form (MV-907A) and forwarded to the Department of Motor Vehicles at:

Department of Motor Vehicles
Division of Data Preparation and Control
Empire State Plaza
Albany, New York 12228

G.O.270

# City of Canandaigua
# Police Department
### General Order

| | |
|---|---|
| **General Order:**    270 | **Subject:** Records Management and Reporting |
| **Authority:** Chief Mathew A. Nielsen | **Effective Date:** January 1, 2009 |
| **Rescinds:** All Previously Issued Directives | Revised 2/13/09, 7/27/09, 2/6/10, 4/12/10, 11/14/14, 3/25/19, 8/10/20, 4/8/21 |

## I.    PURPOSE

The purpose of this General Order is to establish the Canandaigua Police Department record keeping system, which is to be efficient and reliable and which accounts for Field Reporting and Central Records activity.

## II.    POLICY

It shall be the policy of this department to receive all documents created by the Canandaigua Police Department and retain them pursuant to Federal and State law and as noted in Departmental Policy. These records will be used to satisfy the reporting requirements of Federal and State Government, to evaluate the needs and performance of the department, and identify crime trends and opportunities to better serve the community.

## III.    RECEIPT OF INFORMATION

Information may be received in a variety of ways. Officers may receive information of incidents that require documenting directly, from a citizen, by walk-in or telephone, from arrest, from vehicle and traffic stops, and by radio dispatch from the County 911 Communications Center.

## IV.    RECORDING INFORMATION

A. A record of the original information is recorded by Ontario County 911 concerning any incident to which a police officer is assigned. The 911 Center will assign a unique complaint report number to each generated complaint. This record of the original complaint is entered into the 911 Computer Aided Dispatch (CAD) system and assigned a complaint number. The entry of the complaint into the Ontario County CAD system in the 911 Center would include information concerning the date and time of the initial reporting, names of involved persons including names of citizens requesting the service, victims and complainants name, nature of the incident, address of incident/complainant, phone number of persons reporting, etc.

   B. Upon completion of the complaint, the officer via the radio, the MCT (Mobile Communications Terminal) or in some cases the phone, shall clear the complaint with the appropriate clearance code (see General Order # 225 for a list of all codes).

   C. After the officer clears the incident with the appropriate code, the Ontario County 911 Center enters into the CAD system, the nature, date, and time of the action taken by the officer.

## V.    TYPES OF REPORTS

   A. SJS Incident Report- is a basic general report form used for a variety of common criminal and non-criminal incidents. Most incidents, made part of the official record of the Department, will be documented on this form. In all cases members must document all reported offences whether made by a complainant, victim or otherwise.

   B. The SJS Arrest Report is used for recording information on the arrest of an individual. The SJS Arrest Report is also used in cases where a criminal summons has been served on the individual. An SJS Arrest Report is used for V&T arrests where the arrest is of a custodial nature and for all AUO First (1st) or Second (2nd) Degree cases.

   C. A New York State Accident Report (MV104A) is used to report the collision of automobiles with other objects including pedestrians, bicyclist, other automobiles, and other objects. Officers shall complete the accident report when property damage has been reported to them by either party and a report is requested. When there is death or personal injury as a result of a motor vehicle accident or damage in excess of $1,000, the completion of the accident report is mandatory. Officers are to complete the accident report when investigating accidents between motor vehicles and horses, dogs, cattle, or deer and when the owner of the animal cannot be located or a report is requested by either the driver of the vehicle or the owner of the animal. These reports shall be done on the TRACS system.

   D. A New York State Domestic Incident Report (DIR) is used to document situations of domestic disputes/violence as defined by NY State Law and General Order # 630. Supervisors shall ensure their officers are in compliance. The SJS report is still used to further document the Domestic Incident. The Administrative Sergeant and records clerk will ensure copies of all Domestic Incident Reports are electronically forwarded through the eJustice Portal to the DCJS database.

   E. Uniform Traffic Tickets/TRACS shall be used to record Vehicle & Traffic Law violations. The TSLED/TRACS tickets shall be the form used by this Department. UTT's issued in connection with a custodial arrest shall accompany the arrest report and incident report for review by a supervisor. TRACS tickets are transmitted directly to City Court while TSLED tickets used are to be placed in the dispatch/typist mailbox for proper recording and distribution.

F.  City of Canandaigua Parking Tickets shall be used to document vehicles that are parked in violation of the City ordinances on parking, and the appropriate NY State violations as covered by the ticket. Officers shall place the carbon copies of the parking ticket in the parking ticket folder for processing by the typist.

G.  Other types of reports/records the Department maintains shall include but not be limited to: Criminal investigation files, warrant files, request for service reports, payroll files to include time off, vacation, sick time, etc., Department personnel records, evidence/property records, civil records, budget records vehicle maintenance records, equipment inventory records, and all records as may be required by statute, city ordinance or directive by the Chief of Police.

## VI.  RECORDS SYSTEM COMPONENTS

A.  Supervisor Review

1.  Upon completing any report, officers shall place the report in the Sergeant's review tray in the Sergeant's office. The supervisor shall review the report for completeness and accuracy. The submitting officer is responsible to ensure that all SJS reports are IBR compliant before submitting the report for approval. If approved, the supervisor shall either electronically or physically sign where appropriate space is provided on the department copies. If the report needs correction, it shall be noted and returned as soon as possible to the officer responsible for it with the corrections needed.

2.  Sergeants shall note on the report if review by the Investigative Division is warranted.

3.  Sergeants are responsible for making the court and DA copies.

4.  Officers must notify the Sergeant / OIC of any reports that were not completed prior to the end of shift. Reports that are not completed prior to the end of an officer's shift should be placed in the hold tray located in the Sergeants office. Officers should complete reports/investigations in a timely fashion. Sergeants or the shift OIC should review the hold tray daily to distribute held reports and to ensure officers are completing work in a timely fashion.

5.  Sergeants / OICs will only hold officers past the end of their scheduled shift to complete paperwork that is time sensitive.

6.  The hold tray in the Sergeant's office is not to be used for reports that require follow up. Reports that require follow up shall be copied by the case officer and the copy shall be used for follow up. The original report is to be submitted for review by the Sergeant and then supplemental reports to the original shall be completed and submitted for review and sign off.

7.  Reports submitted for review to the supervisor that require follow-up will be accepted with a status of pending investigation. The supervisor shall copy the report and note the necessary follow up that needs to be done. The copy will be returned to the reporting officer to complete the work and submit supplemental reports. The Sergeant may make recommendation the report be forwarded to the Investigative Division for review and follow-up.

8.  Investigating officers do not have the authority to close cases where he or she believes a crime has been committed. At the completion of the investigation, the officer may recommend closure of a case to the Sergeant who will make a final determination. This shall not apply when a person has been arrested due to the investigation.

B.  Clerical Personnel Processing

Clerical personnel shall be responsible for the daily processing of all reports and related paperwork. Clerical staff shall retrieve the paperwork from the Reviewed Tray in the Sergeant's Office and after checking to see that a supervisor has approved the case, they will process the case for distribution and filing. The Records Clerk will assign a YO number or Investigative number if appropriate, after conferring with the Sergeant in charge of CID.

C.  Warrants

Cases involving warrants will have a Warrant Jacket initiated containing the arrest warrant. The Warrant Control Officer shall be responsible for filing all incoming and outgoing warrants.

D.  State Fingerprint / Criminal History Records

1.  The Canandaigua Police Department shall maintain full participation in the New York State Fingerprint / Criminal History Records System. Upon affecting an arrest for a crime requiring fingerprinting of the defendant, officers will obtain one set of prints through the Live Scan program.

2.  Officers shall complete the required information at the time of booking.

3.  All persons to be fingerprinted due to arrest shall be printed at the time of arrest. Exceptions may be made for a combative subject or a highly intoxicated subject or for medical reasons.

4.  It shall be noted in the incident report that fingerprints and photographs were taken through the Live Scan program or such reasons stated for not obtaining prints and photographs.

G.O.270

     5. Should the Live Scan program not be operating in the police facility, arrestees shall be taken to the Ontario County Jail to utilize their Live Scan system.

E. Statistical Summaries

     1. The Canandaigua Police Department will maintain full participation in the Uniform Crime Reporting (UCR) System. The responsibility for preparation of the monthly UCR rests with the Administrative Sergeant. The UCR is created by submission of Incident Based Reporting (IBR) reports via Ejustice Portal.

     2. On a monthly basis, the Administrative Sergeant shall electronically generate the IBR report and correct any known errors. Once corrected, the IBR report will be rerun and submitted via the Ejustice Portal.

     3. Once submitted, the Administrative Sergeant shall review the response received via email or Ejustice Portal and correct as many errors noted in the response as possible.

     4. The Administrative Sergeant shall promptly report any problems with the monthly reports to the Chief of Police.

     5. The Administrative Sergeant shall by the fifteenth of each month create a report of department activity for the prior month and be responsible for other reports as directed by the Chief of Police.

F. Sealing Orders

     1. When a Sealing Order is received, the Administrative Sergeant shall utilize the attached Sealing Order Check List Form to cause the following to occur:

         a. Locate the case file in the Master File Box.
         b. Determine if the entire case will be sealed or if certain charges will be sealed.
         c. If only a certain charge(s) has been sealed, copy the incident report and redact the sealed information from the copy.
         d. Place the copy with the original case file and place the original report in a Sealed File Folder.
         e. Include in the Sealed File Folder, paperwork from the original case file that supports the sealed arrest.
         f. Remove the sealed charge(s) from the SJS report.
         g. If the entire case is to be sealed, place the entire original case file in a Sealed File Folder and seal the report in SJS.
         h. Locate the file in Laserfiche and move all of the original file documents to a new file in the sealed documents folder.
         i. Scan in the sealing order as the first page of the file in the sealed documents folder.

    j.   If sealing a certain charge(s), replace the original file with the redacted file created above.

    k.   If sealing the entire case, replace the original file with the scanned in copy of the sealing order and no other documents.

    l.   Seal the arrest in LiveScan, if not done in LiveScan, pull the digital image from the "F" drive or remove the photo and negative from the arrest file.

    m.   The Arrest Blotter shall be redacted and any records kept in the desk area shall be redacted or removed.

    n.   The arresting officer shall be notified via email and directed to respond via email after they have destroyed any associated case material. Attach a copy of these emails to the checklist.

    o.   Notify the Ontario County Records Office by emailing a scanned copy of the sealing order. The email will be sent with a delivery receipt request and include "sealing order for (name of person)" in the subject line.

    p.   Mail a letter to the defendant at the last known address (check with the attorney of record if known) advising the defendant that the case has been sealed. If the arrest was not done in LiveScan, also advise that they can respond to the police department to pick up the photograph and fingerprint card within 15 days or they will be shredded.

G. Sealing of Juvenile Cases / Juvenile Records

1. Upon review of any report where a Juvenile is a suspect of an offence, the Duty Sergeant or OIC shall place the approved report in the Juvenile Tray located in the Sergeant's Office.

2. The Sergeant in charge of CID shall review the above reports and deliver a redacted copy of the report to the records office to be filed.

3. No record is to be kept with the main files that would indicate the subject has been arrested as a Juvenile Delinquent or listed as a suspect.

4. All records of Juvenile Delinquency arrest and all other reports pertaining to juvenile as suspects for any offense are to be kept separate from adult files. The Sergeant in charge of CID and the Chief of Police shall have exclusive access to these files, which shall be maintained in the secured Juvenile Office Closet.

5. All juvenile records shall be withheld from public inspection.

6. The Family Court in which county a petition was adjudicated may, upon motion and for good cause shown, order such records open under conditions prescribed in the Family Court Act. Any order to release such information must be in writing.

7. Upon receiving a Court order to seal a case for a juvenile, the Administrative Sergeant will forward, without delay, the sealing order to the Sergeant in charge of CID. The Sergeant in charge of CID will then physically seal the case folder. The Sergeant in charge of CID will place their initials and date on the sealed case and sealing order to indicate the date and identity of the sealing officer.

H. Multiple Defendant Sealing Orders

1. Sealing Orders for cases with multiple defendants shall be handled as outlined above with the following steps taken to ensure the completion of the Sealing Order on the defendant having their case sealed:

   a. The Administrative Sergeant shall be responsible for redacting the co-defendants having their case sealed to ensure deleting of references to the defendant. This shall be accomplished by covering the defendants name with black marker to make the name and/or other references unreadable.

I. Name Indexing

The Department will maintain the arrest blotter database of all persons arrested by this agency. The arrest section contains, at a minimum, the defendant's name, address, date of birth, sex, race and the specific charge. Each arrested adult will have a unique sequence of numbers attached to their name.

## VII.   FREEDOM OF INFORMATION REQUEST

It is the policy of the Canandaigua Police Department to fully comply with the New York State Freedom of Information law, and to expeditiously provide citizens with police records and information to which they are entitled. All records of the Police Department are available as required by appropriate New York State and Federal Laws.

## VIII.   RECORDS MAINTENANCE

The City of Canandaigua Police Department will maintain records produced by the agency in accordance with the Retention and Disposition Schedule for New York State Local Government Records (LGS-01), pursuant to Article 57-A of the Arts and Cultural Affairs Law. Schedule LGS-01 will include: Incident and/or crime reports; Arrest Reports and; Traffic accident reports. The LGS-01 will serve as a minimum guideline and times may be extended by the department.

G.O.270

## Sealing Order Check List

1) _____   Locate the case file in the Master File Box
2) _____   Determine if the entire case will be sealed or if certain charges will be sealed. (note "sealed" in the Special Services Case File if applicable.)
3) _____

    A. If only a certain charge(s) has been sealed, copy the incident report and redact the sealed information from the copy.
       1. Place the copy with the original case file and place the original report in a Sealed File Folder. Include in the Sealed File Folder, paperwork from the original case file that supports the sealed arrest.
       2. Remove the sealed charge(s) from the SJS report

    B. If the entire case is to be sealed, place the entire original case file in a Sealed File Folder and seal the report in SJS.

4) _____

    A. Locate the file in Laserfiche and move all of the original file documents to a new file in the sealed documents folder.
       1. Scan in the sealing order as the first page of the file in the sealed documents folder.
       2. If sealing a certain charge(s), replace the original file with the redacted file created above.
       3. If sealing the entire case, replace the original file with the scanned in copy of the sealing order and no other documents.

5) _____   Seal the arrest in LiveScan, if not done in LiveScan, pull the digital image from the "F" drive or remove the photo and negative from the arrest file. _____ Violation – Not Processed.
6) _____   Notify the desk typist of the sealing order and direct the typist to seal all records kept in the desk area. Have the desk typist initial when completed.
7) _____   Notify the arresting officer of the sealing order via email and direct them to respond via email after they have destroyed any associated case material. Attach a copy of these emails to the checklist
8) _____   Notify the Ontario County Sheriff's Records Office by emailing a scanned copy of the sealing order to Erin Holley (erin.holley@co.ontario.ny.us). The email to Erin will be sent with a deliver receipt request and include "sealing order for (name of person)" in the subject line. _____ Violation – Not Processed.
9) _____   Mail a letter to the defendant at the last known address (check with the attorney of record if know) advising the defendant that the case has been sealed. If the arrest was not done in LiveScan, also advise that they can respond to the police department to pick up the photograph and fingerprint card within 15 days or they will be shredded.
10) _____  Send Administrative Sergeant an email request to destroy camera footage.
11) _____  Return this checklist, a copy of the sealing order, a copy of the letter sent to the defendant, copies of emails to and from the officer, a copy of the email to Erin Holley and the printed read receipt of the email sent to her to the Administrative Sergeant.

# City of Canandaigua
# Police Department
### General Order

| General Order: 500 | Subject: Arrest Procedures |
|---|---|
| Authority: Chief Mathew A. Nielsen | Effective Date: January 1, 2009 |
| Rescinds: All Previously Issued Directives | Revised 10/11/19, 10/29/20, 12/31/20, 1/04/21 |

## I.   PURPOSE

This policy is written to guide Canandaigua Police Officers with basic steps on how arrests should be planned, executed and completed.

## II.   POLICY

It is the policy of the Canandaigua Police Department that all arrests made by departmental personnel shall be conducted professionally and in accordance with established legal principles. In furtherance of this policy, all officers of this department are expected to be aware of, understand, and follow the laws governing arrest. This policy sets forth the fundamentals of the arrest procedure.

## III.   PROCEDURE

### A. Investigative Detention

1. All officers shall be aware of the distinction between *investigative detention* and *arrest.*

2. Officers shall conduct an investigative detention based upon reasonable suspicion that the person detained has committed, is committing, or is about to commit a crime while in a public place.

3. Officers shall not prolong the investigative detention beyond the period necessary to accomplish the purpose of the detention. Officers shall be aware that prolonging an investigative detention unnecessarily may cause a court to view the detention as an actual arrest.

4. Officers shall take precautionary measures for their own safety during an investigative detention, including display of firearms or handcuffing the detainee. Officers shall be

CPD-000032

aware that unnecessary or prolonged display of firearms, handcuffing, and so on during the investigative detention may cause a court to view the detention as an actual arrest.

5.   Officers who reasonably believe that a person under investigative detention may pose a threat to their safety shall conduct a frisk or pat-down search of the detainee's clothing for weapons. Officers shall not conduct any further search of an investigative detainee unless and until it appears that there is probable cause for the arrest of the detainee. The officer must have an articulable reason why he/she believes that this person poses an immediate threat (holding a weapon, past history of violence, etc.)

6.   If during the investigative detention, it becomes apparent that there is probable cause to believe that the detainee has committed a criminal offense, the detainee shall then be placed under arrest, and the procedures for arrest set forth in this policy, including the procedures for a search incident to an arrest, shall then be followed by the arresting officers

**B.   Basis for Arrest**

1.   Officers shall conduct an arrest only when based upon:

a.   Probable Cause (See G.O. 505 Arrest Without Warrant)
b.   An Arrest Warrant or Bench Warrant of Arrest (See G.O. 510 Warrants-Criminal Summons)

**C.   Arrest Procedures**

1.   Arrest Planning

a.   Wherever possible, arrests shall be planned in advance in consultation with a supervisor or other experienced officers.

b.   Where advance planning and consultation is not possible, the arrest shall be made in accordance with the arresting officer's departmental training in arrest procedures.

2.   Timing and Manner of Arrest

a.   Arrests shall be made at a place and in a manner that will maximize the probability of a successful arrest and minimize the danger to officers and innocent bystanders.

3.   Informing the Arrestee

a.   The arresting officers shall identify themselves, inform the suspect of his or her arrest, and specify the charges for which the arrest is being made as soon as reasonable under the circumstances.

    b.  Officers not in uniform shall display their shields and credentials when making the arrest to ensure proper identification.

4.  Use or Show of Force During Arrest

    a.  Officers shall use only that level of force that they reasonably believe is necessary to make an arrest in accordance with the Canandaigua Police Department Use-of-Force Policy and Article 35 of the New York State Penal Law.

    b.  Weapons shall be displayed during an arrest only where it is reasonably believed necessary to ensure the safety of the officers or others and the successful completion of the arrest. Pointing a firearm at a suspect is governed by this agency's Use of Force Policy, General Order 400 and Firearms Protocol, General Order 420.

5.  Safety Precautions

    a.  Officers shall approach every arrest situation with the knowledge that any arrest, regardless of the offense involved may present an element of danger. Therefore, officers making arrests shall take all reasonable precautions to ensure the safety of the arresting officers and the general public. These precautions shall include the following:
        i.  Restraint of the arrestee as noted in section III E below.
        ii.  Search of the arrestee as noted in section III F below.
        iii.  Protective sweeps of the premises or area where the arrest occurs to ensure that no other persons or weapons are present that may represent a danger to the officers, the public or the arrestee.

6.  Arrestee Requests

    a.  Following the arrest, officers shall not normally permit arrestees to leave the immediate area of the arrest for personal purposes (e.g., to get a coat). In exceptional cases where it is deemed necessary to grant the arrestee's request, the arrestee shall first be searched for weapons and then be accompanied and closely monitored by the arresting officer or other officers.

## D.  Location of Arrest

1.  Public safety: Whenever possible, arrests shall be made in a location where the arrest will not pose a threat to the safety of the public (e.g., crowded places where bystanders may be injured should the arrestee offer resistance, particularly resistance involving the use of firearms).

2.   Arrests on private premises belonging to third parties:  No officer shall enter premises owned or occupied by a third person to make an arrest unless the officer has a separate legal basis for entering the premises.  Such a basis may be provided by any of the following:

   a.   Possession by the officer of a search warrant for those premises.

   b.   Consent of a person empowered by law to give consent.

   c.   Exigent circumstances.

**E.   Restraint of Arrestees**

1.   All arrested persons shall be handcuffed after being taken into custody, except as otherwise provided by Departmental Policy.

2.   Other lawful forms of restraint may be used when necessary and reasonably available for the safety of officers, prisoners, and others.

3.   A four-point restraint is defined as the hands and ankles bound behind an individual's back.  Arrestees **shall never** be restrained in this position.  If an arrestee is not controllable by other means readily available, they may be placed in four-point restraints with the hands and ankles bound together in the front of their body.  If a four-point restraint is deemed necessary, the arrestee shall be placed on his or her side or in a sitting position once bound and monitored for potential physical problems such as difficulty in breathing.

4.   Arrestees should not be placed on their stomach while handcuffed for a protracted period of time.  Arrestees will never be placed in a patrol vehicle in any position other than a sitting position

**F.   Search Incident to Arrest**

1.   Officers shall conduct a thorough search of the person arrested.

2.   Any criminal evidence discovered during the search of the arrestee's person shall be seized and preserved in accordance with standing departmental procedures.

3.   The search incident to arrest shall include not only the person of the arrestee, but also areas within the reach and control of the arrestee.

4.   Strip searches shall not be conducted in the field except under the most extreme circumstances and with prior approval from a supervisor.  Any officer conducting a strip

search of an arrestee in the field shall be prepared to justify the reasons for such a search and to document those reasons in a subsequent written report.

5.  Body cavity searches, except oral cavities, shall not be conducted in the field. Whenever possible, searches incident to arrest shall be conducted by officers of the same gender as that of the person being searched.

## G. Post-Arrest Protection of Officers, Arrestees, Victims and Bystanders

1.  Officers shall be aware that, following an arrest, they are legally responsible for the safety of the arrestee, any victims present, and all bystanders. Therefore, officers shall take all steps reasonably necessary to:

    a.  Protect the officer from the arrestee.

    b.  Protect victims and third persons from the arrestee.

    c.  Protect the arrestee from self-injury or injury by others. In particular, officers shall not allow victims into close proximity with the arrestee, and shall prevent bystanders from approaching the arrestee before the arrestee is transported from the scene. In addition, officers shall not allow the arrestee out of their immediate presence for any reason until the arrestee is properly secured and transported.

    d.  Provide attention to the medical and mental health needs of all persons in custody and obtain assistance and treatment of such needs which are reasonable and provided in good faith under the circumstances per Article 3, section 28 of the New York State Civil Rights Law.

## H. Mirandizing Arrestees

1.  Arrestees shall be advised of their *Miranda* rights before any questioning that pertains to the offenses that he/she was arrested for.

2.  A waiver of the *Miranda* rights must be obtained before any questioning of an arrestee.

3.  If the arrestee has not waived his or her *Miranda* rights, no questioning shall be conducted beyond that necessary to accomplish the booking procedure (name, address, etc.).

4.  If the arrestee declines to waive his or her *Miranda* right to counsel, or if the arrestee, after waiving that right, elects to reassert it, questioning must cease immediately and no further questioning may be conducted unless:

    a.  An attorney representing the arrestee is present, or

     b.  The arrestee voluntarily initiates a further interview.

5.  If the arrestee has not waived his or her *Miranda* rights, then even though the arrestee is not being directly questioned, officers shall refrain from engaging in conversation among themselves in the presence of the arrestee that is calculated to elicit incriminating statements or admissions from the arrestee.

**I.  Appearance Ticket in Lieu of Physical Arrest**

1.  Officers may issue an appearance ticket in lieu of a physical arrest in all situations where the appearance ticket is authorized by law except in domestic violence cases and order of protection violations.  In situations where an appearance ticket is discretionary, officers shall consider the following:

     a.  Whether the person is likely to disregard an appearance ticket.

     b.  Whether the person, if cited and released, is likely to cause harm to himself or herself or any other person, or are impaired or intoxicated to the point where they are unable to properly care for themselves.

     c.  Whether there are other factors that should be considered and are permitted by law and departmental policy.

     d.  Officers who release intoxicated or impaired arrestees into the care or supervision of a third party or facility will document in their incident report the name, address and phone number of the of the individual or facility to whom the arrestee was released.

     e.  **Appearance tickets must be issued in person, this includes Uniform Traffic Ticket's. They cannot be mailed or otherwise delivered except by personal service. The only exception to personal service is the issuance of parking tickets (CPL 150.40 Sub 2).**

**J.  Transportation of Arrestees**

1.  All arrestees shall be searched before being transported.

2.  All arrestees shall be handcuffed or otherwise restrained during transportation in accordance with departmental policy.

3.  Before an arrestee is transported, the area of the transporting vehicle to be occupied by the arrestee shall be searched for articles, including those, which may have been left behind by previous arrestees that may present a hazard to the transporting officers.

4.  Security devices in the transporting vehicle, such as door locks and security screens, shall be checked to be certain that they are operating properly.

5.  Officers shall seat arrestees in the right rear passenger seat of a Canandaigua Police Department vehicle.

6.  All arrestees shall be safely restrained with seatbelts.

## K.  Arrest of Juveniles

All officers shall be aware that the arrest, transportation, and booking of juveniles are subject to special legal requirements.  Officers shall be familiar with and observe these special requirements at all times when arresting juveniles. See General Order 705.

## L.  Arrest of Departmental Members

When arresting a member of their own Department, officers shall take all precautions and follow all procedures as provided by departmental policy.  If at all possible, notify the Chief of Police prior to the arrest of a departmental member or staff.

## M.  Off-Duty Arrests

Refer to General Order 520 Off-Duty Arrests.

## N.  Fingerprinting and Photographing

1.  The arresting officer must take or cause to be taken, the fingerprints of arrested persons or defendants for any offense, which is the subject of the arrest or is charged in the accusatory instrument filed against person(s) or defendant(s) including:

    a.  Any Felony.

    b.  A Misdemeanor defined in the Penal Law.

    c.  A Misdemeanor defined outside the Penal law, which would constitute a felony if such person had a previous judgment of conviction for a crime (e.g. DWI).

    d.  Loitering as defined in subdivision three, section 240.35 or subdivision two, section 240.37 of the Penal Law.

2. A Police Officer who makes an arrest for any offense (either with or without a warrant) may take or cause to be taken, the fingerprints of the person arrested when the Police Officer:

   a. Is unable to ascertain such person's identity.

   b. Reasonably suspects that the identification given by the arrested person is not accurate.

   c. Reasonably suspects that the person arrested is being sought by law enforcement officials for the commission of some other offense.

3. Whenever fingerprints are required to be taken pursuant to paragraph 1 of this section, or permitted to be taken pursuant to paragraph 2 of this section, the photograph and palm prints of the arrested person or the defendant, as the case may be, may also be taken (CPL 160.10).

**O. Arraignments**

1. When the Canandaigua City Court is in session, all arraignments shall be held at the Canandaigua City Court unless the arrest is based on a Superior Court Warrant issued by or returnable to the Ontario County Court. Arrests based on Warrants issued or returnable to the Ontario County Court shall be arraigned in the Ontario County Court.

2. When the Canandaigua City Court or the Ontario County Court for a Superior Court Warrant returnable there are not in session, all defendants shall be transported to Ontario County Centralized Arraignment at the Ontario County Jail Facility, 3045 County Complex Drive, Canandaigua to await arraignment.

**P. Release after Arrest**

1. If, after an arrest, it becomes apparent that there is no probable cause to hold the arrestee, the arrestee may be released, under the following conditions:

   a. The officer is satisfied that there are insufficient grounds for making a criminal complaint against the person arrested.

   b. The supervisor is consulted in reference to the original incident, apparent grounds for arrest and determination that probable cause does not exist.

   c. The arrestee can be released at a safe location and is not otherwise placed at risk as a result of the incident. If necessary, police should provide transportation for the released person to a safe location.

    d.  Any record of arrest of a person released shall include a record of release that classifies the incident as a "detention" rather than an arrest. This shall be documented in an Incident report; no arrest report shall be completed.

2.  Following an arrest and the processing as required, an arrestee may be released on an appearance ticket or following arraignment as follows:

    a.  If the person is under the influence of alcohol, drugs or suffers from a significant physical injury, the arrestee shall be released to a responsible adult party.

    b.  If the person does not meet the criteria in a. above, police shall ensure that the person is released at a safe location and is not otherwise placed at risk as a result of the incident. If necessary, police should provide transportation for the released person to a safe location.

G.O.505

# City of Canandaigua
# Police Department
### General Order

| General Order: 505 | Subject: Arrests Without Warrant |
|---|---|
| Authority: Chief Stephen Hedworth | Effective Date: January 1, 2009 |
| Rescinds: All Previously Issued Directives | Revised 11/12/19 |

## I.    PURPOSE

The purpose of this general order is to provide officers with guidance when taken any action resulting in the arrest of an individual(s) without a warrant.  The authority to arrest, granted by the People of the State of New York to a Police Officer, carries with it the responsibility to exercise discretion, but that discretion is necessarily limited.  A variety of circumstances (e.g. seriousness of conduct, willingness of the victim to prosecute with exception of domestic violence misdemeanors, age of the suspect, recidivism) as well as various options (e.g. resolution, warning, referral, summons, appearance ticket, physical arrest) demand due consideration prior to any action.

## II.    POLICY

It is the policy of the Canandaigua Police Department that no person will be arrested without probable cause to believe that an offense has been committed.  Authority to arrest is strictly limited to those situations where the Criminal Procedure Law of the State of New York authorizes an arrest (See CPL 70.10 sub 2).

The Canandaigua Police Department neither condones nor permits the use of any bias-based profiling in traffic contacts, field contacts, and investigations or in asset seizure and forfeiture efforts.  Arrests will not be based solely on a common trait of an individual, including but not limited to:  age, race, creed, color, religion, national origin, gender, sexual orientation, disability, marital status or economic status.

Mediation will not be used as a substitute for appropriate criminal proceedings when the victim desires prosecution and there is reasonable cause to believe that an offense has been committed.

Upon deciding to arrest, the officer will follow such procedures as outlined herein and under other current directives, such as those regarding appearance tickets, juvenile procedures, uniform traffic summonses, domestic offenses, etc. which may be applicable.

No arrest shall take place until the officer has completed an investigation and believes that probable cause exists for an arrest.

Officer should be guided by G.O. 500 Arrest Procedures when making an arrest.

## III.  PROCEDURE

A. Canandaigua Police Officers may arrest for any crime committed within the State of New York when probable cause exists (See Off Duty General Order 520 for further clarification.) whether committed in the presence of the officer or otherwise.

B. Canandaigua Police Officers may only arrest for a petty offense when the violation occurs in their presence or as authorized by law (VTL leaving the scene of an accident).  Furthermore, officers may issue an UTT for offences not occurring in their presence pursuant to case law.  In these cases, officers must secure a supporting deposition from person(s) who have personal knowledge of the infraction (witnessed the violation).  However, officers may not take physical custody for the issuance of a UTT for an infraction not occurring in their presence.  Officer may not take physical custody for Petty offenses not witnessed by the police officers, they must either seek a criminal summons/warrant or proceed under II D. **\*UTT's must be served personally, the mailing of a UTT in strictly prohibited.**

The petty offense must have occurred in the City of Canandaigua and such arrest is made in Ontario County or in an adjoining county, except that an officer may pursue the violation into a non-adjoining county while in close pursuit.

C. In the event that a Canandaigua Police Officer responds to an incident and upon arrival the complainant is making allegations that a violation has occurred i.e.,  present time, the officer shall advise the complainant who witnessed the violation to perform a citizen's arrest and the officer will then take physical custody of the suspect if probable cause exists and prepare an accusatory instrument for the complainant to sign. Conversely, if the suspect is gone upon officer's arrival and the witnessing complainant wishes to pursue charges, the officer shall secure a supporting deposition from the complainant. The officer then shall cause an investigation to occur. Upon the completion of the investigation, if probable cause exists, the officer shall prepare an accusatory instrument and apply for a summons or warrant.

D. Citizen Arrest

1. A citizen has the legal authority to arrest and detain a person who has committed an offense, and turn that person over to a Police Officer.  When the offense is a violation or misdemeanor, such offense must have in fact been committed in the citizen's presence.  Further, a Citizen's Arrest for a violation or misdemeanor can only occur in the county where the alleged offense was committed.  Conversely, a citizen may make an arrest for a felony that has in fact been committed outside their presence anywhere in the state.

2.  If there is reasonable cause to believe the person did not commit the offense, or if the offense is otherwise authorized, the officer will not accept the citizen's arrest.

3.  In those circumstances where an officer has reasonable cause to believe that the suspect did not commit the offense and/or that the arrest was otherwise unauthorized, the officer will document the incident and the reason(s) for not accepting the citizen's arrest.  Said documentation will be on an Incident Report.

4.  In citizen's arrest situations where probable cause exists to substantiate an arrest, the officer will assist the complainant in filing an accusatory instrument at the time of the arrest and the issuance of an appearance ticket, if applicable. The complainant, not the officer, will sign the accusatory instrument.

5.  If after accepting a citizen's arrest and the citizen later becomes uncooperative and refuses to sign the accusatory compliant, the suspect will be released. Such actions shall be documented on an incident report.

E.  Unarrest Situations

1.  Pursuant to CPL 140.20, sub 4, if after arresting a person for any offense, an officer, upon further investigation, determines the reasonable cause to arrest has changed and/or there is not probable cause to believe that the arrested person committed such offense or crime or any other offense, based upon the conduct in question, the officer must immediately release such person from custody with an explanation of the circumstances of the release. The facts and circumstances will be documented on the Incident Report.

2.  In cases of a non-arrest or an unarrest incident where countermeasures have been used, the officer will notify a supervisor prior to the release of the subject.  Any resistance encountered by the officer or injury to the subject will be documented as directed in General Order #415.

F.  Temporary Questioning of Persons in Public Places

1.  Pursuant to CPL 140.50, a Police Officer may stop and detain a person in a public place located within the City of Canandaigua when the officer reasonably suspects that such person is committing, has committed, or is about to commit a crime as defined in the penal law.  The Police Officer may demand of him/her a name, address, and explanation of his conduct.  If during the stop, the officer reasonably suspects that he or she is in danger of physical injury, he may conduct a pat down search for a deadly weapon or any instrument readily capable of inflicting serious physical injury.

G.O.705

# City of Canandaigua
# Police Department
### General Order

| General Order: 705 | Subject: Investigative Division Function |
|---|---|
| Authority: Chief Stephen Hedworth | Effective Date: January 1, 2009 |
| Rescinds: All Previously Issued Directives | Revised 6/17/11, 10/31/19 |

I. **PURPOSE**

The purpose of this General Order is to establish responsibility for Department personnel and standardize the method used to investigate an incident.

II. **POLICY**

It is the policy of the City of Canandaigua Police Department to use all available resources to bring about a successful conclusion to all investigations. It is the responsibility of all personnel to respond to, investigate and process the scene of all incidents in a manner consistent with this and any other pertinent procedures.

III. **INVESTIGATIVE FUNCTION**

A. The Criminal Investigation Division (CID) is the investigative arm of the department. The mission of the division is to:

1. Initiate criminal investigations.

2. Conduct Background checks as assigned.

3. Secure and protect the integrity of crime scenes.

4. Identify:

    a. Witnesses
    b. Victims
    c. Suspects

5. Conduct interviews or interrogations of any parties who witnessed or were involved in an incident.

6. Limit the access to a crime scene to law enforcement officials with an authorized purpose for entering the scene and;

    a.  Record the identities of those that enter or exit.
    b.  Record their reason for entry and,
    c.  The times of entry and exit for all persons who enter and exit a crime scene.

7. Conduct searches of scenes for items of evidence.

8. Recover evidence if so qualified to do so or notify an Evidence Technician or Crime Scene Specialist as needed.

9. Complete necessary notifications when directed to do so.

10. Arrest offenders

11. Prepare reports and the appropriate charging documents for prosecution.

## IV.    PRELIMINARY INVESTIGATION

The preliminary investigation will end when the patrol officer has exhausted all police action at his immediate disposal.  Consideration shall be given to such factors as expertise, the time available or time of day and the degree of seriousness of the offense.

## V.    FOLLOW-UP INVESTIGATION

A. The follow-up investigation will be the second phase of the investigation.  This begins when specialized skills and equipment are needed to bring the case to a successful conclusion.

B. The Follow-up Investigation shall include, but not be limited to:

1. Review and analyze all previous reports prepared during the preliminary investigation.

2. Conduct additional interviews and/or interrogation of victims, witnesses or suspects.

3. Review departmental and other records for possible leads on the case.

4. Seek additional information from other sources such as other officers or informants.

5. Collect physical evidence.

6. Identify and apprehend suspects.

7.  Determine involvement of suspect(s) in other crimes.

8.  Check suspect(s) Criminal History.

9.  Prepare cases for court presentation by consulting with the District Attorney.

10. Assist in case preparation and testify in court.

C.  The following types of cases will be forwarded to the Criminal Investigation Division for follow-up investigation:

1.  All Felony cases.

2.  All sex offense cases.

3.  All Juvenile cases.

4.  All hate crimes

5.  All bad check cases

6.  All bail jumping cases as requested by the District Attorney's Office.

7.  All crimes in which a weapon was used.

8.  All cases of a protracted nature, i.e. identity theft cases.

9.  All cases requiring a certain expertise of the members of the investigation division.

10. All other cases as deemed necessary to achieve the goals and objectives of the department.

## VI.  CASE MANAGEMENT

A.  Incident Report review and assignment

1.  Upon completion of an incident report, the shift supervisor shall review the report for completeness and accuracy. Following the review, if the shift supervisor believes the CID should follow-up on the case, they will submit the case to the "CID" tray.

2.  The Sergeant in charge of the CID shall review all reports in the "CID" tray. Following the review, they shall assign applicable cases to members of the investigation division or refer the case back to the initial case officer for follow-up.

3. The assigned cases will then be forwarded to the records staff for labeling, assignment of a CID case number, completion of case tracking and other processing as required.

B. Case investigation

1. The Detective assigned a case is responsible for the development of an investigation plan and all documents and reports related to the case.

2. All leads or information developed as a result of the investigation shall be documented in the original incident report via a supplemental report. All supplemental reports shall include the date of action and the date written.

3. In addition to other reports, the assigned detective shall complete periodic progress reports on each case.

4. Members of the CID shall meet with the Sergeant in charge of the division on a weekly basis to review all open and active cases. Such meetings shall be to keep the sergeant in charge of the division up to date on cases and for them to offer suggestions and routes of investigation to the detectives.

5. The case detective shall "work" each case using all of the resources that are available to them. When the detective has exhausted all means of solving the case successfully, they shall submit the case to the Sergeant in charge of the CID with a recommendation to determine or change the case status. The recommendation to change the case status shall be based on the weekly meetings and progress reports generated.

6. The case status classifications shall be as follows:

    a. **Open**: indicates a case is assigned to a detective and is actively being investigated.

    b. **Closed – Cleared by Arrest**: The offender has been identified and arrested.

    c. **Closed – Exception**: The offender has been identified and no prosecution is initiated; Complainant withdrew complaint.

    d. **Closed – Unfounded**: Investigation has determined that no offense has occurred.

    e. **Closed – Inactive**: All leads have been exhausted and no suspects have been identified.

    f. **Closed – Other**: The case has been turned over to another agency for jurisdictional reasons or turned over to the District Attorney's Office for review.

**VII.   CONSTITUTIONAL REQUIREMENTS**

    A. Interview and interrogation

        1.  All officers shall interview, interrogate or otherwise question persons in accordance with State and Federal Laws.

        2.  Witnesses who have observed a crime being committed are excellent sources of information in the development of the criminal investigation.  Some witnesses are reliable and completely impartial; others may be reluctant, biased or influenced by personal prejudice.  Physical factors should also be considered that could cause an inaccurate interpretation of observed events.

            a.  Officers must be able to recognize individual differences and determine the specific reliability of witnesses.

        3.  Interview / Interrogation:  Developing information from individuals takes the form of:

            a.  Interview:  The process of obtaining information from a cooperative person, not responsible for the event or incident.

            b.  Interrogation: The process of obtaining information from an uncooperative person who may either be a suspect, witness or victim of the event.

        4.  When an officer has not arrested an individual or otherwise taken the person into custody in a manner which restricts the individual's freedom or ability to discontinue the conversation, then the officer may ask questions that are necessary and pertinent without giving the Miranda Warning.

        5.  At the beginning of any custodial interrogation, (questioning initiated by the officer after a person has been taking into custody or **deprived of their freedom or action in any way),** the person to be interviewed shall be advised of their *Miranda* Warnings.  After the notification, the person to be interviewed may waive his rights but he must do so voluntarily, knowingly and intelligently.  The burden of proof that a waiver was made within the meaning to the law rests with the police agency.  A voluntary statement form is to be used to take the statement of the suspect and signed and witnessed by the officer taking the statement.  If after taking the statement, the suspect refuses to sign it, the officer obtaining the statement will sign it and write REFUSED above the suspect's signature line on the last page of the statement.

    B. Search and Seizure – Constitutional Requirements

        1.  Police action is termed a search where:

    a.  There is prying into hidden places by a police officer in which the person whose premises or person is being searched has a reasonable expectation of privacy.

    b.  The Fourth Amendment guarantees the right for people to be free from unreasonable searches and seizures of their homes, persons or things.

        i.  Illegally seized items of evidence will not be admitted in court and may be cause for a lost criminal case.

       ii.  An illegally conducted search invites civil suits under the Civil Rights Act.

     iii.  In order to ensure that Forth Amendment Rights are protected, members will obtain search warrants upon probable cause in all appropriate criminal cases except the following:

- Consent searches
- Emergency searches
- Plain view
- Abandoned property
- Inventory searches of vehicles
- Search incident to arrest
- Pat downs of suspicious persons

C.  Searches Defined

  1.  Emergency or Exigent Searches:

    a.  A search warrant is not necessary in an emergency.

    b.  Factors to be considered in evaluating whether an emergency exist include but are not limited to:

        i.  The degree of urgency involved and the time required to get a warrant.

       ii.  The officer's reasonable belief that contraband is about to be removed or destroyed.

     iii.  The possibility of danger to others, including officers left to guard the site.

     iv.  Information that the possessors of the contraband are aware that police are aware of the activities or location.

      v.  Whether the offense is serious or involves violence.

     vi.  Whether officers reasonably believe the suspects are armed.

    vii.  Whether the officers have probable cause.

   viii.  Whether the officers have strong reason to believe the suspects are on the premises.

     ix.  The likelihood of the suspects escaping.

      x.  The suspect enters onto the premises while the officer is in hot pursuit.

2. Plain View Searches

   a. A Plain View search is technically a search.
   b. To make a plain view seizure of property, the officer must inadvertently observe the property in a place where he has a legal right to be.

   c. It must be immediately apparent to the officer that the items (s)he observed mat be evidence of a:

      i. Crime
      ii. Contraband, or
      iii. Otherwise subject to seizure.

   d. Officers may not move items, look inside of, underneath or behind something for serial numbers or other identifying marks. If such movement is necessary, officers shall obtain a search warrant.

3. Abandoned Property

   a. A search warrant is not required for property that has been abandoned.

   b. To constitute abandoned property, two conditions apply:

      i. The property must have been voluntarily abandoned.
      ii. The property must have been discarded outside the area in which someone has a reasonable expectation of privacy.

   c. An officer must have probable cause to undertake a search or make an arrest.

   d. Probable cause exists where the facts and circumstances within their (the arresting officer's) knowledge and of which they had reasonable, trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

GO 725

# City of Canandaigua
# Police Department
### General Order

| General Order: 725 | Subject: Criminal Intelligence Collection and Sharing |
|---|---|
| Authority: Chief Stephen Hedworth | Effective Date: January 1, 2009 |
| Rescinds: All Previously Issued Directives | Revised 09/02/09, 6/17/11, 08/16/12, 05/25/16, 12/04/19 |

## I. PURPOSE

It is the purpose of this policy to provide Canandaigua Police Department Personnel with guidelines for the collection, analysis, and distribution of intelligence information.

## II. BACKGROUND

Information gathering is a fundamental and essential element in the duties of any law enforcement agency. When acquired, information is used to prevent crime, pursue and apprehend offenders, and obtain evidence necessary for conviction. It is the policy of this agency to gather information directed toward specific individuals or organizations where there is reasonable suspicion that said individuals or organizations may be planning or engaging in criminal activity, to gather it with due respect for the rights of those involved, and to disseminate it only to authorized individuals. While criminal intelligence may be assigned to specific personnel within the agency, all members of this agency are responsible for reporting information that may help identify criminal conspirators and perpetrators.

## III. POLICY

It is the policy of this Department to investigate all known criminal activity. All such investigations will be coordinated through the investigating Officer's supervisor as well as the Criminal Investigations Division. Investigations involving Organized Crime and Vice often require more manpower than this Department has to devote. It is therefore the policy of the City of Canandaigua Police Department, when determined by the Chief of Police or his designee, to seek the assistance of the Ontario County Sheriff's Department and/or the New York State Police for these investigations.

## IV. PROCEDURE

A. The collection, processing and dissemination of criminal intelligence information shall be the responsibility of the Criminal Investigations Division.

B. The Criminal Investigations Division Commander shall be responsible for the management of the types of criminal information collected, processed and disseminated and shall keep the Chief of Police informed of all intelligence gathering activities and information.

   1. The types of criminal intelligence information collected shall include, but not limited to, the following:
      a) Organized Crime
      b) Vice
      c) Narcotics
      d) Subversive Activities
      e) Civil Disorders

C. The Operations Division Commander will serve as the department's Field Intelligence Officer (FIO) for terrorism information, and will be the liaison to the New York State Intelligence Center (NYSIC). The Operations Division Commander or his designee is responsible for distributing pertinent terrorism related intelligence, alerts and bulletins to members of the department. The Field Intelligence Officer will maintain bilateral relationship with the following agencies for terrorism information and alerts:

   1. The New York State Intelligence Center (NYSIC).
   2. The New York State IAJB E-Justice Portal.
   3. Federal Bureau of Investigations, New York Region.

## V. INTELLIGENCE FILES

A. All criminal intelligence information shall be maintained in a locked filing system located in the Criminal Investigations Division.  Information shall be filed by subject matter.

B. Files shall be reviewed at least once every two years by the Criminal Investigations Division Commander.  Out of date and unfounded information shall be purged and destroyed by the use of the department's paper shredder.

C. In an effort to protect the rights and privacy of individuals, Intelligence Files shall be redacted where appropriate.  Additionally, access to the criminal intelligence files shall be limited to the following personnel:

   1. Chief of Police
   2. Operations Division Commander
   3. Criminal Investigations Division Commander
   4. Investigations Section Personnel.
   5. Monroe County Crime Analysis Center (MCAC)

    6.  Individuals from other law enforcement agencies on a "need to know" basis. Files shall be viewed in the presence of the Investigations Section personnel only after authorization is granted by the Criminal Investigations Division Commander or the Chief of Police.

D.  Intelligence information shall be collated and analyzed in a secure environment protected from inadvertent disclosure of information.

## VI. SURVEILLANCE AND INTELLIGENCE EQUIPMENT

A.  The Criminal Investigations Division Commander is responsible for the storage, maintenance, distribution, and use of department surveillance and intelligence equipment.

B.  Equipment shall be kept in an active state of readiness and shall be utilized only in accordance with State and Federal Laws.

    1.  Surveillance and/or intelligence equipment shall only be issued with the approval of the Investigation Section Commander or his designee.

C.  Personnel utilizing surveillance and/or intelligence equipment shall be given additional orientation as to the sensitivity of their duties and the importance of meeting privacy, confidentiality and public disclosure laws.

## VII. INTELLIGENCE GATHERING TECHNIQUES

A.  The following techniques shall be utilized to assist the department's intelligence gathering process.

    1.  Develop and maintain contact with informants.
    2.  Obtain court ordered wiretap and eavesdropping warrants.
    3.  Conduct physical surveillance of suspected criminal activity, including the lawful use of audio/visual monitoring.

## VIII. PROCESSING PROCEDURE

A.  **COLLECTION** - All personnel of this department shall, in a timely fashion, transmit intelligence information to the intelligence component on an incident report.

B.  **EVALUATION** - The Criminal Investigations Division Commander, or his designee, shall assemble raw data from all intelligence information.

C.  **COLLATION** - Intelligence information shall be collated by subject matter in chronological order.

D. **ANALYSIS** - Raw data shall be reviewed by the Criminal Investigations Division Commander, or his designee, for confirmation of its content. As confirmed data increases, the Criminal Investigations Division Commander may authorize a case investigation.

E. **DISSEMINATION** - Where appropriate, the Criminal Investigations Division Commander may divulge confirmed criminal intelligence information to other operational units of the department or to other governmental agencies.

## IX. INTERAGENCY INVESTIGATIONS

A. Interagency cooperation is often necessary regarding criminal intelligence, and while the exchange of information or records between agencies should be encouraged, the release should always be on a "need to know" basis. The release of intelligence information to any outside law enforcement agency shall be made only with the approval of the Chief of Police and with the stipulation that such intelligence not be duplicated or otherwise disseminated without prior approval.

B. Release of intelligence information in general including electronic surveillance and photographic intelligence information shall be made only by or with the approval of the Chief of Police.

## X. ANNUAL REVIEW

A. On an annual basis, the Chief of Police shall review the procedures and processes related to the collection, processing, and sharing of suspicious incidents and criminal intelligence relating to criminal and homeland security activities. The review shall determine if the procedures in place continue to meet the intelligence collection needs of the department, are compliant with New York State and federal statutes, and the guidelines set forth by the Commission on Accreditation for Law Enforcement Agencies.

# City of Canandaigua
## Police Department
### General Order

| General Order: 900 | Subject: Outside Agency Law Enforcement Assistance |
|---|---|
| Authority: Chief Stephen Hedworth | Effective Date: January 1, 2009 |
| Rescinds: All Previously Issued Directives | Revised 4/12/10, 12/03/19 |

## I.    PURPOSE

The Canandaigua Police Department is the primary provider of Law Enforcement services within the City of Canandaigua, however there may be times where additional manpower or technical expertise is needed.  It is further understood that other agencies may request the same from the Canandaigua Police Department.

## II.   POLICY

It shall be the policy of this department to request and provide assistance to or from other law enforcement agencies when the need arises due to unusual circumstances.  This General Order shall govern such requests.

## III.  PROCEDURE

### A.  Requests for Assistance within the City of Canandaigua

1. The Canandaigua Police Department will generally contact the Ontario County Sheriff's Department and / or the New York State Police when there is a need to request the use of outside law enforcement services including additional manpower, canines, SWAT, SCUBA, bomb disposal, aviation and navigation units.

2. The request for assistance from an outside law enforcement agency shall generally be made by the on-duty Sergeant or Acting Sergeant for normal routine assistance.  Any large-scale requests for assistance must come from the Chief of Police or the Operations Commander.

3. Requests for assistance can be made through the 911 Center with follow-up by contact with the supervisors or officers of the agency from which assistance is requested.

4.  The Chief of Police or the Operations Commander, at their sole discretion, may contact any other outside law enforcement agency, if the Canandaigua Police Department and/or our community would be better served by such request.

**B. Requests for Assistance by another Agency**

1.  The Canandaigua Police Department will make every effort to assist any law enforcement agency that requests assistance subject to the following:

    a.  The on-duty Sergeant / Acting Sergeant shall have the authority to offer assistance for any police purpose within a 5-mile radius of the City of Canandaigua.

    b.  The only exception to this rule is if another law enforcement officer is at risk of death or serious bodily injury and no other sworn officer is available from the agency requesting, then the on-duty Sergeant / Acting Sergeant may send one car anywhere within Ontario County.

    c.  Any other large-scale requests for assistance must be approved by either the Chief of Police or Operations Commander.

## IV.    NOTIFICATIONS

A.  In any instance that drug work or other investigations take place outside the City of Canandaigua, the Detective / Police Officer shall attempt to notify an appropriate Investigator from the agency that has primary jurisdiction. If the Investigator is unable to be reached or cannot assist, the on-duty Sergeant of the agency who has primary jurisdictions shall be notified.

B.  In any case where the Canandaigua Police Department is going to attempt to serve a warrant in any location other than the City of Canandaigua, the Sergeant / Officer shall notify the agency of primary jurisdiction.

## V.    MULTI-JURISDICTIONAL SPECIAL WEAPONS AND TACTICS TEAM (SWAT)

A.  The Canandaigua Police Department, by entering into an agreement with the County of Ontario, City of Geneva and Village of Clifton Springs, has agreed to have members of the department, when possible, participate in the Multi-Jurisdictional Special Weapons and Tactics Team ("SWAT" or the "Team"). The use of and participation in the SWAT team shall be governed by the Inter-Municipal Agreement.

B.  Members that are assigned to the SWAT Team, shall follow procedures as outlined in the Inter-Municipal Agreement. The Chief of Police shall retain such agreement and a copy of

such will be given to each member that meets qualifications and is assigned to the SWAT team.

C. Department members who wish to be on the SWAT Team are required to meet the qualifications as established by the Ontario County Sheriff's Office as stated in the Inter-Municipal Agreement section III SWAT Member Qualifications.

D. Members of the department who are assigned to the SWAT team shall be under the tactical command of the SWAT team Commander, Team Leader or their designee while engaged in a SWAT operation but may be called back to duty with in the City of Canandaigua by the Operations Commander or the Chief of Police if required. The SWAT team Commander or Team Leader will be under the command of the Incident Commander for the incident.

E. The Team may be activated in response to any incident that would be more efficiently and safely resolved by highly trained police tactical team. Incidents in which the SWAT team could be activated include but are not limited to:

1. Active shooters.
2. Barricaded subjects.
3. Hostage takers.
4. Persons committing violent acts.
5. High risk search or arrest warrants.

F. Members assigned to the Team will have their response gear in their assigned police vehicle when on duty. Such gear will be stored in a secured location within the vehicle.

G. Members summoned to respond to a SWAT deployment will notify the Operations Commander who will in turn notify the Chief of Police.

H. Members will be held to General Order 415, when documenting use of force, while deployed at an incident with the Team along with any other applicable General Orders of this department and the terms of the Inter-Municipal Agreement.